UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota, by Michael Campion, its Commissioner of Public Safety,<br><br>          Plaintiff,<br><br>vs.<br><br>CMI of Kentucky, Inc., a Kentucky corporation,<br><br>          Defendant. | Civil Case No. _____<br><br>**COMPLAINT** |

The State of Minnesota, by its Commissioner of Public Safety, Michael Campion ("the State"), for its Complaint against CMI of Kentucky, Inc. ("CMI"), alleges as follows:

### INTRODUCTION

1. This action arises out of Defendant CMI's breach of a contract for the sale and maintenance of a fleet of evidentiary breath test instruments to be used by the State primarily for the purpose of investigating and prosecuting the crime of driving while impaired ("DWI"). In that contract, CMI agreed not only to sell and help maintain this fleet of instruments, but also to release information pertaining to the instrument when ordered to do so by courts handling cases in which an evidentiary breath test is part of the evidence. In addition, CMI expressly agreed that any documentation and copyrighted material conceived or originated and arising out of the contract would become the sole

property of the State. CMI has breached both of these obligations. Specifically, CMI has repeatedly refused to provide the State with the computer "source code" used to program the computer-operated functions of this breath testing instrument.

2. Access to the source code has been demanded by hundreds individuals charged with impaired driving-related offenses, and its production has been ordered by many district courts throughout the State of Minnesota. Despite the plain language of the contract and repeated demands for production, CMI has refused to provide the State with a copy of the source code. CMI's refusal to turn over the source code has placed the outcome of numerous impaired driving-related cases in jeopardy, has forced the State to incur substantial expenses, and may force the State to replace its entire existing fleet of evidentiary breath testing instruments. The State now seeks, *inter alia*, an order for specific performance directing CMI to provide the State with a copy of the source code, as well as damages in excess of $75,000.

## PARTIES

3. Michael Campion is the Commissioner of Public Safety for the State of Minnesota.

4. Defendant CMI is a Kentucky corporation with its headquarters located at 316 East Ninth Street, Owensboro, Kentucky, 42303. CMI has had continuous and systematic contacts with the State of Minnesota since at least 1984. Until recently, CMI's registered agent for service of process in the State of Minnesota was National Registered Agents, Inc., located at 590 Park Street, No. 6, St. Paul, MN 55103. Upon information

2

and belief, on approximately January 3, 2008, a Minnesota litigant seeking the source code served documents on CMI through National Registered Agents, and Defendant CMI promptly discontinued its relationship with National Registered Agents. Defendant CMI's agent for service of process in Minnesota is therefore the Minnesota Secretary of State.

## JURISDICTION AND VENUE

5.  Jurisdiction is proper under 28 U.S.C. § 1338(a) because Counts I and II of this Complaint assert claims arising under the U.S. Copyright Act. This Court has jurisdiction over the supplemental state law claims pursuant to 28 U.S.C. § 1367. Although the State does not believe that the copyrightable material at issue in this matter has been registered with the U.S. Copyright Office, jurisdiction is nonetheless proper because the State seeks only equitable relief and attorney fees for its infringement claim. *See Olan Mills, Inc. v. Linn Photo Co.*, 23 F.3d 1345, 1349 (8th Cir. 1994) ("When a copyright owner has established a threat of continuing infringement, the owner is entitled to an injunction regardless of registration."). Furthermore, because Defendant CMI is the sole party with actual possession of the disputed material, it would be impossible for the State to comply with the requirements for registration. *See, e.g., Foraste v. Brown University*, 248 F. Supp.2d 71, 78 (D.R.I. 2003) ("[I]t would be wholly inequitable to require that [plaintiff], prior to proceeding with this action, register a copyright in images to which [defendant] presently denies him access;" citing *Olan Mills*).

3

6. Venue is proper under 28 U.S.C. § 1400(a) because Counts I and II of this Complaint assert claims arising under the U.S. Copyright Act and because this Court has personal jurisdiction over Defendant CMI, in that CMI has had continuous and systematic contacts with the State of Minnesota since at least 1984, and thus can be said to reside in Minnesota as described in 28 U.S.C. § 1391(c).

## FACTUAL BACKGROUND

7. Since approximately 1955, the Minnesota Legislature has authorized the administration of breath alcohol tests to individuals arrested for DWI. Initially, these breath testing procedures were established and implemented by individual counties and municipalities. In 1967, however, the Legislature authorized the establishment of the first state-wide breath testing program, to be administered by the Bureau of Criminal Apprehension ("BCA"), a subdivision of the Department of Public Safety.

8. The first alcohol breath testing instrument approved for use by the Commissioner was known as the Breathalyzer, and this instrument was recognized as being presumptively reliable by the Minnesota Supreme Court in 1971. *See City of St. Louis Park v. Quinn*, 289 Minn. 184, 182 N.W.2d 843 (Minn. 1971). The BCA maintained a fleet of Breathalyzer instruments until approximately 1984, when it purchased its first fleet of Intoxilyzer-brand breath testing instruments from Defendant CMI. Not only did the Intoxilyzer instrument use infrared technology to measure a test subject's breath alcohol concentration, but a number of its functions were computer-automated, making it considerably easier to operate than the Breathalyzer.

4

9. In the more than twenty years in which the BCA has maintained a fleet of Intoxilyzer breath testing instruments, the instrument itself has undergone a number of changes. These changes have included alterations both to its mechanical operation and to its computer-automated functions. The Intoxilyzer instrument has been formally approved by rule by the Commissioner. *See* Minn. Rule 7502.0420, subp. 3 (2005).

10. In addition to periodically updating its fleet of Intoxilyzer instruments, the BCA has also regularly evaluated other competing alcohol breath test instruments for possible use in the State.

11. In the fall of 1996, the State issued a Request for Proposal ("RFP") seeking bids for a new fleet of evidentiary breath alcohol test instruments. This RFP was open to proposals not only from Defendant CMI, but from other competing manufacturers as well. In addition to requesting information related to the cost of new breath test instruments, the RFP set out detailed technical specifications that the instruments would be required to satisfy, as well as outlining other requirements, such as maintenance and technical support, ownership of copyrighted material, and governing law.

12. With respect to ownership of copyrighted or copyrightable material, the RFP specifically states in paragraph 29 that:

> All right, title, and interest in all copyrightable material which Contractor shall conceive or originate, either individually or jointly with others, and which arises out of the performance of this Contract, will be the property of the State and are by this Contract assigned to the State along with ownership of any and all copyrights in the copyrightable material. Contractor also agrees, upon request of the State to execute all papers and perform all other acts necessary to assist the State to obtain and register

5

copyrights on such materials. Where applicable, works of authorship created by Contractor for the State in performance of this Contract shall be considered "works for hire" as defined in the U.S. Copyright Act.

13. The RFP also expressly required responding vendors to agree to provide information relating to the functioning of the instrument to attorneys representing individuals charged with crimes where a breath test from the instrument is at issue. Specifically, the contract requires:

> Provision for information to attorneys supplied directly from manufacturer including statement of all non-disclosure/non-reproduction agreements required to obtain information, fees and deposits required, to be used by attorneys representing individuals charged with crimes in which a test with the proposed instrument is part of the evidence. This part of the contract to be activated with an order from the court with jurisdiction of the case and include a reduced fee schedule for defendants found by the court to be entitled to a publicly funded defense.

14. The RFP further required the manufacturer to provide information relating to the operation and functioning of the instrument to the BCA, at no initial cost to the BCA.

15. Defendant CMI submitted its response to the RFP on October 25, 1996. In that response, CMI represented that the State's needs could be met either by its latest stock version of the Intoxilyzer, known as the Intoxilyzer 5000, or by a version of the Intoxilyzer 5000 specially configured for the State of Minnesota. Regardless of which option the State selected, Defendant CMI expressly stated that the terms of the RFP were acceptable to the company: "CMI hereby accepts the terms and conditions as stated in the state of Minnesota's Request for Proposal for Evidentiary Breath Alcohol Test

6

Instruments without qualification. CMI understands that the terms and conditions as stated in the RFP shall become part of the contract between CMI and the state of Minnesota should CMI be the successful vendor in the award of contract."

16. In its response to the RFP, Defendant CMI not only agreed to the State's terms regarding copyright ownership and disclosure of information, but it attached a short Confidentiality Agreement to be executed by litigants who wished to review information pertaining to the Intoxilyzer instrument which the company deemed to be proprietary or otherwise confidential to CMI. Defendant CMI never indicated that it held any information pertaining to the Intoxilyzer instrument which it would refuse to release to litigants under any circumstances.

17. The State elected to accept Defendant CMI's response to the RFP, and notified CMI of the contract award on January 2, 1997. With respect to the two instrument options proposed by CMI, the State elected to order a version of the Intoxilyzer 5000 which was custom-configured for the needs of the State's breath testing program. This particular version of the instrument has become known as the "Minnesota model" of the Intoxilyzer 5000, or the Intoxilyzer 5000 "EN." At present, there are approximately 200 Intoxilyzer 5000EN breath testing instruments in use by various law enforcement agencies throughout the State of Minnesota.

18. While the Intoxilyzer 5000EN primarily relies on infrared technology to determine a subject's breath alcohol concentration, its actions are also determined in part by binary computer code contained in two "Z80" microchips which are installed on each

7

Intoxilyzer 5000EN breath testing instrument. This binary code is, in turn, derived from a program written in "assembly language." This assembly language program is commonly referred to as the "source code" to the Intoxilyzer 5000EN.

19. Although both the Minnesota Legislature and Minnesota courts have recognized that breath test results from the Intoxilyzer 5000EN are presumptively reliable, Minnesota law does permit this presumption to be challenged by drivers who have had their licenses revoked for DWI-related offenses. *See, e.g.*, Minn. Stat. § 169A.53, subd. 3(b)(10) (2006). These challenges are typically raised (1) in criminal DWI prosecutions, or (2) in civil suits brought against the Commissioner pursuant to the State's Implied Consent Law. *See generally* Minn. Stat. Chapter 169A (2006) ("Driving While Impaired"). To assist drivers in evaluating the validity of their Intoxilyzer test results, a wide range of information pertaining to the Intoxilyzer 5000EN is available through the BCA. This information includes the specific test record itself, a computer-generated "usage and maintenance report" for each individual instrument, and the results of the validation studies performed by the BCA on the instrument prior to the Commissioner's approval of it by rule. In addition, any person wishing to examine an actual Minnesota model Intoxilyzer 5000 may do so by simply making an appointment at BCA headquarters and posting a bond equivalent to the cost of a new instrument.

20. Although the BCA maintains a substantial body of information pertaining to the instrument's operation and functioning, the State has never had a copy of the source code to the Minnesota model of the Intoxilyzer 5000 in its actual possession or custody.

21. In early 2006, the Commissioner began receiving demands for production of the source code to the Minnesota model Intoxilyzer 5000 from drivers challenging the validity of their breath test results. Although such demands had not previously been made in Minnesota, litigants in other states had already demanded production of the source code, and Defendant CMI had consistently refused to disclose it on the grounds that it was a proprietary trade secret.

22. Prior to receiving the first source code demands from Minnesota motorists, the BCA had never felt it necessary to request a copy of the code from CMI. Source code review is not a generally accepted means of determining whether a scientific measuring instrument is fit for a particular purpose, nor does the BCA believe that source code review is an appropriate means to determine whether this particular instrument works as represented by the manufacturer.

23. Regardless of the BCA's views on the merits of source code review, the Commissioner has now been ordered to produce the source code in more than one hundred implied consent cases pending in Minnesota. Although it is undisputed that the BCA has never had a copy of the source code in its actual possession or custody, the district courts that have ordered production have concluded that the source code is either owned by the State or within its "control" because of the State's contract with CMI.

24. Even before the BCA began receiving the first orders for production of the source code, it contacted Defendant CMI and requested that the company provide it with a copy of the source code so that it could be reviewed by litigants and by the BCA. As

with other states, and regardless of the terms of its contract with the State of Minnesota, Defendant CMI refused to turn over the source code on the grounds that it was a proprietary trade secret. The BCA renewed its request when it began receiving the initial orders for production of the source code. Despite these court orders for production, Defendant CMI again took the position that it was the sole owner of the source code and that the source code itself contained proprietary trade secrets which it would not disclose under any circumstances.

25. The Commissioner continued to receive orders for production of the source code for more than a year. Despite having promptly forwarded these orders to Defendant CMI and despite having made numerous additional demands for production of the source code, Defendant CMI flatly refused to produce the code. In approximately September of 2007, however, CMI changed course and indicated that it would produce the source code if district court judges agreed to sign a protective order that Defendant CMI had drafted and which the company indicated would adequately protect its interests.

26. Unlike the Confidentiality Agreement which Defendant CMI attached to its response to the RFP, this new proposed protective order was lengthy and highly restrictive. Whereas the Confidentiality Agreement contained only approximately a half-page of text, the new proposed protective order contained over ten pages of single-spaced text, and contained terms ranging from a Kentucky jurisdiction and venue provision to a stipulation that CMI would suffer irreparable harm should the source code be inadvertently disclosed.

27. Because Defendant CMI's new proposed protective order contained such detailed and restrictive terms, a substantial majority of district court judges have refused to enter that order in DWI prosecutions or implied consent cases. Although both the Commissioner and various district court judges have provided Defendant CMI with a range of alternative, reasonable protective orders, Defendant CMI has refused to honor any of those orders. As a consequence of this refusal, only one litigant in the entire State of Minnesota has received access to the source code, while the Commissioner is facing sanctions in dozens, if not hundreds, of implied consent cases because the source code has not been produced as ordered.

28. In addition to providing Defendant CMI with alternative, reasonable protective orders, the Commissioner has expressly requested that Defendant CMI honor the Confidentiality Agreement which it attached to its response to the RFP. Defendant CMI has thus far refused to do so.

29. Defendant CMI has also attempted to block Minnesota litigants' access to the source code by raising arbitrary and unreasonable financial barriers. Upon information and belief, in the one instance in which Defendant CMI has actually produced the source code to a criminal defendant, the company required payment of more than $1,600 to satisfy its alleged cost of producing the code. Defendant CMI has attempted to justify this high cost by alleging that producing the source code required it to incur substantial expenses in the areas of printing, formatting, and binding. In a subsequent letter to counsel for Plaintiff, dated January 17, 2008, Defendant CMI

represented that the true cost of producing the source code was actually $2,039. A copy of this letter is attached hereto as Exhibit A. The very next day, however, the Kentucky Court of Appeals issued its decision in *House v. Commonwealth of Kentucky*, __ S.W.3d __, 2008 WL 162212 (Ky. Ct. App. Jan. 18, 2008), where it concluded that production of the source code in a Kentucky DWI matter would involve little expense or inconvenience on the part of CMI:

> [T]he burden upon CMI in producing the source code is not oppressive. The record discloses that the code could be copied to a cd rom computer disc and produced in that form at minimum expense. It appears that the only other requirement would be that the passwords to access the code would need to be supplied. Thus, the burden of providing the information is minimal and the expense de minimis.

30.     Because of Defendant CMI's refusal to honor the terms of its contract with the State, the State has suffered substantial and material prejudice. Not only have otherwise valid drivers' license revocations been rescinded in consequence of the Commissioner's inability to produce the source code, but the Commissioner has suffered monetary damages in excess of $75,000. For example, many local law enforcement agencies have discontinued using their Intoxilyzer instruments altogether, relying instead on blood or urine tests to establish an individual's alcohol concentration. This unilateral switch to fluid testing has created a heightened burden on BCA laboratory resources, and has created an unanticipated strain on the BCA's laboratory budget. Furthermore, unless Defendant CMI promptly turns over the source code, the State may be forced to replace its entire fleet of breath testing instruments, which would also require retraining of the

law enforcement officers who are currently certified Intoxilyzer operators. The State estimates the cost of such replacement and retraining to be approximately $3,000,000.

### COUNT I: BREACH OF CONTRACT

31. Plaintiff restates and realleges the foregoing paragraphs of this Complaint.

32. In its contract with the State, Defendant CMI expressly assigned to the State all right, title and interest in any copyrightable material conceived and originated and which arose under its contract with the State.

33. Defendant CMI further agreed that any such copyrightable material would be considered a "work for hire" as defined in the U.S. Copyright Act.

34. The current version of the Minnesota model of the Intoxilyzer 5000 was created directly as a result of Defendant CMI's contract with the State, and its source code was customized to meet the specific needs of the State of Minnesota.

35. Defendant CMI also agreed that any documents that it created while performing its obligations to the State would become the property of the State.

36. Defendant CMI has breached its contract with the State by refusing to provide the State with any portion of the source code, despite numerous demands by the State.

37. In consequence of Defendant CMI's breach of its contract with the State, the State is entitled to, *inter alia*, an order for specific performance directing that CMI provide the State with a copy of the source code, as well as damages in excess of $75,000.

## COUNT II: COPYRIGHT INFRINGEMENT

38. Plaintiff restates and realleges the foregoing paragraphs of this Complaint.

39. In its contract with the State, Defendant CMI expressly assigned to the State all right, title and interest in any copyrightable material conceived and originated and which arose under its contract with the State.

40. Defendant CMI further agreed that any such copyrightable material would be considered a "work for hire" as defined in the U.S. Copyright Act.

41. The current version of the Minnesota model of the Intoxilyzer 5000 was created directly as a result of Defendant CMI's contract with the State, and its source code was customized to meet the specific needs of the State of Minnesota.

42. By continuing to deny the State free access to the source code, Defendant CMI has infringed the State's copyright in the source code to the Minnesota model of the Intoxilyzer 5000. This infringement has included, but is not limited to, preventing the State from exercising its right to control reproduction of the source code and to control distribution of the source code. In particular, the State wishes to make the source code reasonably available to Minnesota litigants, but Defendant CMI's unlawful and bad-faith conduct has thus far prevented the State from reproducing and distributing the source code in this manner.

43. In consequence of Defendant CMI's infringement, the State is entitled to equitable relief, including an order directing that CMI provide the State with a complete copy of the source code, as well as the State's attorney fees.

## COUNT III: BREACH OF CONTRACT

44. Plaintiff restates and realleges the foregoing paragraphs of this Complaint.

45. In its contract with the State, Defendant CMI expressly agreed to provide Minnesota litigants with access to information pertaining to the Intoxilyzer 5000EN upon receipt of a court order directing production of that information.

46. The Commissioner has received numerous court orders directing production of the complete source code to the Minnesota model of the Intoxilyzer 5000.

47. The Commissioner has promptly forwarded these orders to Defendant CMI, accompanied by requests that Defendant CMI provide the litigants with access to the source code. Defendant CMI has refused more than one hundred of these requests.

48. Defendant CMI has breached its contract with the State by refusing to provide Minnesota litigants with access to the source code despite court orders to do so and numerous demands by the State.

49. In consequence of Defendant CMI's breach of its contract with the State, the State is entitled to, *inter alia*, an order for specific performance directing that CMI provide Minnesota litigants with access to the source code, as well as damages in excess of $75,000.

## COUNT IV: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

50. Plaintiff restates and realleges the foregoing paragraphs of this Complaint.

51. In its contract with the State, Defendant CMI conveyed to the State ownership of any and all copyrightable material and documents created in the course of its performance under the contract. These materials include the source code to the Minnesota model of the Intoxilyzer 5000.

52. By refusing to provide the State with a copy of the source code, and by raising arbitrary and unreasonable barriers to production for Minnesota litigants, Defendant CMI has barred the State from enjoying the full benefits of its contract with CMI. Among the benefits deprived by Defendant CMI's bad faith conduct is the State's ability to make the source code reasonably available to Minnesota litigants, as well as the ability to have the source code reviewed and evaluated in the course of impaired driving-related cases. By virtue of Defendant CMI's bad faith refusal to turn over the source code, the State has been subjected to allegations of bad faith not only by litigants but by district court judges throughout Minnesota. As a result, Defendant CMI has created a situation in which the State's breath testing program, once broadly regarded as presumptively reliable, has become viewed as presumptively unreliable by many litigants and judges throughout the State. Consequently, the State has been deprived of the principal benefit it sought to obtain when it entered into its contract with Defendant CMI.

53. In consequence of Defendant CMI's breach of its implied covenant of good faith and fair dealing, the State is entitled to, *inter alia*, an order directing that CMI provide the State with a complete copy of the source code to the Minnesota model of the Intoxilyzer 5000, an order directing that CMI provide Minnesota litigants with reasonable access to the source code, as well as damages in excess of $75,000.

**RELIEF**

WHEREFORE, Plaintiff, the State of Minnesota, respectfully asks this Court to award judgment as follows:

I. Declaring that pursuant to the U.S. Copyright Act, the State of Minnesota is the sole owner of any and all copyrights to the source code for the Minnesota model of the Intoxilyzer 5000.

II. Ordering Defendant CMI to provide the State with a complete copy of the source code to the Minnesota model of the Intoxilyzer 5000.

III. Ordering Defendant CMI to provide Minnesota litigants with copies of the complete source code to the Minnesota model of the Intoxilyzer 5000, provided that those litigants have first obtained a court order directing production, and further provided that those litigants fully execute a copy of the Confidentiality Agreement which CMI attached to its response to the RFP.

IV. Entering judgment in favor of the State and against Defendant CMI in excess of $75,000.

V. Awarding the State its reasonable costs, expenses, and attorney fees.

VI. Granting such further relief as the Court deems appropriate and just.

Dated: March 3, 2007

LORI SWANSON
Attorney General
State of Minnesota

s/ **Martin A. Carlson**
Martin A. Carlson
Assistant Attorney General
Atty. Reg. No. 0299650

Emerald A. Gratz
Assistant Attorney General
Atty. Reg. No. 0345829

445 Minnesota Street, Suite 1800
St. Paul, MN 55101
Telephone: (651) 297-3076
Fax: (651) 297-4077

AG: #1942638-v3