UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota,<br>by Michael Campion, its<br>Commissioner of Public Safety,<br><br>            Plaintiff,<br><br>vs.<br><br>CMI of Kentucky, Inc.,<br>a Kentucky corporation,<br><br>            Defendant. | Civil Case No. 08-603 (DWF/AJB)<br><br>**PLAINTIFF'S MEMORANDUM<br>IN SUPPORT OF ENTRY OF THE<br>CONSENT JUDGMENT AND<br>PERMANENT INJUNCTION** |

**INTRODUCTION**

On September 12, 2008, the State of Minnesota, by Michael Campion, its Commissioner of Public Safety ("State"), and CMI of Kentucky, Inc. ("CMI") (collectively "Parties"), entered into a Settlement Agreement regarding ownership of and access to the source code ("Source Code") for the Minnesota version of the Intoxilyzer 5000EN, the breath testing instrument used by law enforcement agencies throughout Minnesota to investigate and prosecute driving while impaired ("DWI") offenses in civil and criminal cases. By its terms, the Settlement Agreement is effectuated upon execution and entry by the Court of the corresponding Consent Judgment and Permanent Injunction. *See* Settlement Agreement ¶ 20-21. As will be discussed more fully below, the State submits that entry of the Consent Judgment and Permanent Injunction is properly within the Court's discretion and authority. In addition, the negotiated terms allowing petitioners in civil implied consent cases and defendants in criminal DWI cases

access to the Source Code are fair, reasonable, and adequate. Accordingly, the Court should execute and enter the Consent Judgment and Permanent Injunction in this matter.

## BACKGROUND

This litigation is the end result of a more than two-year dispute between the State and CMI regarding access to the Source Code for the computer software used by the Intoxilyzer 5000EN. Previous versions of the Intoxilyzer instrument have been used in Minnesota since approximately 1984. *See* Gratz Affidavit ¶ 4. Prior to deploying the Intoxilyzer 5000EN into the field for use by law enforcement, the Minnesota Bureau of Criminal Apprehension ("BCA") conducted extensive validation testing on the Intoxilyzer 5000EN, ultimately concluding that the instrument provides consistently valid and reliable measurements of a test subject's breath-alcohol concentration. *See id.* There are approximately 200 Intoxilyzer 5000EN instruments being used by law enforcement agencies throughout Minnesota. *See id.*

The issue of access to the Source Code first arose in early 2006, when the State began receiving demands for production of the Source Code from individuals arrested for DWI and challenging the validity of their breath test results in both criminal DWI and implied consent cases in state district court. *See* Gratz Affidavit ¶ 6. However, the State has never had access to or possessed a copy of the Source Code. *See id.* Nonetheless, some state district courts in Minnesota started ordering production of the Source Code, which involved hundreds of criminal DWI and implied consent cases. *See id.* As a result, the State requested that CMI provide a copy of the Source Code to satisfy litigation demands.

The State and CMI were unable to reach mutually acceptable terms for providing litigants access to the Source Code. Therefore, the State filed its Complaint against CMI in this case on March 3, 2008. In the Complaint, the State asserted two separate contract claims, seeking "an order for specific performance directing that CMI provide the State with a copy of the source code . . . ." *See* Complaint ¶¶ 37, 49. In addition, the State asserted a copyright infringement claim, noting that "the State wishes to make the source code reasonably available to Minnesota litigants, but Defendant CMI's unlawful and bad-faith conduct has thus far prevented the State from reproducing and distributing the source code in this manner." *See* Complaint ¶ 42. Notably, the State asked the Court to order "Defendant CMI to provide Minnesota litigants with copies of the complete source code to the Minnesota model of the Intoxilyzer 5000EN, provided that those litigants have first obtained a court order directing production . . . ." *See* Complaint at 17. CMI filed its Answer to the Complaint on April 9, 2008, denying the State's allegations and asserting a counterclaim for a declaratory judgment.

On May 20, 2008, both parties attended a pre-trial conference with Magistrate Judge Arthur J. Boylan. During this conference, Magistrate Judge Boylan raised the question of whether settlement of the litigation was possible, to which both Parties responded that settlement of the litigation would be difficult and unlikely. Nonetheless, based on strong encouragement by Magistrate Boylan, the Parties started discussing the possibility of settlement at the beginning of June 2008, attending the first official settlement conference on June 27, 2008. Throughout the course of the next few months, the Parties worked intensively in negotiating settlement terms, including multiple phone

conferences and a second settlement conference with Magistrate Judge Boylan on August 18, 2008.

Finally, on September 12, 2008, the Parties entered into a Settlement Agreement regarding ownership of and access to the Source Code. By its terms, the Settlement Agreement is effectuated upon the Court's execution and entry of the corresponding Consent Judgment and Permanent Injunction. If the Court executes and enters the Consent Judgment and Permanent Injunction, the Parties have agreed to voluntarily dismiss this litigation with prejudice. *See* Settlement Agreement ¶ 20. However, if the Consent Judgment and Permanent Injunction are not executed by the Court in the form proposed by the Parties, the Settlement Agreement becomes null and void. *See* Settlement Agreement ¶ 21.

## ARGUMENT

**I.    ENTRY AND EXECUTION OF THE CONSENT JUDGMENT IS PROPERLY WITHIN THE COURT'S DISCRETION AND AUTHORITY.**

The authority of a district court to enter a consent judgment "is based upon the inherent power of the federal courts summarily to enforce settlement agreements." *United States v. Scholnick*, 606 F.2d 160, 166 (6th Cir. 1979). Historically, consent judgments have been utilized by district courts in a variety of civil litigation matters. *See e.g., Scholnick*, 606 F.2d at 163-164 (federal agency requested entry of a consent judgment to end litigation with private company involving a commercial foreclosure); *White v. National Football League,* 836 F. Supp. 1508, 1509-10 (D. Minn. 1993) (party requested entry of consent judgment approving settlement against class members who

4

were players and potential players of defendant organization). Notably, a consent judgment entered pursuant to a settlement agreement that resolves the substance of the disputed claims is a legally enforceable obligation. *See Amalgamated Sugar Co. v. NL Industries, Inc.,* 825 F.2d 634, 639 (2d Cir. 1987). The preclusive effect of the consent judgment depends upon the intent of the parties. *See In re Y & A Group Securities Litigation,* 38 F.3d 380, 383 (8th Cir. 1994). Thus, the scope of a consent judgment must be discerned "within its four corners." *Firefighters Local Union No. 1784 v. Strotts*, 467 U.S. 561, 574 (1984).

In this case, entry and execution of the Consent Judgment is properly within the Court's discretion and authority. On September 12, 2008, after several months of extensive negotiations and settlement conferences, the Parties entered into a Settlement Agreement regarding ownership of and access to the Source Code. Within the Settlement Agreement, comprehensive and complete settlement terms are set forth to cover all claims involved in this litigation. *See* Settlement Agreement ¶¶ 1-27. The Settlement Agreement is effectuated only upon the Court's execution and entry of the corresponding Consent Judgment and Permanent Injunction. If the Court executes and enters the Consent Judgment and Permanent Injunction, the Parties have agreed to voluntarily dismiss this litigation with prejudice. *See* Settlement Agreement ¶ 20. If the Consent Judgment and Permanent Injunction is not executed by the Court in the form proposed by the Parties, the Settlement Agreement becomes null and void. *See* Settlement Agreement ¶ 21. Thus, like *Scholnick* and *White,* the Court should exercise its inherent power to enforce the Settlement Agreement by executing and entering the Consent

Judgment proposed by the Parties. *See Scholnick*, 606 F.2d at 163-164; *White,* 836 F. Supp. at 1509-10. Once this is done, the litigation will be resolved and dismissed.

II. **ENTRY AND EXECUTION OF THE PERMANENT INJUNCTION IS PROPERLY WITHIN THE COURT'S DISCRETION AND AUTHORITY.**

Pursuant to Federal Rule of Civil Procedure 65(a) and the All Writs Act, 28 U.S.C. § 1651(a), a federal court can grant injunctive relief in litigation where the merits have been resolved. Although traditionally used after a case is adjudicated on the merits, a district court can use its discretion to order injunctive relief to enforce the terms of a consent judgment or decree. *See Amalgamated Sugar Co. v. NL Industries, Inc.,* 825 F.2d 634, 640 (2d Cir. 1987) (consent decree executed by district court for litigation between two private companies permanently enjoined one company from taking further action on stock purchase plan); *Prophet Music, Inc. v. Shamla Oil Co., Inc.,* No. 4-92-429, 1993 WL 300204 (D. Minn. Jan. 27, 1993) (unpublished) (consent judgment on copyright infringement claim included permanent injunction limiting defendant's future conduct).

Generally, a district court considering entry of a permanent injunction should analyze the following four factors: (1) the threat of irreparable harm; (2) the balance between the irreparable harm and the injury that granting the injunction will inflict on other interested parties; (3) actual success on the merits of the litigation; and (4) the public interest served by granting the injunction. *See Vonage Holdings Corp. v. Minn. Public Utilities Commission,* 290 F. Supp. 2d 993, 996 (D. Minn. 2003); *Dataphase Systems v. C.L. Systems Inc.,* 640 F.2d 109, 114 (8th Cir. 1980). Granting a permanent

injunction lies within the discretion of the trial court and is subject to review for abuse of that discretion.[1]  *See Randolph v. Rogers,* 170 F.3d 850, 856 (8th Cir. 1999).

In this case, executing and entering the Permanent Injunction is properly within the Court's discretion and authority because all four factors support the injunctive relief. First, the Permanent Injunction will help minimize a threat of irreparable harm to the State.  An irreparable injury is defined as harm that a court would be unable to remedy even if a party prevails in the final adjudication.  *See Allen v. Minnesota,* 867 F. Supp. 853, 859 (D. Minn. 1994).  Here, there is clear evidence of irreparable harm or injury to proper enforcement of Minnesota's DWI laws without full use of the Intoxilyzer 5000EN for breath tests.  *See* Gratz Affidavit ¶¶ 1-8.  Regardless of the eventual outcome of this litigation, if this case is not settled and instead is fully litigated on the merits, the daily irreparable injury to the State, its resources, and the safety of the citizens of Minnesota on roadways due to the pendency of the Source Code issue is unavoidable and permanent. *See* Gratz Affidavit ¶¶ 6-7.  Therefore, like *Allen,* irreparable injury exists in this matter and cannot be remedied even if the State prevails on the merits.  *See Allen,* 867 F. Supp. at 859.

---

[1] Because a district court has inherent power to issue orders to protect and enforce its jurisdiction, the traditional standards required for injunctive relief may not be applicable. *See In re Martin-Trigona,* 737 F.2d 1254, 1262 (2d Cir. 1984).  In this case, if the Court enters and executes the Consent Judgment based upon the Settlement Agreement signed by the Parties, entry of the corresponding Permanent Injunction is necessary to enforce the terms.  Therefore, the four factors included in the legal analysis are arguably not dispositive on whether the Permanent Injunction should be granted in this matter.

Second, this irreparable harm outweighs any concern or harm that entry of the Permanent Injunction may inflict on other interested parties. The Permanent Injunction will obviate any alleged harm to others by allowing them access to the Source Code. Moreover, the Source Code is accessible on a very reasonable basis. The Permanent Injunction authorizes no-cost access to both written and digital versions of the Source Code at CMI's secured facility in Kentucky. *See* Permanent Injunction ¶¶ 1-3. It is common practice during litigation for individuals who seek access to discovery held by third parties to be required to go to the location of the discovery to obtain access.[2] **CITE.** The only pre-requisite to gaining access to the Source Code is that a state district court must order production of the Source Code in a civil implied consent case or a criminal DWI case along with implementing certain measures to protect CMI's proprietary interest in the Source Code. *See* Permanent Injunction ¶¶ 4-5. These type of provisions are also commonly required as part of discovery in litigation. Thus, the irreparable harm to the State outweighs any negative effect the Permanent Injunction may have on others, especially in light of the trade secret concerns of CMI.

Third, the merits of the underlying litigation, and the contentious legal issues related thereto, have been resolved by the Settlement Agreement entered into by the Parties. The proposed Consent Judgment contains findings of fact and conclusions of law disposing of all claims asserted in this litigation. *See* Consent Judgment at 4-11. Once

---

[2] It is also worth noting that no software expert with ability to analyze the specific type of Source Code used in the Intoxilyzer 5000EN has been identified as living or working in the State of Minnesota.

the Court executes and enters the Consent Judgment, the Parties have agreed to dismiss this litigation with prejudice and release one another from all claims arising from the contract created to purchase the Intoxilyzer 5000EN for use in Minnesota. *See* Settlement Agreement ¶¶ 20, 23. Therefore, entry of the Consent Judgment will resolve the merits of the litigation and will necessarily precede appropriate entry of the Permanent Injunction.

Finally, the public interest would be served by entry of the Permanent Injunction in this case. Federal courts may go much further in granting equitable and injunctive relief in furtherance of public interest rather than the sole involvement of private interests. *See Yakus v. United States,* 321 U.S. 414, 441 (1944). Protection of the public interest in legitimate law enforcement is extremely important. *See Spiegel v. City of Houston,* 636 F.2d 997, 1002-3 (5th Cir. 1981) (injunction reversed based on finding that it would have hindered legitimate law enforcement to detriment of public interest). In this case, the public interest of legitimate enforcement of Minnesota DWI laws and effective functioning of the State's DWI system would be served greatly by entry of the Permanent Injunction to allow uniform access to the Source Code and eliminate the possibility of civil implied consent cases and criminal DWI cases being delayed or dismissed for non-production of the Source Code. *See Szczech v. Commissioner of Public Safety,* 343 N.W.2d. 305, 306 (Minn. Ct. App. 1984) ("The trail of broken lives, bodies, and property left by drunk drivers is a holocaust on our highways."); *see also* Gratz Affidavit ¶¶ 6-7. Therefore, the public interest factor weighs heavily in favor of the Court granting injunctive relief in this case

In sum, all four factors relevant to the Court's consideration of whether injunctive relief is appropriate in this case are satisfied. Accordingly, the Court should execute and enter the Permanent Injunction as proposed by the Parties.

**CONCLUSION**

Based upon the foregoing, the State respectfully requests that the Court execute and enter the Consent Judgment and Permanent Injunction in this matter.

Dated: October 28, 2008

LORI SWANSON
Attorney General
State of Minnesota

s/Emerald Gratz
EMERALD A. GRATZ
Assistant Attorney General
Atty. Reg. No. 0345829
445 Minnesota Street, Suite 1800
St. Paul, MN 55101
Telephone: (651) 296-2281

ATTORNEYS FOR PLAINTIFF
STATE OF MINNESOTA

AG: #2326307-v1