UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

State of Minnesota,
by Michael Campion, its                    File No. 08-CV-603 (DWF/AJB)
Commissioner of Public Safety,

     Plaintiff,

 v.

CMI of Kentucky, Inc.,
a Kentucky corporation,

     Defendant.

**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF JOINT MOTION
FOR ENTRY OF CONSENT JUDGMENT
AND PERMANENT INJUNCTION**

Dockets.Justia.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 2

    I.    THE HISTORY OF THE PARTIES AND THE SOURCE CODE
        ISSUE. ................................................................................................. 2

        A.    CMI's Longstanding Relationship With the State. ........................... 2

        B.    Requests for the Source Code in Discovery. ..................................... 3

        C.    CMI's Attempt to Reach a Negotiated Resolution. ........................... 4

    II.    THE PRESENT LAWSUIT AND MOTION. ............................................... 5

        A.    The Instant Litigation. ...................................................................... 5

        B.    Court-Directed Mediation. ................................................................ 6

        C.    The Conditional Settlement Agreement, Proposed Consent
               Judgment, and Permanent Injunction. ............................................... 6

LEGAL STANDARD ..................................................................................................... 8

DISCUSSION .................................................................................................................. 9

    I.    THE SOURCE CODE IS A VALUABLE TRADE SECRET. ................... 10

        A.    The Source Code Falls Within the Minnesota Uniform
               Trade Secrets Act .......................................................................... 11

             1.    The Source Code is not generally known or readily
                    ascertainable. ....................................................................... 11

             2.    The Source Code derives value from being not
                    generally known because others could obtain
                   economic value from its disclosure and use. ........................ 12

             3.    CMI undertakes reasonable efforts to maintain the
                    secrecy of the Source Code. ................................................. 13

II.    THE STATE DOES NOT OWN THE SOURCE CODE. .......................... 14

    A.    The Vast Majority of the Source Code Predates and Did Not Arise Under the Contract. ................................................................ 14

    B.    There is No Evidence That Any Source Code That May Have Been Modified After the Parties Entered the Contract is Copyrightable. ................................................................................ 16

III.    THE CONTRACT DOES NOT REQUIRE CMI TO PROVIDE THE SOURCE CODE TO MINNESOTA LITIGANTS ........................... 19

IV.    THE FORM AND MANNER OF ACCESS AFFORDED BY THE PROPOSED CONSENT JUDGMENT AND PERMANENT INJUNCTION ARE FAIR, REASONABLE, AND APPROPRIATE. ...................................................................................... 23

    A.    The Proposed Printed and Digital Formats Are Fully Analyzable By Persons with Appropriate Skill, Training, and Knowledge in the Field, and Provide Necessary and Reasonable Protection For CMI's Trade Secrets. ........................... 23

    B.    The Proposed Redaction of Passcode and other Security Features From the Accessible Source Code and the Mechanism By Which Authorized Litigants May Obtain Access to the Redacted Portions of the Source Code Are Fair, Reasonable, and Appropriate. ......................................................... 25

CONCLUSION ............................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

*Aries Info. Sys., Inc. v. Pac. Mgmt. Sys. Corp.*,
366 N.W.2d 366 (Minn. Ct. App. 1985) ................................................. 11

*Benefit Res., Inc. v. Apprize Tech. Solutions, Inc.*,
2008 WL 2080977 (D. Minn. May 15, 2008) ....................................... 11

*Burr & Forman v. Blair*,
470 F.3d 1019 (11th Cir. 2006) ............................................................ 8

*Control Data Sys., Inc. v. Infoware, Inc.*,
903 F. Supp. 1316 (D. Minn. 1995) ..................................................... 17

*Feist Publ'g v. Rural Tel. Serv. Co., Inc.*,
499 U.S. 340 (1991) ............................................................................ 17

*Gilbert v. Monsanto Co.*,
216 F.3d 695 (8th Cir. 2000) ............................................................... 9

*In re Comm'r of Pub. Safety v. Underdahl*,
735 N.W.2d 707 (Minn. 2007) ...................................................... 18, 19

*I-Sys., Inc. v. Softwares, Inc.*,
2004 WL 742082 (D. Minn. Mar. 29, 2004) ....................................... 17

*Jostens, Inc. v. Nat'l Computer Sys., Inc.*,
318 N.W.2d 691 (Minn. 1982) ............................................................ 11

*JustMed, Inc. v. Byce*,
2007 WL 2479887 (D. Idaho Aug. 29, 2007) ..................................... 11

*Kemp v. Tyson Seafood Group, Inc.*,
2004 WL 741590 (D. Minn. Mar. 30, 2004) ........................................ 8

*Rufo v. Inmates of the Suffolk County Jail*,
502 U.S. 367 (1992) .......................................................................... 8, 9

*Servais v. T.J. Mgmt. of Minneapolis, Inc.*,
973 F. Supp. 885 (D. Minn. 1997) ...................................................... 19

*Siebring v. Hansen*,
    346 F.2d 474 (8th Cir.1965) ................................................................... 8

*Sierra Club, Inc. v. Elec. Controls Design, Inc.*,
    909 F.2d 1350 (9th Cir. 1990) ................................................................ 9

*State v. Olcott*,
    A06-2340, 2008 Minn. App. LEXIS 374 (Minn. Ct. App. Apr. 15, 2008) ............. 3

*State v. Underdahl*,
    Nos. A07-2293 & A07-2428, 2008 Minn. App. LEXIS 291
    (Minn. Ct. App. May 20, 2008) ............................................................... 3

*Thompson v. Edward D. Jones & Co., Inc.*,
    992 F.2d 187 (8th Cir. 1993) ................................................................. 9

*U.S. v. Homestake Mining Co.*,
    595 F.2d 421 (8th Cir. 1979) ................................................................. 8

*Whelan Assocs., Inc. v Jaslow Dental Lab., Inc.*,
    797 F.2d 1222 (3d Cir. 1986) ............................................................... 17

## **Other Authorities:**

17 U.S.C. § 101 ....................................................................................... 18

28 U.S.C. § 1651 ...................................................................................... 8

Fed. R. Civ. P 54(a) ................................................................................. 8

Minn. R. 7502.0420, subp. 3 ..................................................................... 2

Minn. Stat. § 169A.53, subd. 3(b)(10) ......................................................... 2

Minn. Stat. § 325C.01, subd. 5 ......................................................... 10, 11, 22

Minn. Stat. § 634.16 ................................................................................. 2

18A Charles Alan Wright et al.,
    *Federal Practice and Procedure* § 4443 ............................................... 8, 9

Defendant CMI of Kentucky, Inc. ("CMI") respectfully submits this Memorandum of Law in Support of Joint Motion for Entry of Consent Judgment and Permanent Injunction.

## INTRODUCTION

This so-called "source code issue" has placed CMI on the horns of a dilemma— win the lawsuit and lose a valued customer; or, relinquish control of its most sensitive trade secrets and risk losing its competitive viability.

As the Court knows, this issue has bedeviled the State of Minnesota (the "State"), CMI, and the Minnesota judicial system for more than two years. CMI is confident that it would prevail if the litigation went forward. However, a victory in this lawsuit would not resolve the source code issue. Now, after months of litigation, mediation, and negotiation, CMI and the State have found an acceptable solution that fairly balances the interests of individual DUI defendants and implied consent petitioners, the State, and CMI.

The proposed Consent Judgment and Permanent Injunction provide Minnesota litigants with reasonable access to the source code and, at the same time, recognize and protect CMI's valuable trade secrets. Accordingly, CMI respectfully urges the Court to enter the proposed Consent Judgment and issue the Permanent Injunction.

## BACKGROUND

## I.     THE HISTORY OF THE PARTIES AND THE SOURCE CODE ISSUE.

### A.     CMI's Longstanding Relationship With the State.

The State of Minnesota has been a valued customer of CMI for some two decades. In early 1997, the State and CMI entered a contract under which CMI sold its Intoxilyzer 5000EN breath alcohol testing instruments to the State.[1]  The contract consisted of a Request for Proposal from the State, CMI's Proposal, and the State's Notice of Award. (Previously filed as Exhibit 1 to Joint Mot. to Approve Consent J. and Permanent Inj. (hereafter "Ex. 1, Pt. __ at __).)[2]  The initial contract term of five years was extended by subsequent amendments, until it ultimately expired on January 31, 2008.  (*Id*. Pt. 3 at 20.)

These breath alcohol testing instruments are used by law enforcement professionals to test persons suspected of violating various Minnesota alcohol-related laws.  They are commonly referred to as the "Minnesota version" of the Intoxilyzer 5000EN.  The Intoxilyzer 5000EN has been formally approved by the National Highway Transportation Safety Administration and the Minnesota Department of Public Safety. Minn. R. 7502.0420, subp. 3 (2007); (Answer & Countercl. ¶ 64.)  By statute, the results of a test administered with an Intoxilyzer 5000EN are presumptively valid.  Minn. Stat. § 634.16 (2008).  However, persons charged with driving while impaired may challenge this presumption.  Minn. Stat. § 169A.53, subd. 3(b)(10).

---

[1]     CMI sold an earlier version of the instrument to the State prior to 1997.  (Affidavit of Toby Hall ("Hall Aff.") ¶ 3.)

[2]     Due to its volume, the contract was scanned and filed through CM/ECF in four parts, as follows:  Ex. 1, Pt. 1 is the RFP, Ex. 1, Pts. 2A and B are CMI's Proposal, and Ex. 1, Pt. 3 is the Notification of Contract Award.

**B.   Requests for the Source Code in Discovery.**

In 2006, defendants charged with impaired driving and petitioners challenging implied consent license revocations began requesting the instrument's "source code" in discovery.[3]  The State opposed these discovery requests, arguing that the source code was not discoverable and was not in the State's possession, custody, or control.  While many Minnesota district courts agreed that the source code is not discoverable, some have ordered the State to produce the source code or face discovery sanctions including, in some cases, exclusion of the test results from the evidence in the case.[4]  (Answer & Countercl. ¶¶ 74-75.)

Those district courts that have ordered the State to produce the source code have generally justified doing so on either of the following two grounds.  First, there is a provision in the RFP under which CMI assigns to the State any copyrightable material conceived or originated and arising under the contract.  (Ex. 1, Pt. 1 at 7.)  Without ever determining when the source code was conceived or originated, whether it arose under the contract, or whether any part of the source code (if any) that did arise under the contract was "copyrightable," some courts have simply assumed that the State must own

---

[3]    The source code is, in essence, the instrument's computer program in a "human readable" format.  It is one of CMI's most valuable assets.  (Answer & Countercl. ¶¶ 70-71.)

[4]    In two recent decisions, the Minnesota Court of Appeals has reversed a district court order requiring the State to produce the source code and affirmed a district court order refusing to order production of the source code.  *See State v. Underdahl*, Nos. A07-2293, A07-2428, 2008 Minn. App. LEXIS 291 (Minn. Ct. App. May 20, 2008) and *State v. Olcott*, A06-2340, 2008 Minn. App. LEXIS 374 (Minn. Ct. App. Apr. 15, 2008). (McNab Aff. Exs. H and I.)  Nonetheless, some district courts continue to order the State to produce the source code.

the source code. These courts are simply wrong because the vast majority of the source code was conceived and originated well before the contract, and did not arise under the contract. And to the extent that any source code was modified to meet Minnesota's specifications, such discrete lines of source code, standing alone, may well not be copyrightable.

The second basis on which some courts relied in ordering the State to produce the source code is that the RFP required proposals to include a statement of cost and conditions for providing "information" directly to counsel for defendants who had obtained a state court order. (Ex. 1, Pt. 1 at 22.) The RFP does not define this "information." (*Id*.) However, in its Proposal, CMI indicated that its Operator's Manual was the only "information" it would provide. (*Id*. Pt. 2B at 30.) In awarding the contract to CMI, the State did not object to CMI's definition of "information." (*Id*. Pt. 3, generally.) By its own terms, the contract includes the RFP, the Proposal, and the Notice of Award. (*Id*. Pt. 1 at 7.) Accordingly, CMI was bound to provide only its Operator's Manual to Minnesota litigants—not its proprietary, trade secret source code.

## C.     CMI's Attempt to Reach a Negotiated Resolution.

In response to pressure from courts threatening to exclude the Intoxilyzer 5000EN test results from the evidence in the case, the State asked CMI to make the source code available. (Compl. ¶ 79.) CMI was concerned about the potential ramifications of making its trade secret source code available outside the confines of the company. As discussed below, the source code is its most valuable and sensitive trade secret. Nonetheless, because the State is a highly valued customer of over twenty years, CMI

eventually agreed to make the source code available under restrictions intended to maintain its trade secret status and protect it from inadvertent disclosure or misappropriation. CMI insisted that an appropriately worded protective order be entered and a non-disclosure agreement be executed in each case in which the source code was to be produced. (*Id*. ¶¶ 79-80.) CMI also sought reimbursement for the cost of producing the source code in a printed, hardbound format.[5]

Some of the district court judges who ordered the State to produce the source code refused to execute CMI's requested protective order and some refused to enter any protective order whatsoever. (*Id*. ¶ 94.) Some judges refused to require that CMI be reimbursed. Similarly, some defendants and petitioners, or their counsel, refused to execute the non-disclosure agreement, while others refused to pay for CMI's cost of production. A significant number of criminal prosecutions and revocation proceedings have been impacted by this dispute. (*Id*. ¶ 30.)

## II.   THE PRESENT LAWSUIT AND MOTION.

### A.   The Instant Litigation.

In an attempt to gain access to the source code, the State brought this action on March 3, 2008, alleging copyright infringement, breach of an assignment provision in the contract, and breach of a provision regarding access to information. (Compl. ¶¶ 31-53.) CMI answered, denying the State's allegations and counterclaiming for a declaratory

---

[5]     Tellingly, in one case where CMI actually did provide the source code to a litigant in Minnesota, and in another where CMI merely agreed to make it available, the requesting litigants *did not* review the source code, but instead, immediately dismissed their implied consent petitions and/or entered plea agreements.

judgment that the CMI owns the source code and that the source code is a trade secret. (Answer & Countercl. ¶¶ 95-106.)

### B. Court-Directed Mediation.

During the May 5, 2008, Rule 16 Conference, Magistrate Judge Boylan inquired whether the parties would consider early mediation. The parties were amenable to doing so, and mediated with the Magistrate Judge on June 27, 2008. While a final settlement was not reached on that date, that parties made sufficient progress to warrant a series of further settlement conferences and status conferences with the Magistrate Judge. These took place on July 2, 23, and 30, and August 18, 2008. Through their counsel, the parties met in person and telephonically on numerous other occasions, in what were often extremely difficult negotiations. Nonetheless, due in large part to Magistrate Judge Boylan's efforts, the parties were able to file their Conditional Settlement Agreement (which is conditioned upon the Court's entry of the proposed Consent Judgment and Permanent Injunction) on September 12, 2008.

For the reasons set forth below and in the State's separately-filed Memorandum of Law, the parties believe their settlement and the proposed Consent Judgment and Permanent Injunction represent the best possible resolution of this lawsuit—not only for the State and CMI, but for Minnesota litigants as well.

### C. The Conditional Settlement Agreement, Proposed Consent Judgment, and Permanent Injunction.

Under the Conditional Settlement Agreement, this action will be dismissed with prejudice and without costs to either party if the Court enters the proposed Consent

Judgment and Permanent Injunction.[6] Under the proposed Consent Judgment and Permanent Injunction, CMI will make the source code available *at no cost* to any Authorized Minnesota litigant (or his or her attorney or expert). (Proposed Consent J. and Permanent Inj. at 11.) There only three requirements for access to the source code: 1) the litigant must have received an order from the district court concluding that the source code is discoverable; 2) there must be a protective order in the case that reasonably protects the source code from disclosure outside the litigation; and 3) any person who will obtain access to the source code must execute a non-disclosure agreement. (*Id*. at 12-13.)

In order to protect and maintain its trade secret status, the proposed Consent Judgment and Permanent Injunction require that CMI make the source code available at CMI's headquarters in Owensboro, Kentucky. (*Id*. at 11.) The source code will be made available in both printed, hardbound format and in a searchable digital format. (*Id*. at 11-12.) It will be made available during regular business hours, excluding weekends, holidays, and days when CMI is not open for regular business purposes. (*Id*. at 11.)

Because the source code contains highly sensitive security features and passcodes, limited portions of the source code made available to Authorized Minnesota litigants will be redacted. (*Id*. at 12.) This is necessary to protect the integrity of the State's testing program. (Hall Aff. ¶¶ 26-29.) The redacted portions of the source code do not control

---

[6]     The Conditional Settlement Agreement was previously filed as Exhibit A (Doc. No. 34) to the Joint Motion for Entry of Consent Judgment and Permanent Injunction. The Proposed Consent Judgment and Permanent Injunction was previously filed as Exhibit B (Doc. No. 35) to the Motion for Entry of Consent Judgment and Permanent Injunction.

or affect the instrument's ability to analyze a test subject's breath alcohol concentration. (Hall Aff. ¶ 30.) Nonetheless, provisions have also been made for access to the unredacted source code upon a showing of legitimate need. (Proposed Consent J. and Permanent Inj. at 13-14.)

Under the terms of the proposed Consent Judgment and Permanent Injunction, CMI will continue to make the source code available to Authorized Minnesota litigants until the State has discontinued use of the Intoxilyzer 5000EN and the time for appeal of any conviction or revocation involving Intoxilyzer 5000EN evidence has run. (*Id*. at 14.)

## LEGAL STANDARD

This Court has authority to enter a consent judgment or decree. Fed. R. Civ. P. 54(a). The U.S. Supreme Court has described a consent judgment as:

> a settlement that includes an injunction, or some other form of specific relief, and that is formally entered by the court and enforceable by contempt. A consent decree no doubt embodies an agreement of the parties and thus in some respects is contractual in nature. But it is an agreement that the parties desire and expect will be reflected in and be enforceable as a judicial decree that is subject to the rules generally applicable to other judgments and decrees.

*Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 378 (1992). A consent judgment is a judicial act possessing the "same force and character as a judgment rendered following a contested trial." *U.S. v. Homestake Mining Co.*, 595 F.2d 421, 425 (8th Cir. 1979), quoting *Siebring v. Hansen*, 346 F.2d 474, 477 (8th Cir.1965). A consent judgment may contain both adjudicated and stipulated findings. 18A Charles Alan Wright et al., *Federal Practice and Procedure* § 4443; *see also Kemp v. Tyson Seafood*

*Group, Inc.*, 2004 WL 741590, at \*2 (D. Minn. Mar. 30, 2004) (citing "findings" within consent judgment).

Similarly, pursuant to the All Writs Act, 28 U.S.C. § 1651, this Court is authorized to issue an injunction to "protect or effectuate [its] judgments." *Burr & Forman v. Blair*, 470 F.3d 1019, 1026 (11th Cir. 2006). The Court may also issue an injunction to enforce a settlement that has been incorporated into a final judgment or that expressly provides for the Court's continuing jurisdiction. *See Rufo*, 502 U.S. at 378; *Gilbert v. Monsanto Co.*, 216 F.3d 695, 699-700 (8th Cir. 2000); *Thompson v. Edward D. Jones & Co., Inc.*, 992 F.2d 187, 189 (8th Cir. 1993).

Commentators have noted that "in various circumstances judicial approval of a consent judgment may require careful scrutiny of its fairness in light of the probable outcome on the merits." 18A *Federal Practice and Procedure* § 4443; s*ee also Sierra Club, Inc. v. Elec. Controls Design, Inc.*, 909 F.2d 1350, 1355 (9th Cir. 1990) ("a district court should enter a proposed consent judgment if the court decides it is fair, reasonable, equitable and does not violate the law or public policy.").

## **DISCUSSION**

This Court should enter the proposed Consent Judgment and Permanent Injunction because they represent a just, reasonable, and appropriate resolution of this lawsuit and the issues that brought it before this Court. The proposed Consent Judgment and Permanent Injunction are not only in the best interests of the parties, they also provide Minnesota litigants greater rights and access to the source code than they could have achieved through the State's continuation of this litigation.

The evidence before the Court demonstrates that: 1) the source code is a highly valuable trade secret that is deserving of appropriate protections; 2) the State does not, and cannot, own the source code by virtue of the contract's assignment provision; and 3) the source code is not "information" that CMI is required to provide to Minnesota litigants under the contract. Thus, were this matter to be tried to verdict, the State and its citizens would incur further cost and delay, but would not obtain access to the source code. However, under the proposed Consent Judgment and Permanent Injunction, CMI will make the source code available to Authorized Minnesota litigants at no charge. All that CMI wants in exchange, indeed, all it has ever wanted, is to ensure consistent and appropriate protection of its valuable trade secrets.

## I.      THE SOURCE CODE IS A VALUABLE TRADE SECRET.

With little consideration for CMI's legitimate interests in its valuable intellectual property, and with a fundamental misunderstanding of the contract, various courts and litigants have unfairly lambasted CMI for its "recalcitrance." However, CMI's caution was well founded. In fact, CMI had no choice but to tread cautiously because a trade secret retains that status only so long as it remains a secret, and only so long as its owner takes reasonable measures to preserve that secrecy.

Under the Minnesota Uniform Trade Secrets Act ("MUTSA"), a trade secret is:

information, including a formula, pattern, compilation, program, device, method, technique, or process that:
(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Minn. Stat. § 325C.01, subd. 5.

**A.    The Source Code Falls Within The Minnesota Uniform Trade Secret Act.**

Consistent with the plain language of MUTSA and other state's trade secret statutes, computer programs (including source code) have long been afforded trade secret status. *See, e.g., Jostens, Inc. v. Nat'l Computer Sys., Inc.*, 318 N.W.2d 691, 698 (Minn. 1982); *Aries Info. Sys., Inc. v. Pac. Mgmt. Sys. Corp.*, 366 N.W.2d 366, 368 (Minn. Ct. App. 1985); *see also Benefit Res., Inc. v. Apprize Tech. Solutions, Inc.*, 2008 WL 2080977, at *7 (D. Minn. May 15, 2008) (finding, on motion for injunctive relief, reasonable likelihood of successful showing that source code was a trade secret); *JustMed, Inc. v. Byce*, 2007 WL 2479887, at *10 (D. Idaho Aug. 29, 2007) (holding that "source code clearly falls within the definition of a trade secret").

Here, the source code constitutes, alternatively, a *compilation* of instructions, a computer *program*, a *method* of operating the Intoxilyzer 5000EN, or a *process* by which instructions are given to the instrument's hardware.  Accordingly, if the Source Code is not generally known or readily ascertainable, derives independent value from its secrecy, and CMI has made reasonable efforts to maintain that secrecy, it is a trade secret.

1.    The Source Code is not generally known or readily ascertainable.

Under the Act, trade secrets consist certain types of valuable commercial information that are not "generally known … and not readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use."

Minn. Stat. § 325C.01, subd. 5.  As the controversy underlying this litigation reflects, the substance of CMI's source code is not generally known or readily ascertainable.

The source code is not generally known.  CMI has not shared the source code with its customers, competitors, or the general public.  (Hall Aff. ¶¶ 7, 10.)  Moreover, the source code does not reside in source code form within the Intoxilyzer 5000EN.  Rather, portions of the source code are written in "Z80 assembly" language and other portions are written in "C" programming language.  (Affidavit of Mario D. Santana ("Santana Aff.") ¶ 9.)  After it is written in these programming languages, the source code must be "assembled" or "compiled" and "linked."  (Hall Aff. ¶ 6.)  This converts the source code into file formats that are then loaded into two erasable programmable read-only memory chips ("EPROMs"), which are computer chips that are installed in the instrument.  (*Id*.) Notably, the files that are assembled or compiled, linked and installed in the EPROMs cannot be "reverse engineered."  (*Id*. ¶ 8.)  Thus, the source code is also not readily ascertainable.

  2.  The Source Code derives value from being not generally known because others could obtain economic value from its disclosure and use.

CMI made a substantial investment of resources in designing the Intoxilyzer 5000EN, including creating the software for the instrument.  (*Id*.)  The device itself, meaning its hardware, is readily accessible.  Thus, the instrument itself could be "reverse engineered" or copied with relative ease.  (*Id*.)  However, without the source code, an imitator would still be faced with creating software to operate the knock-off device. Having a copy of the source code would save the imitator thousands of hours of software

engineering time, and quite likely, hundreds of thousands of dollars (or more) of start up investment. (*Id*.) The source code also represents engineering concepts that could be valuable to current competitors, in that the application of those concepts may enhance the performance of competing breath alcohol testing devices. Thus, the source code derives economic value from continued secrecy because it would be highly valuable to either current or future competitors.

    3.    <u>CMI undertakes reasonable efforts to maintain the secrecy of the Source Code</u>.

Given the above, it is not surprising that CMI goes to great lengths to protect the source code. First, only a very limited number of CMI personnel with "need-to-know" have access to the source code. (*Id*. ¶ 11.) Each of these individuals is required to execute non-disclosure and confidentiality agreements before gaining access to the source code. (*Id*.) Second, the source code is maintained under "lock and key" controls. (*Id*. ¶ 12.) Moreover, that secured area is within CMI's facility, which is itself secured with key-card and photo ID controlled access. (*Id*.) Third, in those circumstances where CMI has agreed to make the source code available, it has conditioned access upon very strict Non-disclosure Agreements and court-entered Protective Orders. (*Id*. ¶ 10.) To further protect the source code, CMI has never made it available in electronic form, due to the ease with which electronic data can be duplicated and transmitted. (*Id*.) As a final testament to CMI's commitment to protecting the source code, it has litigated issues relating to ownership and access here and elsewhere. (*Id*. ¶ 13.) By taking these measures, CMI has acted reasonably to protect its trade secret source code.

In sum, computer programs and source code fall within the coverage of MUTSA. CMI has presented substantial evidence that its source code is not available or readily ascertainable, that it derives significant value from its continued secrecy, and that CMI has taken reasonable steps to maintain that secrecy. There has been no contrary evidence adduced in the case. Accordingly, the source code is a trade secret under MUTSA.

## II.    THE STATE DOES NOT OWN THE SOURCE CODE.

As noted above, it has been suggested, in somewhat cavalier fashion, that the State owns the source code on the basis of a boilerplate assignment provision in the contract. That is simply not the case. The assignment provision in question states:

> All right, title, and interest in all copyrightable material which [CMI] shall conceive or originate, either individually or jointly with others, ***and which arises out of the performance of this Contract***, will be the property of the State and are by this Contract assigned to the State….

(Ex. 1, Pt. 1 at 7, emphasis added). Because the vast majority of the source code predates and did not arise out of the performance of the contract, it did not become the property of the State. Moreover, it has not been shown that any source code that may have been modified after the contract was executed is independently copyrightable.

### A.    The Vast Majority of the Source Code Predates and Did Not Arise Under the Contract.

CMI's breath alcohol testing instrument was not developed for the State in response to the contract; rather, it predates the contract. (Hall Aff. ¶ 16.) The State purchased a preexisting instrument, which it asked CMI to configure to certain local specifications. (*Id.*) Many of these specifications already existed as options within CMI's software package. (*Id.*, s*ee also* Ex. 1, Pt 2 at 5.) It was essentially a matter of

switching certain features "on" and others "off" to configure those aspects of the Intoxilyzer 5000EN to the State's specifications. (Hall Aff. ¶ 16.) In other instances, it was necessary to modify discrete portions of the software to meet the State's requirements. (*Id*.) However, those functions did not relate to the instrument's analytical software that controls the instrument's computation of a test subject's test result; rather, they dealt primarily with the user interface and communications software. (*Id*. ¶¶ 16-17.) Because the vast majority of the source code predated and did not arise under the contract, it was not assigned to the State.[7]

Indeed, the State has admitted as much in numerous pleadings and in a sworn affidavit. For example, just three months before filing its Complaint in this action, the State argued to a Rice County Minnesota District Court that, "the State of Minnesota bought an existing breath test instrument pursuant to the RFP. It did not gain any ownership in the copyrighted source code which was already in existence at the time. *The source code belongs to CMI*." (McNab Aff. Ex. A at 10, emphasis added.) Notably, this memorandum of law was signed by the same Assistant Attorney General who signed the State's Complaint in this case. Then again, on April 9, 2008, over a month *after* the State brought this action, it argued to a Scott County Minnesota District Court that "the State of Minnesota did not obtain any ownership or control of the entire source code under the RFP," and "*[t]he source code belongs to CMI*." (McNab Aff. Ex. B at 10, emphasis added.)

---

[7] The State concedes that it has no evidence to rebut CMI's substantial evidence that a majority of the source code was originated and created prior to, and did not arise under, the contract. (Proposed Consent J. and Permanent Inj. at 5.)

The State's assertion in these cases and others was supported by the Affidavit of Glenn G. Hardin, who was then the Toxicology Supervisor for the Minnesota Bureau of Criminal Apprehension. (McNab Aff. Ex. C (Affidavit of Glenn G. Hardin ¶ 1).) Mr. Hardin was responsible for overseeing the State's breath testing, blood alcohol, and toxicology testing programs. (*Id*.) According to his sworn testimony, "portions of the source code for the Intoxilyzer 5000EN that have to do with measuring breath alcohol were already in existence when CMI signed the RFP, and CMI did not conceive or originate any copyrightable material in regard to how the Intoxilyzer 5000EN measures breath alcohol in order to provide the instruments to Minnesota." (*Id*. ¶ 5.)

Thus, notwithstanding the generalized allegations of ownership in the State's Complaint in this case, all of the evidence reflects that the vast majority of the source code predates and cannot have arisen under the contract. Accordingly, it was not assigned to the State and it belongs to CMI.

**B.     There is No Evidence That Any Source Code That May Have Been Modified After the Parties Entered the Contract is Copyrightable.**

Not only have some courts glossed over the critical fact that the source code did not arise under the contract, they have also overlooked the other condition precedent to assignment—copyrightability. The assignment provision applies only to "*copyrightable* material … which arises under this Contract." (Ex. 1, Pt. 1 at 7, emphasis added.) Thus, without determining whether the source code arose under the contract (it did not) or whether any source code that may have been modified under the contract was copyrightable, some courts simply concluded that the State might own it.

Even assuming, for the sake of argument, that a given line of source code was modified in response to the contract, it still would not be assigned to the State unless it was, in and of itself, copyrightable. It would be incumbent upon the State to make this showing. The State has, quite reasonably, not pursued this course because even if the State did obtain ownership of a few discrete lines of source code, that would not begin to resolve the underlying problem, which is access to the "entire source code" for Minnesota litigants, as has been ordered by some state district courts.

But had the State chosen to pursue ownership of some limited portion of the source code, the question of copyrightability would remain, and its resolution is far from clear. In order to be copyrightable, a work must be both original and creative. *See I-Sys., Inc. v. Softwares, Inc.*, 2004 WL 742082, at *7 (D. Minn. Mar. 29, 2004). Copyright protection is afforded to expressions of ideas, but not ideas themselves. *See Whelan Assoc., Inc. v Jaslow Dental Lab., Inc.*, 797 F.2d 1222, 1234-36 (3d Cir. 1986). Thus, non-literal elements of a computer program may be, but are not necessarily copyrightable. *See id.* Discrete elements or portions of a computer program or its underlying source code may be unprotectable because they are unoriginal or are in the public domain. *See Control Data Sys., Inc. v. Infoware, Inc.*, 903 F. Supp. 1316, 1323 (D. Minn. 1995); *see also Feist Publ'g v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345-48 (1991) (holding that not every element of a copyrighted work is necessarily protected; only original expressions within the work may be copyrighted).

Here, any discrete line of source code that may have been written or modified in response to the contract, taken alone, may be insufficiently original or expressive to

constitute copyrightable material. For example, CMI could have revised a line of source code to define a standard communication function such as modem baud rates. (Hall. Aff. ¶ 16.) The manner in which such source code is written for this routine function may be quite utilitarian, standardized and unoriginal. *See Whelan*, 797 F.2d at 1236; *Control Data*, 903 F. Supp. at 1323. A discrete line of source code of this nature would not be independently copyrightable and, therefore, would not be assignable under the contract. In any case, no court has yet considered this question.

Because the vast majority of the source code predates the contract, it was not assigned to the State. Moreover, to the extent that any discrete lines of source code may have been modified in connection with configuring the existing instrument to the State's specifications, there has been no showing of independent copyrightability for those discrete lines of source code. Accordingly, the State cannot, and does not own the entire source code.[8] The proposed Consent Judgment and Permanent Injunction are fair and reasonable because they provide Minnesota litigants with reasonable access to the source code despite the fact that it belongs to CMI, not to the State.

---

[8] There has been discussion among some Minnesota courts about whether the source code constitutes a "work for hire" under the Copyright Act. *See In re Comm'r of Pub. Safety v. Underdahl*, 735 N.W.2d 707, 712 (Minn. 2007); *see also* Compl. ¶ 33 (referring to "work for hire"). This a complete red herring that has no bearing on the question of ownership in these circumstances. Under the contract, CMI agreed that "*[w]here applicable*, works of authorship created by [CMI] for the State in performance of the Contract shall be considered 'works for hire' as defined in the U.S. Copyright Act." (Ex. 1 at 7, emphasis added.) By its own terms, the "work for hire" doctrine *would not apply* to source code modified by CMI under the contract because works for hire are expressly limited to nine distinct categories of works, which do not apply here. 17 U.S.C. § 101. Thus, the "work for hire" provision has no application.

## III. THE CONTRACT DOES NOT REQUIRE CMI TO PROVIDE THE SOURCE CODE TO MINNESOTA LITIGANTS.[9]

The State has also argued that the contract obligates CMI to make "information," including the source code, directly available to Minnesota litigants. (Compl. ¶¶ 44-49.) The State is mistaken, as are others who have made similar assertions. For example, without reviewing the entire contract, the Minnesota Supreme Court made reference to "the express language of *the RFP* that requires CMI to provide the state with 'information.'" *Underdahl*, 735 N.W.2d at 713 (emphasis added). First, the Court was flat wrong in saying that these clause "requires CMI to provide *the state* with information." (*Id*.) The clause, to the limited extent it applies, requires CMI to provide certain information directly to counsel for defendants. (Ex. 1, Pt. 1 at 22.) Moreover, had the Minnesota Supreme Court read the entire contract, rather than only the RFP, it would have discovered that "information" is a defined term that does not include the source code. Pursuant to the contract, CMI is obligated to provide nothing more than a copy of the Operator's Manual to the Intoxilyzer 5000EN to defendants who have obtained an order from the state district court. (Ex. 1, Pt. 2B at 30.)

By its own terms, the RFP is not the contract, it is merely part of the contract. The contract consists of the RFP, CMI's Proposal, and the State's Award. (*Id*. Pt. 1 at 7.) Like any contract, it must be read and construed as a whole. *See Servais v. T.J. Mgmt. of*

---

[9] Under the terms of the proposed Consent Judgment, the Court need not decide this issue. (Proposed Consent J. and Permanent Inj. at 9.) CMI presents the following discussion to further demonstrate that the proposed Consent Judgment and Permanent Injunction are fair and reasonable because they make the source code available in circumstances and on terms that the contract would not.

*Minneapolis, Inc.*, 973 F. Supp. 885, 892 (D. Minn. 1997). The RFP includes a paragraph directing CMI to include in its Proposal:

> Provision for information to attorneys supplied directly from manufacturer including statement of all non-disclosure/non-reproduction agreements required to obtain information, fees and deposits required, to be used by attorneys representing individuals charged with crimes in which a test with the proposed instrument is part of the evidence. This part of the contract to be activated with an order from the court with jurisdiction of the case and include a reduced fee schedule for defendants found by the court to be entitled to a publicly funded defense.

(*Id*. at 22.) Notably, the term "information" is not defined in the RFP.

This requirement for CMI's Proposal had three components: 1) a provision for information to defense counsel; 2) CMI's non-disclosure agreement; and 3) CMI's fee schedule. (*Id*.) In submitting its Proposal to the State, CMI complied with each of these requirements. (*Id*. Pt 2.) CMI included in its Proposal a letter by which information would be provided to defense counsel (*id*. Pt. 2B at 30), a non-disclosure agreement to be executed by persons receiving the information (*id*. Pt. 2B at 31), and a fee schedule (*id*. Pt. 2B at 14). Significantly, in the letter through which information was to be provided to defense counsel, CMI expressly defined the information it would provide as "the Operation Manual for the Intoxilyzer." (*Id*. Pt. 2B at 30.) CMI further stated:

So you understand our guidelines as to obtaining *such a manual*, please find enclosed the necessary documents to be signed by you and returned to our office prior to any release of the material. Please return the signed original Confidentiality Agreement and a check in the amount of $250 made payable to CMI, Inc., to my attention. We will send a signed copy of the Confidentiality Agreement back to your office for your records *along with the Operations Manual*. Upon conclusion of this case, the manual is to be returned to our office along with the signed original Affidavit stating that no copies or photocopies had been produced by you or any of your staff.

(*Id.*, emphasis added.) This letter was included in CMI's Proposal, as required by the RFP. The State did not object to CMI's Proposal, and after receiving and reviewing CMI's Proposal, it awarded the contract to CMI.

The RFP expressly states that the contract consists of the combined RFP, Proposal, and Notice of Award. (*Id.* Pt. 1 at 7.) Thus, while the RFP did not define "information," CMI's Proposal did. Moreover, while the RFP notes that a Proposal that materially deviates from the terms of the RFP may by rejected (*id.* Pt. 1 at 7), the State did not reject CMI's Proposal and its definition of "information." Given that the State had not defined "information" in its RFP, CMI's definition would not constitute a deviation.

It is clear that the *Underdahl* Court, and others, failed to review the contract in its entirety. The State did much the same in its Complaint in this case, ignoring CMI's clear definition of the "information" it would provide to defense counsel. (Compl. ¶ 45.) Thus, if this case was tried, the State would not prevail on this claim and, once again, the source code issue would remain unresolved. Because the proposed Consent Judgment and Permanent Injunction do make the source code available to Authorized Minnesota litigants, and at no cost, they are more than fair and reasonable.

There are two additional factors the Court should consider. First, by its express terms, the RFP only requires that "information" be provided to persons charged with crimes. (Ex. 1, Pt. 1 at 22.) This suggests that whatever "information" is to be provided need only be made available to defendants in DUI proceedings. This inference is further supported by the requirement that CMI provide a reduced fee schedule for *defendants* found to be entitled to a publicly funded defense. (*Id.*, emphasis added.) A strong argument can be made that petitioners in implied consent cases—a civil proceeding— would not be entitled to any "information" under the contract. However, under the proposed Consent Judgment and Permanent Injunction, both criminal defendants and civil petitioners may obtain access to the source code. (Proposed Consent J. and Permanent Inj. at 12.)

Second, the contract expired in January 2008. Thus, CMI has no obligation whatsoever under the "information" clause in any cases arising after that date. Nonetheless, under the proposed Consent Judgment and Permanent Injunction, CMI agrees to provide access to the source code to Authorized Minnesota litigants until such time as the State has discontinued use of the instrument and the time for appeals for any conviction or revocation involving Intoxilyzer 5000EN evidence has run. (*Id.* at 14.)

For each of these reasons, the proposed Consent Judgment and Permanent Injunction represent a better resolution of this case than the State and Minnesota litigants could hope obtain through further litigation and trial.

## IV. THE FORM AND MANNER OF ACCESS AFFORDED BY THE PROPOSED CONSENT JUDGMENT AND PERMANENT INJUNCTION ARE FAIR, REASONABLE, AND APPROPRIATE.

### A. The Proposed Printed and Digital Formats Are Fully Analyzable By Persons with Appropriate Skill, Training, and Knowledge in the Field, and Provide Necessary and Reasonable Protection For CMI's Trade Secrets.

The proposed Consent Judgment and Permanent Injunction require CMI to make the source code available in both printed, hardbound book form, and in a searchable, secure digital format, at CMI's offices in Owensboro, Kentucky. (*Id*. at 11-12.) To protect the source code's trade secret status and CMI's intellectual property interest, it is necessary that access be carefully controlled. Minn. Stat. § 325C.01, subd. 5; (*see also* Hall Aff. ¶ 22; Santana Aff. ¶ 10). To ensure that access is limited to Authorized Minnesota litigants, their counsel, or their experts, the source code must be presented in a format that allows for proper analysis but that limits the risk of duplication or transmission. (Hall Aff. ¶¶ 21-25.)

It is well-established that once electronic data has been copied to disk (i.e., a system's hard drive), it is extremely difficult to fully remove or delete that data from the system. (Hall Aff. ¶ 22; Santana Aff. ¶ 10.) Such data can often be retrieved with relative ease by persons with only limited computer forensic skills, using data restoration tools that are readily available. (Hall Aff. ¶ 22.) Likewise, electronic data can be transmitted to thousands of recipients, or copied thousands of times, in fractions of a second. (*Id*. ¶ 24; Santana Aff. ¶ 10.) Thus, it is appropriate that the source code remain in CMI's possession and control.

The hardbound printed and digital formats prescribed by the proposed Consent Judgment and Permanent Injunction are fully analyzable by persons qualified and skilled in the field. (Hall Aff. ¶ 25; Santana Aff. ¶¶ 12, 15-15.10.) As presented, the source code is "easily readable and understood by a programmer experienced in both assembly-language programming for the Z80 computer chip and the C programming language."[10] (Santana Aff. ¶ 15.) Indeed, the only way to analyze the source code for actual efficacy and function is to review it manually, or in other words, to read it. (*Id.* ¶ 11.) Commercially available, automated software programs can provide certain statistical information about how the source code is structured, but it cannot analyze whether the instrument functions properly. (*Id.*)

Moreover, Mr. Santana, an independent expert, verified that the source code presented in the hardbound, printed format and the secured, searchable digital format, are the same, and, importantly, are the source code that CMI installs in the Minnesota version of the Intoxilyzer 5000EN. (Santana Aff. ¶¶ 16-17.)

Accordingly, the parties have agreed in their Conditional Settlement Agreement and in the proposed Consent Judgment and Permanent Injunction that the form of access proposed is fair, reasonable, and appropriate.

---

[10] In his Affidavit, Mr. Santana, who is Director of Secure Information Services at Terremark, Inc., provided an extensive explanation of the characteristics of the source code that led him to reach this conclusion. (Santana Aff. ¶¶ 15.1-15.10.)

**B.    The Proposed Redaction of Passcode and other Security Features From the Accessible Source Code and the Mechanism By Which Authorized Litigants May Obtain Access to the Redacted Portions of the Source Code Are Fair, Reasonable, and Appropriate.**

It is undisputed that the source code contains various passcodes and other security features.  The State's entire fleet of Intoxilyzer 5000EN instruments could be remotely accessed, modified, disabled, or otherwise tampered with via those passcodes and other security features.  (Hall Aff. ¶¶ 26-29.)  Thus, if strict control of the passcodes and security features is not maintained, the State's entire program could be compromised. (*Id.* ¶¶ 27, 29.)

Access to these passcodes and security features is not necessary to analyze the efficacy of the source code.  (*Id.* ¶¶ 30-32.)  Nonetheless, the proposed Consent Judgment and Permanent Injunction also provide a mechanism under which Authorized Minnesota litigants may obtain access to those portions of the source code, upon a proper showing of legitimate need.  (Proposed Consent J. and Permanent Inj. at 13-14.)  Because they provide for access to all but the most sensitive passcode and security aspects of the source code, and further provide a mechanism by which Authorized Minnesota litigants may obtain redacted security information in proper cases, proposed Consent Judgment and Permanent Injunction are fair, reasonable, and appropriate.

## CONCLUSION

The State and CMI have come to the Court with a solution to the long running "source code issue."  In exchange for recognition and consistent protection of its highly valuable trade secrets, CMI will make its source code available to Authorized Minnesota

litigants.  It is clear that the source code is a trade secret and that CMI's concerns for its protection are warranted.  It is also clear that the State does not own much, if any, of the source code.  Even if the State could have shown that some portion of the source code originated under the contract, and that discrete bit of source code was independently copyrightable, providing that to litigants likely would not have resolved the source code issue.

Similarly, because the contract required CMI to provide nothing more than its Operator's Manual to Minnesota litigants, the State's lawsuit could not resolve this dispute to the satisfaction of either the Minnesota courts or Minnesota litigants. However, the proposed Consent Judgment and Permanent Injunction put this issue to rest once and for all, by making the source code available on terms that recognize the legitimate interests of Minnesota litigants and courts, the State, and CMI.

Because the proposed Consent Judgment and Permanent Injunction represent a fair, reasonable, and appropriate resolution of the issues underlying this lawsuit, CMI respectfully urges the court to enter the Consent Judgment and issue the Permanent Injunction.

Respectfully submitted,

Dated:  October 28, 2008

WINTHROP & WEINSTINE, P.A.

By:  s/William A. McNab
     David M. Aafedt, MN #27561X
     William A. McNab, MN #320924

Suite 3500
225 South Sixth Street
Minneapolis, Minnesota 55402-4629
Tel:  (612) 604-6400
Fax: (612) 604-6800
daafedt@winthrop.com
wmcnab@winthrop.com

*Attorneys for Defendant CMI of Kentucky, Inc.*

4096624v2