## AFFIDAVIT

COMMONWEALTH OF KENTUCKY  )
                          ) ss.
COUNTY OF DAVIESS         )

Comes the Affiant Toby Hall, and being first duly sworn, states as follows:

## BACKGROUND

1. I make this affidavit upon personal knowledge and belief.

2. I am the President of CMI, Inc., d.b.a. CMI of Kentucky, Inc. (collectively, "CMI"), located at 316 East 9th Street, Owensboro, Kentucky. I hold a Bachelor of Science degree in Electrical Engineering and have over fifteen years' experience in instrumentation and software design, including substantial involvement in the design and manufacture of the Intoxilyzer 5000EN ("I-5000EN").

3. CMI manufactures and sells, among other things, the Intoxilyzer I-5000EN breath alcohol testing instrument. CMI sells breath alcohol testing instruments throughout the U.S. and in numerous other countries. CMI has sold the I-5000EN to the Minnesota Bureau of Criminal Apprehension (the "State") and other law enforcement agencies in Minnesota since 1997. CMI sold an earlier version of its breath alcohol testing instrument to the State prior to 1997.

4. In or about late 1996, the State issued a Request for Proposal ("RFP") for breath alcohol testing equipment. CMI submitted a Proposal in response to the RFP. In early 1997, the State accepted CMI's Proposal and awarded a contract to CMI under which the State (including various local law enforcement agencies) subsequently purchased over 200 I-5000EN instruments from CMI.

5. In my professional opinion, the only legitimate way to test the efficacy, accuracy, and functionality of any individual I-5000EN instrument is to test that instrument using various known standards under various controlled conditions. It is my understanding that under Minnesota law, individuals charged with alcohol-related offenses on the basis of evidence (i.e., test results) from an I-5000EN instrument are afforded access to all of the maintenance records for the specific I-5000EN instrument that was used to test that individual's breath alcohol concentration. It is my understanding that such individuals may also obtain access to an actual I-5000EN for testing purposes by making arrangements with the State and posting a bond equal to the price of the instrument. Nonetheless, I have been informed that a number of Minnesota state district courts have ordered the State to produce "the entire source code" of the I-5000EN to defendants and petitioners in criminal DUI and civil license revocation proceedings.

6. The Source Code is, in layperson's terms, the computer software for the instrument, written in "human readable" form. Source Code, in its raw, written form, cannot operate the instrument. It must first be "assembled" or "compiled" and "linked," a process that converts the Source Code into object files or executable files that ultimately reside within two Erasable Programmable Read-Only Memory ("EPROM") chips installed in each instrument. One EPROM generally controls the user interface functions, while the other controls the instrument's analytical functions.

7. To the best of my knowledge, the State does not possess, and has never possessed, a copy of the Source Code.

## THE SOURCE CODE IS A VALUABLE, PROPRIETARY TRADE SECRET

8. The Source Code is complex, technical, proprietary information that is highly valuable to CMI. It represents a substantial commitment of assets and resources and is the culmination of many years of research, development, and software engineering. For that same reason, the Source Code would also be highly valuable to current or future competitors. This is because it is possible to obtain one of CMI's instruments and reverse engineer the physical components. However, it is not possible to remove the software from the EPROMs and accurately reverse engineer it back to usable Source Code. This fact, together with CMI's carefully controlled access to the Source Code, constitutes CMI's principal protections against potential and actual competitors. This is particularly the case in various foreign markets where CMI has invested substantial resources in marketing and business development. Thus, the Source Code derives particular value from the fact that it is secret and not generally known or publicly available. CMI considers the Source Code to be one of its most valuable assets.

9. In June 2008, I gave sworn testimony as a non-party witness in litigation venued in the State of Arizona. I was not represented by counsel at that hearing. I was asked, in general terms, whether certain hardware elements and certain functions of the I-8000 instrument were trade secrets. Based on my layperson's understanding of the law of trade secrets, I testified that the hardware itself, and certain of the instrument's functions which are described in CMI's promotional materials, are not, to my knowledge, in and of themselves trade secrets. I still believe that to be the case. However, the Source Code, the manner in which it was engineered and written, and the manner in

which it causes the instrument to function, is unique among breath alcohol test instruments. It is very a closely guarded secret, and the Source Code remains valuable because it remains a secret. For these reasons, I believe the Source Code to the I-5000EN, and, for that matter, the I-8000, constitutes a trade secret.

10. CMI carefully guards its proprietary Source Code. It has never been made available to the general public or to CMI's customers. In the very limited circumstances where CMI has expressed a willingness to make the Source Code available to litigants, it has conditioned such offers upon the entry and execution of the strictest possible Protective Order and Non-disclosure Agreement. Moreover, until this case, CMI has previously only offered to make the Source Code available in a printed, hardbound stitched book format, with a unique book identifier, and marked "Copying or Duplicating are NOT Authorized By CMI, Inc." on each page.

11. Within CMI, only a very select number of personnel with the "need to know" have access to the Source Code. Even I, the President of the Company, do not have direct or uncontrolled access to the Source Code. Those persons who do have access the Source Code are required to execute a confidentiality agreement as a condition of employment.

12. To further protect the Source Code, it is in a secured location within CMI's facility, which is itself secured by a controlled access security system.

13. As further evidence of CMI's commitment to protecting its Source Code, it has litigated the ownership and control issue in Minnesota and elsewhere, in this case even litigating (with much regret) against the State, a valued customer.

14. CMI cannot begin to calculate the harm it would suffer if the Source Code fell into the hands of a competitor or an unscrupulous individual or enterprise. As noted above, with the Source Code, CMI's device could be duplicated or "knocked off" with minimal effort and CMI would lose its unique place in the market. Moreover, a competitor that was not required to make the investment in design and software engineering that CMI has made would have a tremendous, unfair competitive advantage. For these reasons, the harm CMI would suffer from disclosure of the Source Code would be irreparable.

For these reasons, I believe the Source Code is a trade secret. CMI has at all times treated it as such and will continue to do so in the future.

## OWNERSHIP OF THE SOURCE CODE

15. The contract between the State and CMI included an assignment provision under which CMI agreed to assign to the State "all right, title and interest in all copyrightable material which [CMI] shall conceive or originate ... and which arises out of the performance of this Contract." Based on a misunderstanding or misapplication of this language, some courts have speculated that the State may own the "entire source code." However, the State does not, and cannot, own the entire Source Code by virtue of this provision because the vast majority of the Source Code in the I-5000EN instrument sold to the State was conceived and originated prior to the execution of the contract and, therefore, did not arise under the contract.

16. When CMI was awarded the contract, it configured its then existing model I-5000 to the State's specifications. CMI was able to meet many of the State's

specifications by simply "selecting" pre-existing software options without creating new source code. In some instances, configuring the instrument to Minnesota's specifications required limited modifications to the instrument's software. These modifications addressed things such as baud rates for modem connections, certain communications functions, the organization and layout of reports sent to a printer from the instrument, operator menu selections allowing the operator to identify the statutory basis under which a particular test is being administered, and certain sample acceptance criteria consistent with the State's instructions. However, in connection with the contract, no changes were made to the instrument's analytical software that controls the instrument's computation of a test subject's breath result. The fundamental analytical software package preexisted the contract between the State and CMI. The Source Code that is assembled or compiled, linked, and loaded in the analytical EPROM constitutes a substantial portion of the "entire Source Code" of the Intoxilyzer 5000EN.

17. Only a small portion of the Source Code that is assembled or compiled, linked, and loaded in the user interface EPROM was modified in connection with configuring the instrument to the State's specifications.

18. Moreover, those small, discrete portions of the Source Code that were modified in connection with configuring the instrument to the State's specifications, taken individually, may not be sufficiently original or constitute creative expressions that warrant copyright protection.

19. Accordingly, the State does not and cannot own the Source Code by virtue of the assignment provision in the contract because the majority of the Source Code was

6

conceived and originated prior to the execution of the contract, and any minor modifications made in connection with configuring the instrument to Minnesota's specifications may not be independently copyrightable.

## THE NEED FOR THE PROTECTIONS SET FORTH IN THE PROPOSED CONSENT JUDGMENT AND PERMANENT INJUNCTION

20. In order to resolve a current dispute with the State and to make the Source Code available to litigants in the State in cases where a state district court has ordered the State to produce the Source Code, CMI has conditionally agreed to make the Source Code available under circumstances that adequately protect its trade secret status.

21. Subject to the conditions set forth in a proposed Federal Consent Judgment and Permanent Injunction, CMI has agreed to make the Source Code available to Minnesota defendants in DUI litigation and petitioners in implied consent cases at its headquarters in Owensboro, Kentucky. CMI will make the Source Code available in printed, hardbound format, and in a secure, searchable digital format, as described in the proposed Consent Judgment and Permanent Injunction.

22. To protect the Source Code's trade secret status and CMI's intellectual property interest, it is necessary that access to the Source Code be carefully controlled. Based on my professional experience and training in instrument and software design, I am aware that information in an electronic form is highly "transferrable" and extremely difficult to secure and control. In most operating systems, once information is loaded onto a computer's hard drive, it becomes almost impossible to completely erase or remove that data without physically destroying the hard drive. This is because "deleting"

7

data from a hard drive typically does not remove the data from the hard drive, but instead, it simply deletes certain "locators" that allow the data to be easily retrieved. However, the data can often still be retrieved by a person with even limited computer forensic skills, using restoration programs that are readily available commercially or over the internet.

23. Additionally, due to the internet, e-mail, digital wireless communications, and other technological advances, information in electronic form can be moved around the globe and copied hundreds or even thousands of times in just fractions of a second.

24. Accordingly, in order to maintain the integrity and security of CMI's valuable, proprietary, trade secret Source Code, it is necessary that it be produced only in printed, hardbound format and a fully secured, searchable digital format as described in the conditional Settlement Agreement and the proposed Consent Judgment and Permanent Injunction. This will prevent unauthorized reproduction, transmission, or removal of the Source Code.

25. Based on my professional experience and training and my knowledge of the Source Code, I believe that a qualified expert in the field of software and source code design can fully and appropriately inspect, review, and analyze the Source Code in the written and digital formats set forth in the proposed Consent Judgment and Permanent Injunction.

### PROTECTIONS FOR THE STATE'S TESTING PROGRAM

26. The Source Code contains passcodes and secure communication protocols for instrument operation. The State required CMI to put these passcodes in place to

prevent unauthorized access to control and menu functions on the instrument that are used by authorized technicians to calibrate, test, and maintain the instruments in accordance with the State's needs.

27. Were these passcodes and secured functions to become public, unauthorized persons could gain access and change configurations or otherwise tamper with or disable the instruments and the integrity of the State's testing program would be seriously compromised.

28. The I-5000EN is capable of communicating with a personal computer via modem (phone line) or direct cable connection. These communication protocols are also passcode protected, and those passcodes are also in the Source Code.

29. Unauthorized persons in possession of the passcodes and secured functions could also tamper with or disable the instruments remotely, and the integrity of the State's testing program would be seriously or fatally compromised.

30. These passcodes and communication protocols do not control or affect the manner in which the I-5000EN instrument analyzes a test subject's breath alcohol content.

31. Accordingly, if Minnesota litigants are given access to the Source Code as discussed above and in the proposed Consent Judgment and Permanent Injunction, it is important that these passcodes and security protocols be redacted from the printed, hardbound copy and secure, searchable digital version of the Source Code that is made available to litigants for inspection and review.

32. Based on my professional experience and training and my knowledge of the Source Code, I am confident that a qualified expert in the field of software and source code design can fully and adequately inspect, review, and analyze the functional efficacy of the Source Code notwithstanding the redaction of the Source Code relating to passcodes and secured functions. Moreover, it is my understanding that the proposed Consent Judgment and Permanent Injunction provides a mechanism under which litigants may seek access to the redacted portion of the Source Code.

33. I affirm that all of the above statements are true and correct to the best of my knowledge and belief.

Further your affiant says naught.

This 28th day of October, 2008.

_____
Toby S. Hall
President, CMI, Inc.


COMMONWEALTH OF KENTUCKY )
                         )
COUNTY OF DAVIESS        )

Subscribed and sworn to before me by Toby S. Hall, President of CMI, Inc., on the 28 day of October, 2008

_____
Notary Public, State at Large
My commission expires: 10-22-2011

3906314v4

10