_____

| | |
|---|---|
| State of Minnesota, by Michael Campion, its Commissioner of Public Safety, | |
| | Court File No. 0:08-cv-00603-DWF-AJB |
| Plaintiff, | |
| v. | **APPLICANTS' MEMORANDUM OF LAW IN SUPPORT REQUEST FOR AN EVIDENTIARY HEARING** |
| CMI of Kentucky, Inc., A Kentucky Corporation, | |
| Defendant | |
| Robert J. Bergstrom, Craig A. Zenobian, Shane M. Steffensen and Christopher D. Jacobsen, | |
| Applicants | |

_____

## **INTRODUCTION**

Applicants request an evidentiary hearing on their Objection to the Magistrate's Order Denying Applicants full intervention in this matter. An evidentiary hearing with expert testimony from Mr. Thomas E. Workman will establish that the State of Minnesota does not adequately represent the interests of Applicants, and that this Court must reverse the Magistrate Judge's Order denying intervention.

Such an evidentiary hearing is necessary for Applicants to establish why the

1

Proposed Consent Judgment actually thwarts access to the source code for the Intoxilyzer 5000, and, therefore, why the Proposed Consent Judgment should be denied.

The Magistrate Judge reserved to Applicants the right to seek limited intervention at the Consent Judgement stage. [Docket No. 37, p. 2]. Both Plaintiff State of Minnesota and Defendant CMI agree Applicants should be allowed to so intervene. [Docket No. 34-2, p. 8 ¶19). An evidentiary hearing is necessary for Applicants to fully inform the Court why the Proposed Consent Judgment actually thwarts and inhibits meaningful access and review of the source code.

## FACTS

1. **The Parties**.

    A. **Plaintiff**

    Plaintiff is the State of Minnesota which uses Intoxilyzer 5000EN breath alcohol devices to prosecute motorists under the State of Minnesota drinking and driving laws.

    B. **Defendant CMI**

    Defendant CMI is the manufacturer of the Intoxilyzer 5000EN breath alcohol device which the State of Minnesota uses to prosecute motorists under the State of Minnesota's drinking and driving laws.

    C. **Applicants**

    Applicants are individuals who are being prosecuted by Plaintiff State of Minnesota based on evidence from the Intoxilyzer 5000 breath alcohol instrument owned by the Plaintiff State of Minnesota and which was manufactured by Defendant CMI.

Applicants have orders from the Minnesota District Courts in their underlying criminal prosecutions which compels the production of the "source code" for the Intoxilyzer 5000EN. [Document Nos. 16-4, 16-5, 16-6 and 16-7].

Both Plaintiff State of Minnesota and Defendant CMI have refused to provide the court ordered source code information for the Intoxilyzer 5000 to Applicants in their underlying cases, as well as to those similarly situated.

**2.    Plaintiff State of Minnesota Contracts With Defendant CMI To Purchase All Rights To The Intoxilyer 5000EN While Expressly Requiring Defendant CMI To Provide the Attorneys Of Applicants And Those Similarly Situated With Any Information Ordered By A Court With Jurisdiction Over Prosecutions Involving The Intoxilyzer 5000EN.**

    **A.    The State of Minnesota's Request For Proposal of Bids For Evidentiary Breath Alcohol Test Instruments.**

In the fall of 1996, the State of Minnesota issued a Request for Proposal ("RFP") seeking bids for a new fleet of evidentiary breath alcohol test instruments. [Document No. 16-1]

The RFP stated that the State of Minnesota was the owner of any copyrighted or copyrightable material arising out any contract to provide to Plaintiff State of Minnesota the fleet of Intoxilyzer breath testing instruments.  Paragraph 29 of the RFP states:

> All right, title, and interest in all copyrightable material which Contractor shall conceive or originate, either individually or jointly with others, and which arises out of the performance of this Contract, will be the property of the State and are by this Contract assigned to the State along with ownership of any and all copyrights in the copyrightable material. Contractor also agrees, upon request of the State to execute all papers and perform all other acts necessary to assist the State to obtain and register copyrights on such materials.  Where applicable, works of authorship created by Contractor for the State in performance of this Contract shall be

considered "works for hire" as defined in the U.S. Copyright Act. [Document No. 16-1, p. 9, ¶ 29]. Mr. Thomas E. Workman will testify that this provision conferred all rights to any copyrightable material for the breath alcohol test instrument to Plaintiff State of Minnesota. (Declaration of Thomas E. Workman Jr., ¶ 96).

The RFP also set out detailed requirements that a bidding party would have to meet, including the production and disclosure of any information to the attorneys of criminal defendant which was ordered by a court with jurisdiction over the prosecution of any case where the breath alcohol test instrument was part of the evidence.

Paragraph 12 of the Special Conditions and Requirements of the State of Minnesota's RFP sets for this condition and requirement of the sale:

> The provision of information to attorneys supplied directly from the manufacturer including statement of all non-disclosure/non-reproduction agreements required to **obtain information**, fees and deposits required, to be used by attorneys representing individuals charged with crimes in which a test with the proposed instrument is part of the evidence. This part of the contract to be **activated with an order from the court with jurisdiction of the case** and include a reduced fee schedule for defendants found by the court to be entitled to a publicly funded defense.

(Emphasis added). [Document No. 16-1, p. 24, ¶ 12].

This provision of the RFP intends to provide a mechanism that satisfies a defendant's 5th and 6th Amendment Rights by requiring the manufacturer any information ordered by the court so this information can be used by the defendant's to challenge the presumed validity of the intoxilyzer unit's test results. Minn. Stat. § 169A.53, Subd. 3(b)(10).

## B. Defendant CMI's Unqualified Acceptance Of The State Of Minnesota's RFP.

By writing dated October 25, 1996, Defendant CMI accepted the State of Minnesota's RFP without qualification. [Document No. 16-3, p. 9]. Defendant CMI, stated:

> CMI hereby accepts the terms and conditions as stated in the state of Minnesota's Request for Proposal for Evidentiary Breath Alcohol Test Instruments **without qualification**. **CMI understands the terms and conditions as stated in the RFP shall become a contract between CMI and the State of Minnesota** should CMI be the successful vendor in the award of Contract.

*Id* (Emphasis added).

With its unqualified acceptance of the RFP, Defendant CMI even established a fee schedule for the release of information and materials relating to the intoxilyzer instruments to be manufactured, such as the source code. The fee for the production of such information was $250.00, and even less if the charged person is defended by a publicly funded attorney. [Document No. 16-4].

Despite its **unqualified acceptance** of the State of Minnesota's RFP, Defendant CMI in its Memorandum in Support of Consent Judgment and Permanent Injunction falsely claims that the only information to be provided under the contract is the "operation manual" for the Intoxilyzer 5000. The manner in which CMI makes this claim is curious.

CMI claims it modified the RFP by referring to a letter relating to the production of an operation manual specifically requested in a specific criminal case after accepting

the State's RFP. [Document No. 35-4, p. 31]. There is no merit to CMI's claim.

The letter CMI relies upon has nothing to do with its unqualified acceptance of the State of Minnesota's RFP. More correctly, the letter was the result of having to produce a specifically requested operation manual and a maintenance manual for the Intoxilyzer 5000 in a specific, but unidentified criminal case after CMI's unqualified acceptance of the State of Minnesota's RFP.

The after the fact letter CMI relies upon even states it is in response to a specific request for the operation and maintenance manuals for the Intoxilyzer 5000:

> **In response to your request of to (sic) obtain information, specifically the Operation and Maintenance manuals for the Intoxilyzer® 5000**. The Operation Manual for the intoxilyer manual is the only manual that would be available to you.

(Emphasis added) [Documnet No. 35-4, p. 31].

The after the fact letter CMI relies upon also states it is in relation to a specific, but unidentified criminal case, indicating that upon conclusion of that case the operation manual was to be returned:

> So you understand our guidelines as to obtaining such a manual, please find enclosed the necessary documents to be signed by you and returned to our office prior to any release of this material. Please return the signed original Confidentiality Agreement and check in the amount of $250.00 made payable to CMI, Inc., to my attention. We will send a signed copy of the Confidentiality Agreement back to your office for your records along with the Operations Manual. **Upon conclusion of this case,** the manual is to be returned to our office along with the signed original Affidavit stating that no copies or photocopies had been produced by you or any of your staff.

(Emphasis added) [Document No. 35-4, p. 31].  This letter has absolutely nothing to do with Defendant CMI's unqualified acceptance of the State's RFP.

Contrary to CMI's claim that the contract was limited to the production of only an operation manual if a court ordered production of other information, the Confidentiality Agreement attached to the letter upon which CMI relies makes clear that CMI understood it would have to produce any information as ordered by a Court, not just an "Operation Manual."  The Confidentiality Agreement drafted by CMI includes in its list of information that would be subject to confidentiality "other documents containing information on the Intoxilyzer 5000," not just the operation manual.  The CMI Confidentiality Agreement states in pertinent part:

> Permittee agrees not to disclose any **pamphlets, manuals, or any <u>other documents</u> containing information on the Intoxilyzer 5000** to anyone other than….

(Emphasis Added) [Document No. 35-4, p. 32].

Despite Defendant's claim to the contrary, and Plaintiff's acquiescence, the state of Minnesota did not bargain away a criminal defendant's statutory and constitutional rights to obtain information with which to contest the validity the machine that is used to prosecute motorists.  The mere fact that the State of Minnesota cannot bargain away statutory and constitutional rights of those charged with crimes is beyond reproach. *M'Culloch v. State*, 17 U.S. 316, 351-352 (1819) (stating that, "the United States cannot, either by a direct law, or by a contract with a third party, take away any right from the

states, not granted by the constitution; they cannot do, collaterally and by implication, what cannot be done directly. **Their contracts must conform to the constitution, and not the constitution to their contracts**.") (Emphasis added).

3. <u>**The State Of Minnesota Discovers The Intoxilyzer 5000 It Purchased From Defendant CMI Generates Errors But Does Not Correct It**</u>.

The e-mail conversations uncovered by Applicants and shared with this court demonstrate that the BCA has been aware for years that the Intoxilyzer 5000 can and will deem breath samples as "deficient" or not depending entirely upon which version of software the machine is running. [Document No. 16-10]. By September of 2006, the BCA was searching for a solution to this problem. *Id*.

It was not until at least a year later, in April of 2007, that the proposed solution to this software problem was crafted. Exhibit 1. However, there is no evidence that this fix was implemented in the Intoxilyzers that were in place throughout Minnesota, or that the BCA made any attempt to update the problematic software.

Thus, at least one known software bug exists within the programming to the Intoxilyzer 5000, a bug that has gone deliberately uncorrected resulting in wrong results for an indeterminate number of Minnesotans. [Declaration of Thomas E. Workman Jr., ¶ 91]

When permitted to testify, Thomas Workman would elaborate on how only true access to the source code, and not the type of access crafted by Plaintiff, would result in a explanation for this bug. [Declaration of Thomas E. Workman, Jr., ¶ 93 and ¶ 94]

4. **Courts Order The Production Of The Intoxilyzer 5000 Source Code To Attorneys For Defendants Charged With Crimes Based On The Results Of The Intoxilyzer 5000**

Notwithstanding the known flaw in the Intoxilyzer 5000, a flaw that has gone deliberately uncorrected by the State of Minnesota, Minnesota courts routinely order production of the source code. A small sampling of these orders is included as Exhibits 2-3. In every single Minnesota case where the source code has been ordered produced, the State of Minnesota opposed the production, claiming it did not own the source code and that it did not possess the source code and CMI had no obligation to provide it, despite the express language of the unqualifiedly accepted RFP. *Id.* Minnesota courts have repeatedly rejected Plaintiff's arguments opposing production of the source code. The same can be said in most other states where CMI does business. [Declaration of Thomas E. Workman Jr., ¶ 66-82] Plaintiff's stance in Applicants' underlying cases is clearly reflected in the ultimate result of this litigation – the sham Consent Judgment that does nothing to vindicate Applicants' rights under their court orders and does everything possible to forever remove meaningful review of the source code from Applicants' reach.

5. **Plaintiff State of Minnesota Sues CMI In Federal Court Only After Courts Dismiss Prosecution Of Cases Of Intoxilyzer 5000 Cases For Non-Compliance With Court Orders**.

On March 3, 2008, the State of Minnesota started this lawsuit in Federal Court alleging it was the owner of all copyrighted material concerning the Intoxilyzer 5000 and that Defendant CMI was to provide source code information. [Document No. 1, ¶ 1 and ¶

9

2].

The State of Minnesota brought this action only after some Minnesota State District Courts started dismissing cases for failure to produce the source code. [Document No. 45, pp. 3-4, ¶ 6-7]. Again, this litigation appeared to be motivated by the desire to render toothless valid state court orders like those held by Applicants; a suspicion that appears more likely given the choice by Plaintiff's to not even attempt to litigate any of the contract, trade secret or copyright claims raised in this lawsuit.

6. **<u>Applicants Move To Intervene In This Federal Action To Protect Their Interests In Obtaining The Source Code To The Intoxilyzer 5000</u>**.

On June 6, 2008, Applicants brought their motion to intervene in order to protect their interest as third party beneficiaries with a right to obtain any court ordered information relating to the Intoxilyzer 5000 under the contract made between Plaintiff State of Minnesota and Defendant CMI. [Docket No. 13].

In moving to intervene, Applicants demonstrated that they would be harmed if this matter were determined without Applicants' intervention and that Plaintiff State of Minnesota, which has been prosecuting individuals based on the flawed test results of the Intoxilyzer 5000, about which the State has known, does not adequately represent Applicants.

Plaintiff state of Minnesota has long known that the Intoxilyzer 5000 renders flawed test results which can only be explained with information from the Source Code. [Document No. 16-10]. Despite this knowledge, the State of Minnesota, which is adverse to Applicants in their underlying criminal cases, has always opposed the production of

the source code in the State of Minnesota's prosecutions based upon known flawed test data from the Intoxilyzer 5000. [Document Nos. 16-8, 16-9 and 47]

Applicants also pointed out to the Magistrate Judge that Applicants believed the Plaintiff State of Minnesota and Defendant CMI would attempt to strike a deal and settle this case in such a manner so as to deprive Applicants reasonable and meaningful access to the Source Code despite the express language of the contract. [Document No. 15 p. 6].

**7.** **Plaintiff And Defendant Submit A Proposed Settlement, Consent Judgment And Permanent Injunction.**

On September 12, 2008, Plaintiff and Defendant filed a Joint Motion to Approve Consent Judgment and Permanent Injunction. [Docket Nos. 34-36]. This proposed settlement occurred despite the fact that the State of Minnesota and CMI conducted no discovery in this case, other than the preliminary Fed. R. Civ. P. 26(A)(1) initial disclosures. [Declaration of Charles A. Ramsay, ¶ 2].

Just four days later, on September 16, 2008, the Magistrate Judge denied Applicant's Motion to Intervene, allowing Applicants the right to request permission to intervene as Amicus with respect to the Motion to Approve Consent Judgment and Permanent Injunction. [Docket No. 37].

**8.** **The Proposed Consent Judgment Negotiated By The State Mirrors the State's Position in the Underlying State Court Actions and in Doing So Thwarts Access To The Source Code, Contrary To Applicants' Interests.**

The proposed Consent Judgment and Permanent Injunction negotiated by the State of Minnesota is designed to prevent access to the source code to those being prosecuted by the State of Minnesota.

A.  **The Proposed Consent Judgment Will Thwart The Issuance Of State Court Orders Requiring The Production Of The Source Code Necessary To Trigger Production Of The Source Code Under The Proposed Consent Judgment**.

The Proposed Consent Judgment and Permanent Injunction conditions access to the source code upon the issuance of an order from a Minnesota state court judge. [Docket No. 35, p. 12, ¶ 4].

However, the Proposed Consent Judgment and Permanent Injunction negotiated by the State is an attempt to rewrite the contract between the State and CMI in such a manner to prevent Minnesota state court from issuing orders that require the production of the source code.

First the State, through the Proposed Consent Judgment and Permanent Injunction attempts to erroneously rewrite ¶ 12 of the Special Conditions and Requirements of the State of Minnesota's RFP to mean that its language is **limited to the production of the Operation Manual for the Intoxilyzer 5000**. [Docket No. 35, p. 5, Finding No. 3]. This is contrary to the plain language of the RFP and Minnesota State Court orders construing the RFP language to the contrary and ordering production of the source code. [Document Nos. 16-4, 16-5, 16-6, 16-7; Declaration of Thomas E. Workman Jr., ¶ 95]

Second, the State of Minnesota seeks to have this Court erroneously conclude that the assignment in the RFP does not create full ownership of the source code in the Intoxilyzer 5000 that the State of Minnesota purchased. [Document No. 35, p. 9, Conclusion No. 1; Declaration of Thomas E. Workman Jr., ¶ 96]].

Contrary to Plaintiff's negotiated proposed Consent Judgment, the assignment provision of the RFP is a common provision intended to confer complete ownership of all copyrighted information to the purchaser of the product having the copyrighted information. (Declaration of Thomas E. Workman, ¶ 98). Such a provision is common the marketplace and is designed to protect purchasers of items like breath testing devices from incidents where the manufacturer goes out of business, files for bankruptcy, or the ongoing product designed and maintainance is involuntary transferred to another party. (Id.).

The State of Minnesota seeks to have the Court approve the erroneous Findings and Conclusions that the RFP does not require production of the source code and that the State does not own the source code because the Minnesota state district court orders requiring the production of the source code are based in large part on the contract language that the State of Minnesota is the owner of the source code and that the source code is the type of information the contract intended CMI would produce the source code when ordered by the Court. [Document Nos. 16-4, 16-5, 16-6, 16-7].

With the approval of this Consent Judgment, the State will have an order from this Court, which will allow the State to continue its opposition to the issuance of state court orders requiring the production of the source code that are needed to trigger production under the Proposed Consent Judgment. This is diametrically opposed to Applicants' interests.

The State's Proposed Findings and Conclusions in this case may be claimed to be

binding on Applicants and those similarly situated in the Minnesota state prosecutions, although not parties to this case, so as to prevent Minnesota State Courts from issuing orders requiring the production of the source code, also contrary to Applicants' interests. *See Marino v. Ortiz,* 484 U.S. 301, 108 S.Ct. 586 (1988); *Citizens for Open Access To Sand And Tide, Inc.*, 60 Cal.App.4th 1053, 71 Cal. Rptr.2d 77 (1998).

This is particularly so since under the All Writs Act, 28 U.S.C. § 1651, the Court may make orders necessary to "protect or effectuate [its] judgments" even as to third parties. *Burr & Foreman v. Blair*, 470 F.3d 1019, 1026 (11th Cir. 2006). This is not in the interests of Applicants and those similarly situated.

### B. The Proposed Consent Judgment Fails To Provide Reasonable Access To The Source Code For Those With Court Orders Requiring Access To The Source Code.

The proposed Consent Judgment and Permanent Injunction provides Applicants and those similarly situated with no meaningful or reasonable access to the Intoxilyzer 5000 source code to prevent any meaningful defense in their underlying prosecutions.

The Consent Judgment forgoes all claims to uninhibited access to the source code in Minnesota, that forces manual review of the source code, instead of automated source code review, which is intended to defeat meaningful or timely access by Applicants or those similarly situated. Automated source code review could be completed by an expert in about 100 days. [Declaration of Thomas E. Workman Jr., ¶ 64] Manual source code review would take that same expert up to thirty years to perform for just one case. [Declaration of Thomas E. Workman Jr, ¶ 65] The type of review touted as "no cost" by

Plaintiffs will actually cost each and every Applicant literally hundreds of thousands of dollars over the course of 10 years just to analyze the source code in a handicapped fashion in the State of Kentucky for just one case. [Declaration of Thomas E. Workman Jr., ¶ 65]. The 30 year manual review required to be performed in Kentucky will be cost prohibitive. This simply does not and cannot mesh with any criminal defendant's Fifth and Sixth Amendment Constitutional rights to due process and a speedy trial.

Mr. Workman would explain to the court exactly why automated review of the source code is not just a luxury, but a necessity, and would demonstrate why the Proposed Settlement is evidence of Plaintiff's desire to actually hamper and prevent Applicants' from meaningful review of something they are contractually and legally obligated to obtain. [Declaration of Thomas E. Workman Jr., ¶ 85 and ¶ 86].

> C. **The Proposed Consent Judgment That Thwarts Access To The Source Code Is Premised On The False Finding And Conclusion The Source Code Is A Trade Secret Under The Minnesota Uniform Trade Secrets Act.**

The Proposed Consent Judgment and Permanent Injunction justifies the onerous requirements concerning access to the source code on the Court finding and concluding that the source code for the Intoxilyzer 5000 is a trade secret under the Minnesota Uniform Trade Secret Act Minn. Stat. § 325C.01. [Docket No. 25, p. 8, Finding No. 7 and p. 10 Conclusion Nos. 4 and 5].

The source code, however, is not a trade secret under the Minnesota Uniform Trade Secret Act, or under any similar other state acts. That is because CMI, obtained a publicly available patent for the Intoxilyzer 5000. A patent, which is publicly available

for anyone to review, negates CMI's contention that the source code is a trade secret. [Declaration of Thomas E. Workman, ¶ 104]. Florida and Arizona courts have each rejected claims by Defendant that the source code in CMI Intoxilyzer devices qualify for trade secret protection under the Florida and Arizona Uniform Trade Secrets Acts. For the same reasons the source code does not qualify for trade secret status under the Florida and Arizona statutes, it does not qualify for trade secret protection in Minnesota under the Minnesota Uniform Trade Secrets Act. Florida and Arizona, like Minnesota, are Uniform Trade Secrets Act states. *See Arizona Statutes* §§ 44-401—44-407; *Florida Statutes Annotated* §§ 688.001—688.009; *Minn. Stat. Ann.* §§ 325C.08 [Declaration of Thomas E. Workman, ¶ 106]. In Minnesota, uniform laws of other states are construed the same as uniform laws adopted in Minnesota. *Minn. Stat.* §§ 645.22.

There is no legitimate basis for finding or concluding the Intoxilyzer 5000 and its source code are trade secrets. This is sought simply to impose the onerous requirements upon those charged with crimes to prevent access to the source code to explain the machine's invalid test results.

## ARGUMENT

I. **AN EVIDENTIARY HEARING TO TAKE TESTIMONY FROM APPLICANTS' EXPERT, MR. THOMAS WORKMAN IS NECESSARY FOR THE COURT TO HAVE A FULL UNDERSTANDING OF THE COMPLEX ISSUES INVOLVING THE DENIAL OF APPLCANTS' MOTION FOR FULL INTERVENTION AS WELL APPLICANTS' REQUEST THAT THE COURT REJECT THE PROPOSED CONSENT JUDGMENT.**

An evidentiary hearing, so Applicants may present the expert testimony of Mr.

Thomas E. Workman, an expert in patent law and forensic computer science, should be permitted so that the Court can make an informed decisions on the issues of 1) whether the state of Minnesota adequately represents the Applicants in this case to require reversal of the Magistrate Judge's denial of full intervention; and 2) whether to reject the Proposed Consent Judgment because it actually thwarts access to the Intoxilyzer 5000's source code.

Expert testimony should be taken when it assists the court to understand evidence or a fact in issue. Minn. R. Evid. 702.  See also *Hartley v. Dillard's, Inc.,* 310 F.3d 1054, 1060 (8th Cir. 2002).  Doubts regarding usefulness should be resolved in favor of the testimony. *Clark v. Heidrick*, 150 F.3d 912, 915 (8th Cir. 1998).

In this case, the Magistrate Judge denied Applicants' Fed. R. Civ. P.24(a) motion to intervene, erroneously holding that under the second element of Fed R. Civ. P. 24(a)(2) the State of Minnesota adequately represents the Applicants' interests as third party beneficiaries under the contract between the State and CMI.

Although the Magistrate Judge had documentary evidence that the Intoxilyzer 5000 renders false positives, that the state knew of this problem, that the state has continued to prosecute individuals with this machine in the Minnesota State Courts while opposing the production of the source code that will allow Applicants to explain the flaw to fact finders in the state courts, and that Applicants were concerned that the State would negotiate a settlement that thwarted access to the source code, the Magistrate Judge incorrectly concluded the State of Minnesota adequately represents the Applicants even

after the State of Minnesota and CMI submitted a Proposed Consent Judgment and Permanent Injunction that is designed to prevent any meaningful access to the source code.

Mr. Workman's testimony will fully inform the court as to how the State does not adequately represent Applicants' interests in this case. To this end, he will testify on the complex issues concerning what source code is, a known flaw with the Intoxilyzer 5000's test results, the state of Minnesota's knowledge of this flaw and deliberate decision not to correct it, and how an analysis of the source code will allow Applicants to explain this known flaw to juries in the state courts to prevent their wrongful convictions.

Additionally, Mr. Workman's testimony will fully inform the court as to why the proposed Consent Judgment should be rejected, as it does not provide for access to the source code as contemplated under the original RFP. To this end, Mr. Workman's expertise as both a computer scientist and a practitioner of Patent Law will aid the court in understanding how the proposed Consent Judgment is inconsistent with patent and copyright law and how the source code is not a trade secret. In addition, Mr. Workman will provide testimony to aid the court in understanding how the limited access to the source code in Kentucky, permitting only manual review, prevents those charged with crimes meaningful review of the source code, contrary to their Constitutional rights. His testimony will involve complicated computer science, and complex patent and copyright principles, which the Magistrate judge apparently did not fully appreciate from a review of mere documentary evidence.

Mr. Workman, with expertise in patent law and the U.S. Patent Office also will provide testimony on how the Proposed Consent Judgment and Permanent Injunction would have the Court incorrectly find and conclude that the source code is not owned by the State of Minnesota and is not a trade secret which would allow the State of Minnesota to continue to oppose production of the source code in the Minnesota state courts and therefore prevent production of the source code under the Proposed Consent Judgment.

He will also testify to the fact that CMI is involved in numerous, complex cases in several states, in some cases absorbing fines in excess of $1.5 million dollars due to their contempt for state court proceedings. [Declaration of Thomas E. Workman, Jr., ¶ 79] It appears, based upon the record before the court and the upcoming testimony of Mr. Workman, that Defendant's sudden about-face and desire to reach a settlement with a state-actor stems more from the acquiescence of Plaintiffs than from any real or meaningful litigation over the merits of the present lawsuit.

Ultimately, Mr. Workman's testimony will demonstrate that the State does not adequately represent Applicants to require Applicant's full intervention. Mr. Workman's testimony will also demonstrate that the Proposed Consent Judgment and Permanent Injunction does not provide any meaningful access and should be rejected outright by the Court.

Applicants respectfully request that the Court set a hearing date so Mr. Workman may testify before the Court. Applicants anticipate his testimony would take 4-6 hours.

## CONCLUSION

Applicants respectfully request that the Court permit Applicants to create a full and complete record through an evidentiary hearing where expert testimony can be given on Applicants' Objection to the Magistrate's Order Denying Intervention, so that this Court may properly apply Fed. R. Civ. P. 24(a).

Applicants further respectfully requests that Court permit an evidentiary hearing where Mr. Workman will provide expert testimony that will demonstrate for the Court that the Proposed Consent Judgment is just a ruse intended to thwart meaningful source code review.

RAMSAY & ASSOCIATES, P.L.L.C.

Dated: October 31, 2008  /s/ Charles A. Ramsay
Charles A. Ramsay   ID No. 260277
2780 Snelling Avenue North, #330
Roseville, Minnesota 55113
651-604-0000

Dated: October 31, 2008  /s/ Daniel J. Koewler
Daniel J. Koewler   ID No. 388460
2780 Snelling Avenue North, #330
Roseville, Minnesota 55113
651-604-0000

GORES LAW OFFICE

Dated: October 31, 2008  /s/ John J. Gores
John J. Gores   ID No. 228928
7091 Highway 65 NE, Suite 201
Fridley, Minnesota 55432
763-571-4777

*Attorneys for Applicants*