UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota,<br>by Michael Campion, its<br>Commissioner of Public Safety, | File No. 08-CV-603 (DWF/AJB) |
| Plaintiff, | |
| v. | **BRIEF OF AMICUS CURIAE -**<br>**MINNESOTA SOCIETY FOR**<br>**CRIMINAL JUSTICE** |
| CMI of Kentucky, Inc.,<br>a Kentucky corporation, | |
| Defendant, | |
| and | |
| Robert J. Bergstrom, Craig A. Zenobian,<br>Shane M. Steffensen, and Christopher D.<br>Jacobsen, | |
| Plaintiff-Intervenors. | |

# TABLE OF CONTENTS

I. INTRODUCTION..................................................................................................3

II. INTERESTS OF AMICUS...................................................................................4

III. HISTORY OF THE SOURCE CODE ISSUE....................................................5

    A. Discoverability of the Source Code in Minnesota State Courts........................5

    B. Discoverability of the Source Code in Other State Courts...............................6

IV. ARGUMENT......................................................................................................7

    A. The Proposed Settlement Does Not Make the Source Code Readily and Reasonably Available to Minnesota litigants........................................................7

        1. The Geographical Restrictions on Accessing the Source Code are Unreasonable..................................................................................8

        2. The Proposed Digital and Paper Formats of the Source Code Do Not Allow for a Thorough and Meaningful Analysis of the Source Code.........9

    B. The Proposed Settlement Does Not Fully Protect Minnesota Defendants' Constitutional Right to Confront Their Collective Accuser................................10

    C. The Proposed Settlement Would Require this Court to Make Incorrect and Improper Findings................................................................................14

    D. There Are Strong Public Policy Reasons to Deny the Proposed Settlement...16

        1. The State's "Unclean Hands"..........................................................16

        2. Minnesota Litigants' Constitutional and Property Rights Outweigh any Alleged Copyright Held by CMI..............................................17

V. CONCLUSION..................................................................................................18

# I. INTRODUCTION

## A. Procedural History

Throughout 2007 and 2008 defense attorneys across Minnesota brought numerous motions seeking disclosure of the Intoxilyzer 5000 source code.[1] District courts varied on their willingness and to what degree to order disclosure of the code. Some courts denied the discovery requests, some ordered disclosure under protective conditions, and others ordered full disclosure of the code without protective conditions. A series of orders that were adverse to the State in both the criminal and implied consent cases began to grow. These orders and the manufacturer's refusal to supply the source code caused the State to commence this federal action against the manufacturer of the Intoxilyzer 5000EN (hereinafter CMI) on March 3, 2008. (Doc. No. 1.). In the federal complaint filed in this action, the State is seeking disclosure of the source code alleging that

> [T]he State is entitled to, *inter alia*, an order for specific performance directing that CMI provide Minnesota litigants with access to the source code [because] Defendant CMI conveyed to the State ownership of any and all copyrightable material and documents created in the course of its performance under the contract [including] the source code to the Minnesota model of the Intoxilyzer 5000.

(Doc. No. 1 at ¶¶ 49-51.) Without any civil discovery yet occurring, the State and CMI moved this Court on September 12, 2008 (Doc. No. 34) to approve the proposed settlement through the Entry of the parties' Proposed Consent Judgment and a Permanent

---

[1] Source code is the set of instructions and procedures that represent the Intoxilyzer software and ultimately governs how a machine will operate. *See* Declaration of Thomas E. Workman, Jr. at ¶¶ 8-23 (Doc. No. 55).

Injunction (Doc. No. 35). Numerous members of the criminal defense bar had concerns with the proposed settlement that was initially scheduled for hearing in December 2008.

Criminal defense attorney, Charles Ramsey, sought to intervene in the federal case on behalf of his clients Robert J. Bergstrom, Craig A. Zenobian, Shane M. Steffensen, and Christopher D. Jacobsen (hereinafter Petitioners) (Doc. No. 13). In support of Petitioner's application to join the suit, Mr. Ramsey filed the Declaration of Thomas E. Workman, Jr. (Doc. No. 55), a source code expert. Mr. Workman's Declaration outlines the relevance of the source code and the need for its disclosure. On November 6, 2008 this Court allowed the Petitioners to intervene, concluding that the State could not adequately represent the interests of Minnesota drivers charged with DWI (Doc. No. 58).

On November 26, 2008, the Court issued an order specifically allowing *Amicus Curie* to submit "briefs expressing their respective positions on the issues presented by the settlement reached between the State of Minnesota and Defendant CMI." (Doc. No. 65). Pursuant to that order, the Minnesota Society of Criminal Justice respectfully submits this brief.

## II. INTERESTS OF THE AMICUS

The Minnesota Society for Criminal Justice is a 25-year-old non-profit organization comprised of approximately fifty Minnesota criminal defense attorneys. The organization's focus is centered on current issues affecting DWI defense in Minnesota. *Amicus* in this brief addresses the propriety of approving the proposed settlement between CMI and the State of Minnesota.

## III. HISTORY OF THE SOURCE CODE ISSUE

### A. Discoverability of the Source Code in Minnesota State Courts

CMI's failure to produce the source code resulted in two noteworthy cases in the Minnesota appellate courts colloquially known as *Underdahl I* and *Underdahl II*. *In re Commissioner of Public Safety (Underdahl I)*, 735 N.W.2d 706 (Minn. 2007) stands for the proposition that the Commissioner of Public Safety had an adequate legal remedy to obtain a copy of the source code by suing CMI. The Minnesota Supreme Court concluded that the Commissioner was not entitled to a writ of prohibition, which would have barred a district court judge's order requiring the Commissioner to turn over the source code in an Implied Consent proceeding. *Id.* at 713. The court stated that it could not "conclude that the district court ordered the production of information that is clearly not discoverable." *Id.* The *Underdahl I* court also noted that the State owns at least a portion of the Intoxilyzer 5000 source code by virtue of the contract language between CMI and the State. *See id.* at 710.

In *State v. Underdahl (Underdahl II)*, 749 N.W.2d 117 (Minn. Ct. App. 2008), the Minnesota Court of Appeals ruled that before a court determines that the source code is relevant to a party's guilt or innocence and subsequently orders disclosure of the source code, there must be some type of showing that examination of the source code could reveal possible inaccuracies in the machine's results. *Id.* at 122. The court stated that it had "no occasion on these records to attempt defining what showing would be necessary to justify requiring disclosure of the Intoxilyzer source code." *Id.* at 121.[2] Despite the

---

[2] *Underdahl II* alluded to individual showings that may be enough to satisfy Minn. R. Crim. P. 9, including how source code affects the operation of the Intoxilyzer, what effect source code has on regulating the Intoxilyzer's accuracy, what possible deficiencies may

two *Underdahl* decisions there still remains a high degree of uncertainty as to when and in what context individual state district courts will order disclosure of the source code.

*Amicus* agrees with the State and CMI's assertions that CMI's failure to turn over the code has resulted in the suppression of many Intoxilyzer test results, that some counties have ceased using breath tests to avoid the possible suppression of results, and that the BCA has experienced a rise in the number of blood and urine tests as a result. As this Court is aware, the proposed settlement is CMI and the State's attempt to rectify the source code problem they created. The tumultuous history of this litigation, CMI's history in this and other states, and the State's prosecutorial position gives *Amicus* reason to be wary of any settlement that purports to be in the interests of Minnesota citizens charged with alcohol-related offenses.

### B. Discoverability of the Source Code in Other State Courts

The "source code battle" is occurring in many states where CMI's machines are in use other than Minnesota. In Arizona, defendants have been seeking the source code of a different model of Intoxilyzer (the 8000). CMI has been equally uncooperative in complying with discovery orders in those cases.[3] The Honorable Deborah Bernini of the Arizona Superior Court in Pima County ordered production of the source code for the Intoxilyzer 8000 on September 10, 2008. (Attached as **Exhibit A**). CMI has refused to produce the code. That court held CMI President Toby Hall in contempt for CMI's

---

exist in the source code, how any deficiencies could be discovered by analyzing the source code, and how any deficiencies may affect the accuracy of the machine's results or that testing the machine without the code would not reveal any possible inaccuracies. *Id.* at 122. The court did not state that all or any of these specific showings would be required to justify disclosure.

[3] *See Thousands of Tucson DUI Cases Could Get Tossed*, Associated Press (Nov. 10, 2008), *available at* http://www.azcentral.com/news/articles/2008/11/10/20081110az-duicases10-on.html.

6

failure to turn over the code and scheduled a hearing on November 24, 2008 for Mr. Hall to explain himself. *Amicus* does not believe Mr. Hall appeared for the scheduled hearing.

Multiple disputes have also arisen in Florida regarding the source code. There, a county court ordered CMI to pay fines in the amount of $3,000 per day for its refusal to turn over the code. *See* Order of Civ. Contempt., July 10, 2007 (Attached as **Exhibit B**). In a separate case, the Circuit Court of the Twelfth Judicial Circuit in Manatee County denied CMI's petition for a writ of certiorari and quoted its lower county court which found:

> "The defendants have established through expert testimony that the Source Code is reasonably necessary to determine whether the Intoxilyzer 5000 contains the software approved by the State of Florida, whether it is functioning as per the approved Source Code, and whether any alterations have affected its operation or reliability."

Order Den. Pet. for Writ of Cert., June 2, 2008 (Attached as **Exhibit C**). *Amicus* believes that CMI has yet to pay these fines and as a result has been held in contempt. *Amicus* calculates that the fines are in now excess of $1.6 million.

*Amicus* is not aware of any instances in which CMI has disclosed the source code in other states. *Amicus* is not aware of any instances in which CMI has proved that it owns a proprietary interest in the code.

### IV. ARGUMENT

#### A. The Proposed Settlement Does Not Make the Source Code Readily and Reasonably Available to Minnesota Litigants.

The State and CMI allege that they have a mutual desire "to make the Source Code readily and reasonably available to defendants and petitioners subject to Minnesota's DWI and implied consent laws." (Doc. No. 35, Part II). However, under the current terms of the settlement, this alleged goal will go unfulfilled.

7

### 1. The Geographical Restrictions on Accessing the Source Code are Unreasonable.

CMI and the State propose to make the source code available only at CMI's headquarters in Owensboro, Kentucky. Owensboro is roughly 750 miles away from the Twin Cities. The source code will be available for inspection only when CMI's doors are open for business. A defendant who has been arrested in Minnesota by an agent of the State of Minnesota, who took an Intoxilyzer test in Minnesota, who is charged by the State of Minnesota, who will go to court in Minnesota, who will be defended by an attorney licensed in Minnesota, who will be tried by Minnesota citizens in front of a Minneosta Judge, will have to hire a team of experts to travel to *Kentucky* to fully defend himself against the evidence presented against him in Minnesota. A 750-mile trek flies in the face of any cognizable interpretation of the phrases 'readily available' and 'reasonably available'.

*Amicus* believes the geographical restriction evidences CMI's and the State's *true* desire to discourage any analysis of the code. This Court and the State of Minnesota have numerous tools to protect unlawful dissemination of the code without resorting to an unreasonable geographical limitation on the physical home of the source code. The source code could be safeguarded equally as well if it were kept under lock and key at the Minnesota BCA or the Commissioner's headquarters in Minnesota.

By analogy, a company that conducts business in a state or has minimum contacts with a state avails itself of that State's jurisdiction and is expected to succumb to service requirements and the legal requirements of a state. The notion that Minnesota litigants must travel halfway across the country to effectively and completely defend themselves is manifestly unjust.

## 2. The Proposed Digital and Paper Formats of the Source Code Do Not Allow for a Thorough and Meaningful Analysis of the Source Code.

If a Minnesota litigant hires a team of experts to make the long trek to Kentucky, it is likely that the expert's journey will have been in vain. CMI and the State have proposed to provide the code in a digital format that allows for searching and a paper format. Even the most technologically inexperienced individual appreciates the archaic nature of studying complicated computer code in a paper format. A paper version of the code is useless for analytical purposes. When printed, the code spreads itself over voluminous pages of paper. Mr. Workman estimates that it would take an expert 30 years of full time work to comb through this many pages of code. (Doc. No. 55, p. 10, ¶ 65). The inclusion of a paper form of the code is further evidence of CMI's unwillingness to discourage any meaningful analysis of the code.

The proposed digital form of the source code is insufficient for an expert to conduct a meaningful analysis. While CMI has proposed that the digital form will be searchable, merely searching the code will not reveal how the code *actually works*. Any other useful information about the proposed digital form of the code is absent. Without more specificity as to the exact specifics of the proposed digital form, *amicus* cannot determine whether a meaningful analysis of the code can occur. *Amicus* would propose that a version of the code which would allow for the automated code review referenced in paragraph 63 of Mr. Workman's Declaration may suffice. Regardless of the exact digital form *Amicus* views the vague-yet-searchable proposed version of the code as nothing more than a veiled tactic at preventing any inquiry into an imperfect machine.

## B. The Proposed Settlement Does Not Fully Protect the Constitutional Rights of Minnesota Defendants' to Confront Their Collective Accuser.

The United States and Minnesota Constitutions require criminal defendants to be afforded a fair trial. *U.S. Const. amend. VI; Minn. Const. art I, §6.* The Minnesota Supreme Court interprets the Minnesota Confrontation Clause to be identical to the Confrontation Clause of the Federal Constitution. *State v. Rodriguez*, 754 N.W.2d 672 (Minn. 2008). An integral part of a fair trial is a defendant's opportunity to confront the witnesses against him. A defendant's opportunity to question those witnesses comprises this right to confrontation. *State v. Greer*, 635 N.W.2d 82, 89 (Minn. 2001). The primary objective of the confrontation clause is to force a declarant to be cross-examined, as well as compelling him to stand face to face before a jury in order that they may judge whether he is worthy of belief. *State v. Byers*, 570 N.W.2d 487 (Minn. 1997). District courts possess broad discretion on imposing reasonable limits on the cross-examination of witnesses. *State v. Lanz-Terry*, 535 N.W.2d 635, 639 (Minn. 1995). "A defendant in a criminal case has the right to present a defense in accordance with the rules of evidence." *State v. Wolf*, 592 N.W.2d 866, 868 (Minn. Ct. App. 1999). Any evidence tending to make the existence of a fact of consequence to the determination of the action more or less probable than it would be without the evidence is admissible. *See* Minn. R. Evid. 401, 402.

Certainly, the Intoxilyzer is not a live witness, but its results are being used to conclude that a defendant has violated a specific provision of the Minnesota Statutes. The Intoxilyzer, then, is serving a de facto expert witness and not subject to cross-examination. While a live witness might testify as to how an Intoxilyzer has been

maintained or how the machine was operated in a certain instance, live witnesses do not testify as to how specific sections of code are executed and how such execution could affect test results. A defendant who is faced with Intoxilyzer-produced test results can *only* present a complete defense if he can conduct a complete and efficient analysis on how those results were produced. Access to the source code in a form that allows for an expeditious yet thorough examination of the code is *required* by due process. The proposed settlement calls for the source code to be provided in forms that are insufficient to conduct a meaningful analysis of the code. Providing the code in the proposed form is tantamount to allowing cross-examination of a witness who speaks a foreign language and refusing to allow an interpreter.

A meaningful analysis of the source code could reveal information that is materially related to a defendant's guilt. Under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), information that is materially related to a defendant's guilt is required to be disclosed. The source code could contain information that materially relates to a defendant's alleged guilt and is therefore required to be disclosed. That information must be provided in a form in which a meaningful analysis can occur so an accused can determine *how* the machine may or may not have be arrived at a correct result.

*Amicus* recognizes that recent caselaw exists that supposes that machine-generated data is not subject to the constitutional protections of the confrontation clause of the Sixth Amendment. "Witnesses with whom the Confrontation Clause is concerned are human witnesses." *U.S. v. Lamons*, 532 F.3d 1251, 1263 (11th Cir. 2008). While not binding on this Court, The *Lamons* Court concluded that statements which are wholly

11

generated by machines are non-testimonial and not subject to the Confrontation Clause. The court did not express an opinion on scientific reports generally and noted that "statements that may have been generated through the contemporaneous lens of human interpretation and analysis, pose[d] a more difficult problem." *Id.* at 1264. However, the data at issue in *Lamons* was a compact disc with a list of telephone calls and a call report created from the compact disc.

The *Lamons* court noted that the right to cross-examination

> is primarily a functional right that promotes reliability in criminal trials .... [Confrontation] (1) insures that the witness will give his statements under oath-thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth"; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness making his statement, thus aiding the jury in assessing his credibility.

*Id.* (quoting *Lee v. Illinois*, 476 U.S. 530, 540, 106 S.Ct. 2056, 2062, 90 L.Ed.2d 514 (1986) (internal quotation marks and citations omitted).

The source code is far more testimonial than a machine-generated list of phone calls. While a machine cannot perjure itself in the traditional sense of the word, subjecting the machine's processes to scrutiny will only further the discovery of truth and will provide evidence to a jury on whether the machine's results are credible. Allowing the machine to be "cross-examined" by providing the source code in a usable form is proper and just.

It is helpful to keep in mind that the Intoxilyzer results are used in situations involving a *prima facie* case alleging a violation of Minnesota Statute 169A.20[4] subd. 1 (5) commonly known as the ".08 charge." The results of the machine constitute the *entirety* of the charge. The judgment and processes of the machine are substituted for a jury. Because the machine is *completely* responsible for the evidence against someone accused of violating Minnesota Statute 169A.20 subd. 1 (5) and is the only relevant witness establishing the facts of the charge, a right to examine how that evidence is analyzed is required. In *Lemans*, discussed above, the machine-generated evidence did not constitute the charge itself. It was merely a portion of the evidence that was partially responsible for showing guilt. Here, by contrast, the Intoxilyzer result is the sole evidence of the .08 charge.

Also, this case deals with evidence of an evanescent nature and is unavailable for retesting. A Minnesota citizen accused of driving with an alcohol content of .08 or higher cannot run a new Intoxilyzer test at a later point to show that the results are incorrect. The integrity, accuracy, and reliability of the machine's results in a .08 criminal prosecution or driver's license suspension hearing are, therefore, of more importance than test results in other kinds of criminal cases that can be reproduced or reanalyzed.

Data generated from a machine that is *purely* mechanical in nature is different than what we are addressing in this case. For example, a telephone recording device

---

[4] Minn. Stat. 169A.20 subd. 1 reads, "It is a crime for any person to drive, operate, or be in physical control of any motor vehicle within this state or on any boundary water of this state . . . when the person's alcohol concentration at the time, or as measured within two hours of the time, of driving, operating, or being in physical control of the motor vehicle is 0.08 or more.

13

merely records the data without computer interpretation. In the case at hand, however, an Intoxilyzer through its source code makes an infinite number of determinations as to how a minute puff of air translates into a *per se* criminal violation. In that respect it is far more testimonial than a mere record. Here, the *manner* in which a machine interprets a breath sample is at issue. For this reason, the Intoxilyzer is more like a human witness than a machine. How the machine interprets a sample is not exact. If it were, the machine would not require two samples. There would never be any variation between a subject sample and a replicate sample. There would be no margin of error. Because this machine closely resembles human testimony the confrontation clause of the Minnesota and United States Constitutions are applicable. The spirit of the confrontation clause is to determine whether testimony is to be believed; CMI's unwillingness to allow an analysis of its code coupled with evidence that the machine is in need of routine software updates, combined with evidence of incorrect test results is reason enough to trigger the fundamental right to confront the machine.

### C. The Proposed Settlement Would Require this Court to Make Incorrect and Improper Findings.

The proposed settlement would require this Court to make specific findings of fact and law. These proposed findings are based upon the unchallenged affidavits of the parties to the settlement without any discovery having yet occurred. *Amicus* asserts that some of these findings are factually incorrect and/or do not sufficiently consider the rights of Minnesota litigants, are contrary to Article I, §6 of the Minnesota Constitution and the Sixth Amendment of the United States Constitution, and are against Minnesota public policy.

A brief review of the settlement (Doc. No. 35) shows that this Court is being asked to make the following findings of fact:

> 1. CMI has presented substantial evidence that the majority of the Source Code was conceived and originated prior to the execution of the Contract. ¶ 2.
>
> 2. The inability to produce the Source Code has impacted the Minnesota judicial system with the increased filings of motions seeking discovery of the Source Code in criminal DWI and implied consent cases, which has taxed already strained judicial resources. ¶ 6.
>
> 3. [The inability to produce the Source Code] has disrupted the effective functioning of law enforcement agencies and the state court system . . . . *Id.*
>
> 4. The Source Code derives independent economic value from its continued secrecy. ¶ 7.
>
> 5. A printed, hardbound book format . . . and . . . the digital format . . . will provide reasonable access while also reasonably protecting the Source Code's trade secret status. ¶ 8.
>
> 6. The production or reproduction of the Source Code in any electronic format other than the digital format described in paragraph 3 of the Permanent Injuction presents an undue and unreasonable risk to its trade secret status . . . . *Id.*
>
> 7. The provision of the Source Code with critical security features and menu passcodes redacted will provide reasonable access . . . . ¶ 9.

Without proper discovery, these statements are unfounded, bald assertions. Allowing the intervening party to challenge the validity of these assertions will result in findings of fact that have been proposed *and* verified. This Court should not approve the current version of the Settlement and thereby put forth these findings of fact without first allowing proper discovery to occur. Further, any proposed findings of law are premature as they will be based upon incorrect findings of fact.

### D. There Are Strong Public Policy Reasons Against the Proposed Settlement

#### 1. The State's "Unclean Hands"

This Court should also consider that the State has "unclean hands" as it relates to the alleged fairness of any settlement. Almost a year ago, the decision in *Underdahl* put the State on notice that all copyright material associated with the Intoxilyzer machine is the State's property. *Underdahl* at 708. *Underdahl* also alerted the State that its "contractor [will] provide information . . . to be used by attorneys representing individuals charged with crimes in which a test of the proposed instrument is part of the evidence." *Id.* The State took the position for many months in countless implied consent or DWI criminal cases that it was improper or unnecessary for it to turn over the code. The State also alleged that it did not have the rights to the source code. Then, when it initiated this suit, the State reversed itself and alleged that it did, in fact, have contractual rights to the source code. In the proposed settlement, the State has now once again changed its position without any formal discovery occurring.

This Court should remember that the State is the party that selected CMI's product for implementation. The Petitioners did not choose what brand of breath-testing device would be purchased and implemented to determine their alleged guilt. The State entered into the contract through its own Request for Proposals. If the State had designed and constructed its own breath testing machine it is certain that the machine and its

16

software would be entirely transparent and Minnesota litigants would have full access to how the machine arrived at its results. Minnesota litigants should not be denied the opportunity to review how the evidence against them was created merely because the State is unwilling to zealously pursue its contractual rights to the source code and to fully protect the rights of its citizens to fully defend themselves when accused of a crime.

### 2. Minnesota Litigants' Constitutional and Property Rights Outweigh any Alleged Copyright Held by CMI.

*Amicus* adheres to the position that the State has complete contractual rights to the source code. If, however, after discovery has occurred, this Court should find that CMI has some proprietary interest in the code, Petitioner's fundamental constitutional rights in defending themselves from incarceration and the loss of property rights should still outweigh any proprietary interest alleged by CMI. "The Sixth Amendment's right of an accused to confront the witnesses against him is likewise a fundamental right and is made obligatory on the States by the Fourteenth Amendment." *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). CMI has alleged that public disclosure of the source code would result in substantial and irreparable financial harm. Even if dissemination of the code could cause some financial harm to CMI, the constitutional fundamental rights afforded to Minnesota defendants facing possible incarceration or the loss of property interests certainly outweigh any alleged monetary interests purported by CMI.

While *Amicus* recognizes that Minnesota State Court decisions are not binding on this Court, it may be of value to review several state court decisions. Attached as **Exhibit D** is Hennepin County District Court Judge Jack Nordby's November 18, 2008 order granting discovery of the source code in *State v. Gadow*, Court file No. 27-CR-08-46085.

17

Judge Nordby writes, "Not only is the defense entitled to this information, defense counsel would arguably be guilty of ineffectively assisting a client for not demanding the information." *Id.* Further, Judge Nordby's order in *State v. Schrupp*, Court file No. 27 CR 07-042907 attached as **Exhibit E** also gives judicial insight stating that the source code is "ultimately a right to confrontation of the accuser, and more broadly the right to due process of law, specifically the right to present a defense . . . ." As recently as December 16, 2008 state judges are still ordering disclosure of the code without a protective order.[5]

## V. CONCLUSION

MSCJ respectfully disagrees with the assertion by the State and CMI that the proposed settlement "make[s] the Source Code readily and reasonably available to defendants and petitioners subject to Minnesota's DWI and implied consent laws". The settlement would require Minnesota citizens to travel a great distance and at great expense to seek access to the source code. The proposed format for disclosure is inadequate for a meaningful and thorough analysis of the code. Further, the protections proposed by the State and CMI are excessive. MSCJ requests this Court to reject the proposed settlement and set a reasonable time frame for discovery to occur.

---

[5] *See* Order Grant. Mot. to Recons. (Attached as Exhibit F).

Dated this 30th day of December, 2008    *Amicus Curie* - Minnesota Society
                                         of Criminal Justice (MSCJ)[6]


                                         s/ Marsh J. Halberg
                                         Marsh J. Halberg
                                         Attorney ID# 39548
                                         3800 American Boulevard W.
                                         Ste. 1590
                                         Minneapolis, MN 55431
                                         (952) 224-4848

---

[6] Prepared by attorneys Lee M. Orwig and Marsh Halberg on behalf of MSCJ. Jeffrey S. Sheridan, Attorney ID# 183222 will appear for oral argument on behalf of MSCJ.