# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

State of Minnesota,
By Michael Campion, its
Commissioner of Public Safety,

        Plaintiff,

v.                                                 File No. 08-CV-603 (DWF/AJB)

CMI of Kentucky, Inc.,
A Kentucky corporation,

        Defendant,

and

Robert J. Bergstrom, Craig A Zenobian,
Shane M. Steffensen, and Christopher D.
Jacobsen,

        Plaintiff-Interveners.

## *AMICUS CURIAE* BRIEF OF MINNESOTA DWI TASKFORCE

December 31, 2008                               Joshua P. Graham (#0386716)
                                                          MERCHANT & GOULD P.C.
                                                          3200 IDS Center
                                                          80 South Eighth Street
                                                          Minneapolis, Minnesote 55402
                                                          Telephone:   612-332-5300
                                                          Facsimile:    612-332-9081

                                                          **Attorney for *Amicus Curiae***
                                                          **Minnesota DWI Taskforce**

Pursuant to the Court's Order of November 26, 2008 (Docket No. 65), *amicus curiae* the Minnesota DWI Taskforce submits this brief expressing its position on the issues presented by the Proposed Consent Judgment and Permanent Injunction (Docket No. 35) ("Consent Agreement") jointly filed by Plaintiff State of Minnesota ("the State") and Defendant CMI of Kentucky ("CMI") regarding access to the source code of the Intoxilyzer 5000NE ("Source Code"). It is the position of the DWI Taskforce that the Consent Agreement is reasonable.

This brief focuses on the question left unanswered by the Supreme Court of Minnesota in Underahl v. Commissioner of Public Safety: Who owns copyrights in the Source Code? 735 N.W.2d 706 (Minn. 2007). Based on the federal copyright laws and the contract between the State and CMI, the State likely owns some of, but not all, the rights in the Source Code. The remainder of the rights likely belongs to CMI. The Consent Agreement is reasonable because it limits the State's rights to copy and distribute its portion of the Source Code in exchange for CMI's granting access to the complete Source Code. This compromise gives civil and criminal implied-consent defendants access to the complete Source Code.

## I. UNDERAHL V. COMMISSIONER OF PUBLIC SAFETY

In Underahl, the Supreme Court of Minnesota considered whether the court of appeals had properly denied the State a writ of prohibition to prevent enforcement of an order compelling "the complete computer source for the operation of the Intoxilyzer 5000EN." 735 N.W.2d at 708 (internal brackets omitted). The decision focused on two

clauses in the State's request for proposal ("RFP"), which resulted in CMI providing the Intoxilyzer 5000EN. Id. at 708-09. The first clause (hereinafter, "copyright clause") is:

> All right, title, and interest in all copyrightable material which Contractor shall conceive or originate, either individually or jointly with others, and which arises out of the performance of this Contract, will be the property of the State and are by this Contract assigned to the State along with ownership of any and all copyrights in the copyrightable material[.] Contractor also agrees, upon the request of the State to execute all papers and perform all other acts necessary to assist the State to obtain and register copyrights on such materials. Where applicable, works of authorship created by Contractor for the State in performance of the Contract shall be considered "works for hire" as defined in the U.S. Copyright Act.

Underahl, 735 N.W.2d at 708; (see State of Minnesota, Department of Administration, Request for Proposal, Title: Evidentiary Breath Alcohol Test Instruments at 7 (hereinafter, "RFP") (Ex. 1, part 1 to Docket No. 35).) The second clause requires the winning contractor to provide:

> information . . . including statement of all non-disclosure/non-reproduction agreements required to obtain information, fees and deposits required, to be used by attorneys representing individuals charged with crimes in which a test with the proposed instrument is part of the evidence. This part of the contract to be activated with an order from the court with jurisdiction of the case and include a reduced fee schedule for defendants found by the court to be entitled to a publicly funded defense.

Underahl, 735 N.W.2d at 708-09; (see RFP at 22.) With respect to the copyright clause, the State argued that although it owned that portion of the Source Code created exclusively for it, the Source Code is not within the State's "possession, custody, or control." Underahl, 735 N.W.2d at 712. The State argued that any portion of the Source Code created exclusively for it was merely a "derivative work," which did not convey rights in the complete Source Code. Id. (citing 17 U.S.C. § 101). Underahl argued that

3

the Source Code was a "work for hire," which did convey rights in the complete Source Code to the State. Id. (citing 17 U.S.C. § 101). Lacking the necessary facts, the Court forewent the copyright issue, finding that the second clause provided an adequate basis for affirming the denial of the writ of prohibition.

## II. DEVELOPMENT OF THE SOURCE CODE

According to the record, much but not all of the Source Code was developed before the State issued its RFP. Specifically, the record suggests that CMI had not begun developing the capability to compare the measured breath volume with predicted normal pulmonary vital capacity based on parameters such as sex, age, height, etc. (CMI, Inc., Response To: RFP at 7 (Ex. 1, part 2A to Docket No. 35).) Indeed, CMI likely could not have developed this portion of the Source Code prior to RFP because the State provided the table delineating these predicted normal pulmonary vital capacities after it issued the RFP. (RFP at 36-37, 43-44.) Additionally, CMI had to modify its existing source code to meet the specifications of the State. (Def.'s Memo. in Support of Joint Motion to Approve Consent Agreement at 15 (Docket No. 47).)

## III. COPYRIGHT LAW

Necessary to understanding the copyright issues presented in this case is an understanding of the terms "derivative work" and "work made for hire" as used in the copyright statutes.

### A. Work Made for Hire

The copyright statute defines "work made for hire" as:

> (1) a work prepared by an employee within the scope of his or her employment; or
>
> (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. . . .

17 U.S.C. § 101. Importantly, "employee" as used in this statute does not include independent contractors. Cmty. For Creative Non-Violence v. Reid, 490 U.S. 730, 750 (1989). The general common law of agency governs whether a party is an employee or an independent contractor. Id. An independent contractor's work will be classified as "made for hire" only if: (1) the contractor was specially commissioned to create the work in question, (2) the created work falls within one of nine statutorily defined categories, and (3) the parties expressly agreed in a written instrument signed by them that the work would be a work made for hire. Armento v. Laser Image, 950 F. Supp. 719, 728 (W.D.N.C. 1996) (citing 17 U.C.S. § 101).

### B. Derivate Work

The copyright statutes define "derivate work" as:

> a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

17 U.S.C. § 101. Although a derivative work is copyrightable separately from the original work, that copyright "extends only to the material contributed by the author of

5

such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." 17 U.S.C. § 103.

## IV. DISCUSSION

Based on the present record, the State likely owns rights in a portion of the Source Code, but does not have rights in the complete Source Code. The complete Source Code was not a "work made for hire," meaning that absent any other agreement, the copyright for the Source Code would remain with CMI. However, CMI transferred to the State the copyright in any portion of the Source Code that arose out of the performance of its contract, including modifications to the preexisting source code. This portion is likely a "derivative work," meaning that the State owns the copyright to this portion, but that the copyright does not encompass the complete Source Code.

### A. The Source Code Was Not a Work Made for Hire

The copyright statute provides two avenues by which a work may be a "made for hire." Either the work was made by an employee or the work meets three requirements: (1) it was specially commissioned; (2) it falls within one of nine statutorily defined categories; and (3) the parties expressly agreed in a written instrument signed by them that it would be a work made for hire. 17 U.S.C. § 101; Armento, 950 F. Supp. at 728. CMI was not an employee of the State, but was consistently referred to as "Contractor" in the RFP. (See, generally, RFP.) Thus, the Source Code is only a work for hire if it follows the second avenue. It does not.

Although the copyright clause in the RFP is somewhat ambiguous as to designating "work for hire," the Source Code cannot be classified as such. It does not fall

within the nine statutorily defined categories; it was not commissioned for use as (1) a contribution to a collective work, (2) a part of a motion picture or other audiovisual work, (3) as a translation, (4) a supplementary work, (5) a compilation, (6) an instructional text, (7) a test, (8) answer material for a test, or (9) an atlas. See 17 U.S.C. § 101. Falling within one of these nine categories is a separate and distinct requirement from the express agreement requirement for a work-made-for-hire classification. Schiller & Schmidt v. Nordisco Corp., 969 F.2d 410, 412 (7th Cir. 1992) (". . . they were works for hire only if they fell in one or more of the categories of intellectual property enumerated in section 101(2), as they did, *and* were specially commissioned by Schiller, as they were, *and* the parties had signed a statement to that effect . . . ." (emphasis in original)). Regardless of the interpretation of the copyright clause in the RFP, the Source Code cannot be classified as a "work made for hire."

### B. The State Likely Has Rights in the Source Code as a Derivative Work

Although the Source Code is not a "work made for hire," the copyright clause in the RFP granted the State rights in all "copyrightable material which Contractor shall conceive or originate, either individually or jointly with others, and which arises out of the performance of this Contract." Supra, § I. A "derivative work" is copyrightable and protects modifications to existing works that are, as a whole, an original work of authorship. 17 U.S.C. § 101. A copyright in a "derivative work," however, does not grant rights in the preexisting work. 17 U.S.C. § 103.

### 1. The Source Code Is Likely a Derivative Work

CMI states that in certain instances "it was necessary to modify discrete portions of the software to meet the State's requirements." (Def.'s Memo. in Support of Join Motion to Approve Consent Agreement (Docket No. 47) at 15 (internal cites omitted).) "These modifications addressed such things such as baud rates for modem connections, certain communication functions, the organization and layout of reports sent to a printer from the instrument, operator menu selections allowing the operator to identify the statutory basis under which a particular test is being administered, and certain sample acceptance criteria consistent with the State's instructions." (Affidavit of Toby Hall (President of CMI) at ¶ 16 (Docket No. 49).) Furthermore, the record suggests that CMI added to the preexisting source code the capability to compare the measured breath volume with predicted normal pulmonary vital capacity. (CMI, Inc., Response To: RFP at 7 (Ex. 1, part 2A to Docket No. 35).)

Other courts have found similar modifications to support a valid copyright in a "derivative work." See Montgomery v. Noga, 168 F.3d 1282, 1290-91 (11th Cir. 1999). In Montgomery, the court was reviewing a finding that the source code of a program that enabled users to view pictures on a computer screen qualified as a "derivative work." Id. at 1286, 1290-91. The programmer testified that the source code at issue was substantially similar to the preexisting source code from which it derived. Id. at 1290. The record in that case, however, established that in the derived source code, the programmer "corrected many problems, increased the number of graphics file formats that VPIC users could view, increased by 50 percent the speed at which VPIC would

8

decode graphics stored in the GIF file format, and configured VPIC to work with additional graphics computer chips and cards." Id. at 1291. The court affirmed that the modified source code was copyrightable.

Similarly, CMI's derived Source Code, *inter alia*, altered the user interface and added functionality. Based on these changes, the Source Code is likely copyrightable as a "derivative work." Under the copyright clause of the RFP, the copyright in the Source Code as a "derivative work" likely belongs to the State.

### 2. CMI Retains Rights to Control the Source Code

Even though the State likely owns rights in the Source Code as a "derivative work," these rights are not unfettered. The owner of a preexisting work still retains the right to control any material in a derivative work that appears in the preexisting work. 17 U.S.C. § 103. Indeed, a party holding the rights in a preexisting work may restrict use of a derivative work for which it does not hold the rights. Russell v. Price, 612 F.2d 1123, 1128 (9th Cir. 1999) (cited as persuasive authority in U.S. v. Washington Mint, L.L.C., 115 F. Supp. 2d 1089, 1099 (D. Minn. 2000)).

In Russell, the court was reviewing a judgment that distributors of a film had infringed the copyright of the play on which the film was based. Id. at 1124. The distributors argued that the copyright to the film had expired, meaning the public had rights to the film. Id. at 1126. The court disagreed, holding that "although the derivative work may enter the public domain, the matter contained therein which derives from a work still covered by statutory copyright is not dedicated to the public." Id. The court held that that the copyright holder could prevent the movie from being exhibited without

9

the holder's authorization.  Id.; see 17 U.S.C. § 106 (listing the right to "display the copyrighted work publicly" as an exclusive rights in copyrighted works).

By analogy, CMI can assert its rights in the its preexisting source code to control the Source Code.  Like the public in Russell, the State has rights in the Source Code as a derivate work, but like the copyright holder in Russell, CMI retains the rights in the preexisting work from which it derives.  Thus, CMI has the authority to prevent the State from reproducing or distributing copies of any portion of the Source Code that contains CMI's preexisting source code.  See 17 U.S.C. § 106 (listing the right to reproduce and distribute copies as exclusive rights in copyrighted works.)

### C. The Consent Agreement is Reasonable Because It Balances the Rights in the Source Code to Provide Access to the Complete Source Code.

As discussed above, both the State and CMI likely own copyrights in portions of the Source Code.  The State likely owns rights in the Source Code as a derivative work, and CMI likely owns rights to control the Source Code through its copyright in the preexisting source code.  To provide access to the complete Source Code, both parties would have to agree.  In the Consent Agreement, both parties have agreed to provide limited access to the complete Source Code.

To come to an agreement, the State and CMI have compromised their respective rights.  The State's rights in the Source Code as a "derivative work" extends to the modifications and the addition of the capability to compare the measured breath volume with predicted normal pulmonary vital capacity.  The modifications are likely intertwined with the preexisting source code and would make no sense standing alone.  Disclosing

copies of only the modifications would likely be of trivial use to an implied-consent defendant. On the other hand, the additional capability is likely less intertwined with the preexisting source code. Disclosing copies of the source code for the additional capability may make more sense and be of greater use to an implied-consent defendant, but would not shed light on any other portion of the Source Code. Even though the State likely owns the copyright on the source code for the additional capability, CMI values keeping that source code a secret. (Consent Agreement at 10.)

In exchange for limiting the State's rights to copy and distribute the portion of the Source Code for which it likely owns a copyright, CMI has agreed to allow limited access to the complete Source Code. Because CMI owns the copyright in the preexisting source, it could limit the State's ability to copy and distribute the complete Source Code, effectively limiting the State's ability to produce the complete Source Code in litigation. Even if the State did produce the complete Source Code, CMI could prevent a defendant from installing the Source Code on a computer to test it. See Wall Data Inc. v. County Sheriff's Dep't, 447 F.3d 769, 773 (9th Cir. 2006) (affirming finding that unauthorized installation of software infringed copyright on the software); MAI Sys. Corp. v. Peak Computer, 991 F.2d 511, 519 (9th Cir. 1993) ("The law also supports the conclusion that Peak's loading of copyrighted software into RAM creates a 'copy' of that software in violation of the Copyright Act.") Thus, CMI's authorization in necessary to release copies of the complete Source Code. The Consent Agreement requires CMI to do just that.

## V. CONCLUSION

Given that both the State and CMI have rights in the Source Code, the Consent Agreement is a reasonable comprise between their opposing interests. The State desires to facilitate access to the Source Code, while CMI desires to keep it a secret. Even though the State has the right to facilitate access to portions of the Source Code, CMI has the right to prevent access to other portions. The Consent Agreement accounts for the desire of both parties and provides access to the complete Source Code. The State has agreed to limit access to its portion in exchange for CMI loosening restrictions on its portion. Thus, it is the position of the DWI Taskforce that the Consent Agreement is reasonable.

December 31, 2008
/s Joshua P. Graham
Joshua P. Graham (#0386716)
MERCHANT & GOULD P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesote 55402
Telephone:   612-332-5300
Facsimile:   612-332-9081

**Attorney for *Amicus Curiae***
**Minnesota DWI Taskforce**