# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

State of Minnesota,                                    File No. 08-CV-603 (DWF/AJB)
by Michael Campion, its
Commissioner of Public Safety,

                    Plaintiff,

  v.

CMI of Kentucky, Inc.,
a Kentucky corporation,

                    Defendant,

  and

Robert J. Bergstrom, Craig A. Zenobian,
Shane M. Steffensen, and Christopher D.
Jacobsen,

                    Plaintiff-Intervenors.

---

## DEFENDANT'S OMNIBUS RESPONSE TO BRIEFS FILED BY *AMICI CURIAE*

Defendant CMI of Kentucky, Inc. ("CMI") respectfully submits this Omnibus Memorandum of Law in Response to the Briefs filed by *Amici Curiae* Minnesota County Attorneys Association ("MCAA"), the Minnesota DWI Taskforce (the "Taskforce"), and the Minnesota Society for Criminal Justice (the "Defense Bar").

# TABLE OF CONTENTS

Page No.

TABLE OF AUTHORITIES ............................................................................ iii

INTRODUCTION ........................................................................................... 1

BACKGROUND .............................................................................................. 3

DISCUSSION .................................................................................................. 4

I.     CMI SUBSTANTIALLY AGREES WITH AMICUS MINNESOTA COUNTY ATTORNEYS ASSOCIATION. ................................................ 4

II.    CMI SUBSTANTIALLY AGREES WITH AMICUS MINNESOTA DWI TASKFORCE. ........................................................................................ 6

III.    CMI STRONGLY DISAGREES WITH AMICUS THE MINNESOTA SOCIETY FOR CRIMINAL JUSTICE. ............................ 9

    A.    The Defense Bar's Arguments Lack Merit. ....................................... 9

        1.    The Proposed Consent Judgment is Geographically Reasonable. .......................................................................... 10

        2.    The Proposed Manner of Production is Also Reasonable. .......................................................................... 13

        3.    The Question of the Constitutional Rights of Minnesota Defendants to "Confront Their Collective Accuser" is Not Before This Court. ...................................... 15

        4.    The Proposed Consent Judgment Does Not Call Upon This Court to Make Findings That Implicate the Rights of Minnesota Citizens, the Minnesota Constitution, the U.S. Constitution, or Minnesota Public Policy. .................... 17

        5.    The Defense Bar's Assertion That the State Has Unclean Hands is as Offensive as it is Wrong. ..................... 18

        6.    The Defense Bar's Argument That Minnesota Litigants' Constitutional and Property Rights Outweigh CMI's Copyright is Misplaced. ............................ 18

B.    The Defense Bar's And Plaintiff-Intervenors' "Expert" Has Been Less Than Candid With This Court And Others And His Testimony And Theories Have Been Met With Significant Judicial Skepticism.......................................................................... 19

CONCLUSION ............................................................................................................. 26

# TABLE OF AUTHORITIES

Page No.

**Cases:**

*Bergstrom v. Comm'r of Pub. Safety*,
Minnesota District Court, Henn. Co.
File No. 27-CV-07-8280 (2007).............................................................. 24

*In re Nat'l Contract Poultry Growers' Ass'n*,
771 So. 2d 466 (Ala. 2000) .................................................................. 10

*Johnson & Johnson Assoc. Inc. v. R.E. Serv. Co.*,
285 F.3d 1046 (Fed. Cir. 2002)............................................................. 21

*Kramer v. Comm'r of Pub. Safety*,
706 N.W.2d 231 (Minn. Ct. App. 2005) ................................................. 4

*Moe v. State*,
944 So. 2d 1096 (Fla. Ct. App. 2007) .................................................... 24

*Phillips Petroleum Co. v. OKC Ltd. P'ship*,
634 So. 2d 1186 (La. 1994)............................................................... 10-11

*People v. Robinson*,
---N.Y.S.2d---, 2008 WL 2389137 (N.Y.A.D. June 10, 2008)......................24

*Robotic Vision Sys., Inc. v. View Eng'g, Inc.*,
249 F.3d 1307 (Fed. Cir. 2001)............................................................. 21

*State of Florida v. Buswell, et. al.*,
Sixth Florida Judicial Circuit,
Case No. CTC 07-0496XDHANC (2007) ............................................. 25

*State of Florida v. Hawkes*,
Thirteenth Florida Judicial Circuit,
No. 3145-XAM (2008)....................................................................... 25

*State of Georgia v. Abney*,
Georgia State Court, Cobb County,
No. 06T-6261 (2007).......................................................................... 23

- iii -

*State of Georgia v. Denard*,
Georgia State Court, Cobb County,
No. 06T-9064 (2007) ............................................................. 23

*State of Georgia v. Mider*,
Georgia State Court, Cobb County,
No. 06T-7052 )2007) ............................................................. 23

*State of New Jersey v. Chun, et al.,*
*New Jersey Supreme Court* Docket No. 58,879 (2007)
(Final Opinion at 194 A.2d 114 (N.J. 2008) ........................ 22

*Syngenta Crop Protection, Inc. v. Monsanto Co.*,
908 So. 2d 121 (Miss. 2005) ................................................ 11

*U.S. v. Wash. Mint, LLC*,
115 F. Supp. 2d 1089 (D. Minn. 2000) ................................ 24

*Underdahl v. Comm'r of Public Safety*,
735 N.W.2d 706 (Minn. 2007) ......................................... 6, 18

**Constitutions:**

U.S. Const. art. III § 2............................................................. 16

**Statutes:**

17 U.S.C. § 103  ...................................................................... 24
28 U.S.C. § 1331 ..................................................................... 16
28 U.S.C. § 1367 ..................................................................... 16
35 U.S.C. § 112 ....................................................................... 21
Minn. Stat. § 169A.53 ............................................................... 4
Minn. Stat. § 325C.01, subd. 5 ............................................... 11
Minn. Stat. § 634.16  ................................................................. 4

**Rules:**

Minn. R. Crim. P. 9.01 .............................................................. 6
Minn. R. Crim. P. 9.02 .............................................................. 6

# INTRODUCTION

*Amici curiae* MCAA and the Taskforce agree with the State of Minnesota (the "State") and CMI that the Proposed Consent Judgment and Permanent Injunction present a fair and reasonable resolution to the so-called "source code issue." The Defense Bar, on the other hand, opposes the Proposed Consent Judgment, although it fails to present an alternative solution. The reason for this is clear—the Defense Bar and many of its clients are happy with the *status quo*. By persuading some state district court judges to order production of something the State cannot produce, the Defense Bar has seriously disrupted Minnesota's breath-alcohol testing system for over two years. Therefore, a resolution to the source code issue is the last thing the Defense Bar wants.

In its strident opposition to the Proposed Consent Judgment, the Defense Bar loses sight of what is before this Court. Its principal argument, that the admission of Intoxilyzer test results in evidence somehow violates the confrontation clause, belongs in another case, before another court. In essence, the Defense Bar takes issue with the Minnesota legislature, Minnesota Statutes sections 169A.53 and 634.16, and a long line of Minnesota decisions, which conclusively establish that the results of a properly administered Intoxilyzer test are presumptively valid and admissible without antecedent expert testimony. The Defense Bar's confrontation clause concerns are not properly before this Court.

What is before this Court is the proposed settlement of a contract dispute between the State and CMI. The State alleged that it took ownership of some part of the source code through an assignment provision in the parties' Contract. In settling with CMI, the

State foregoes this claim, recognizing that, at most, it could own only a very small part of the source code. Thus, even if it were to prevail, that alone would not resolve the source code issue. *Amicus* Taskforce confirms this view—even if the State owns a small part of the source code, producing that to DWI litigants would not solve the problem.

The State also alleged that the Contract required CMI to provide information, including the source code, directly to certain Minnesota litigants. Four Plaintiff-Intervenors have now brought this same claim on their own behalf, so there is no longer a need for the State to pursue it for them. Indeed, this Court has ruled that the State *cannot* adequately present that claim on behalf of potential third party beneficiaries. Again, in settling, the State foregoes this claim, but the Proposed Consent Judgment does not call upon the Court to make any findings or conclusions with respect to the issue, allowing the Plaintiff-Intervenors to continue pursuing the claim.

Irrespective of who brings the third party beneficiary claim, it cannot resolve the overall source code issue because the Contract's definition of "information" to be provided to DWI defendants does not include the source code. Moreover, even if it did, the purported third party beneficiary clause cannot inure to the benefit of any future Minnesota litigants because the Contract expired a year ago. Thus, this clause cannot provide a long term solution to the source code issue.

In short, the Contract, which is really all that is before this Court, will not solve the source code issue. If, as the Defense Bar insists should occur, the suit is tried to conclusion, it will be determined that the State owns none, or very little, of the source

code.  Either way, that will not solve the problem, since DWI defendants demand "the entire source code" and the State will not be able to produce it.

Similarly, a trial will either determine that CMI has no obligation to provide the source code to DWI defendants, or that it had a duty to provide it to defendants who received an order for production from the state district court before the Contract expired. Again, either way, that will not solve the source code issue because current and future litigants will have no avenue to the source code.  Thus, while the Defense Bar urges the Court to deny the Motion for Entry of Consent Judgment and push the lawsuit forward, doing so cannot bring meaningful closure to the source code issue.

Finally, what the Defense Bar studiously ignores is that the two possibilities are not mutually exclusive.  The Court can enter the Proposed Consent Judgment ***and*** permit the Plaintiff-Intervenors to continue pursuing their third party beneficiary claims.  There is no reason to further postpone the entry of the Proposed Consent Judgment.  Other Minnesota litigants should not be denied the benefits of the Consent Judgment, including immediate, no-cost access to the source code, while the Defense Bar and Plaintiff-Intervenors seek to prolong this litigation.

This Court should enter the Proposed Consent Judgment.  Unlike the ongoing litigation, it presents a reasonable resolution to the source code issue.

## BACKGROUND

The facts and circumstances leading up to the State's and CMI's Joint Motion for Entry of Consent Judgment and Permanent Injunction are set forth in their respective memoranda of law.  (Doc. 44 & 47.)  What brings the parties before this Court now is a

relatively simple settlement agreement. It is unique only in that, due to its public interest, the State and CMI have asked this Court to formalize their settlement in a Consent Judgment and Permanent Injunction. For that same reason, the parties asked the Court to accept *amicus* briefs from interested members of the public.

## DISCUSSION

## I. CMI SUBSTANTIALLY AGREES WITH *AMICUS* MINNESOTA COUNTY ATTORNEYS ASSOCIATION.

*Amicus* MCAA correctly notes that the Minnesota version of the Intoxilyzer 5000EN has been tested extensively by the State, without source code review, and has been found to be accurate and reliable. (*Id*. at 3.) The instrument has also been tested and approved for use by the National Highway Traffic Safety Administration ("NHTSA"), and by dozens of other States. Indeed, the results of a properly administered Intoxilyzer test are presumptively reliable and admissible without expert testimony. Minn. Stat. §§ 634.16 & 169A.53; *Kramer v. Comm'r of Pub. Safety*, 706 N.W.2d 231 (Minn. Ct. App. 2005).

As the MCAA correctly points out, there has recently been inconsistency among various Minnesota jurisdictions with respect to the discoverability of the source code. (MCAA *Amicus* Br. Supp. Settlement Agreement ("MCAA Br.") at 3-4.) MCAA asserts that this inconsistency has had a deleterious effect on public perception and enforcement of Minnesota's DWI laws. (*Id*. at 4.) It has caused increased reliance on blood and urine testing, which, in turn, has resulted in a backlog at the Bureau of Criminal Apprehension testing facility and delayed prosecutions. (*See id*.) The impact of this delay is

significant, as the recidivism rate for offenders whose drivers license was revoked within ten days of arrest is approximately half that of those who lost their license more than thirty days after arrest. (*See id.*, citing Stephen M. Simon, *Law Enforcement Actions and the Rate of DWI and DWI Recidivism, Minnesota Police and Peace Officers Ass'n Brochure* (Jan. 2005).)

While holding to its view that source code review is unnecessary, MCAA supports the Proposed Consent Judgment.[1] MCAA urges the Court to enter the Proposed Consent Judgment so that its members and the Defense Bar can stop litigating procedure and discovery rules and get back to litigating substantive issues. As noted above, the Defense Bar prefers just the opposite, and is quite happy to litigate anything but substantive issues relating to its clients' conduct.

CMI agrees, in large part, with the views expressed in MCAA's *amicus* brief. MCAA expresses concern that some state district court judges may not be satisfied with production of the source code in Kentucky, and indeed some may not be satisfied. (MCAA Br. at 6.) However, MCAA's analysis is predicated upon Rule 9.01 of the Minnesota Rules of Criminal Procedure, which addresses a prosecutor's obligation to produce certain materials in discovery. (*See id.*) What MCAA and some courts have overlooked or misunderstood i that the State, in fact, does not have possession or control over the entire source code. As the Taskforce makes clear, the State simply does not own or control the entire source code and it has no means to force CMI to make it available.

---

[1] As the MCAA correctly notes, the instrument is accurate and reliable and there has not yet been one iota of evidence showing that it is not. (MCAA Br. at 5.)

Accordingly, the State cannot be compelled to produce the entire source code under the criminal rules, which require only production of materials in the prosecutor's or the government's possession or control. Minn. R. Crim. P. 9.01 & 9.02. Thus, while some judges may be less than satisfied with the Proposed Consent Judgment, that dissatisfaction would be based on a fundamental misunderstanding of the State's former contract with CMI.

## II.    CMI SUBSTANTIALLY AGREES WITH *AMICUS* MINNESOTA DWI TASKFORCE.

*Amicus* Taskforce effectively explains why the State did not obtain an ownership interest in the entire source code by operation of the assignment clause in its contract with CMI. It provides the comprehensive analysis that has been absent from virtually every state court decision ordering production—including the Minnesota Supreme Court's decision in *Underdahl v. Commissioner of Public Safety*, 735 N.W.2d 706 (Minn. 2007).

The State's contract with CMI included a provision by which CMI assigned to the State all:

> copyrightable material which [CMI] shall conceive or originate…and which arises out of the performance of this Contract.

> \*\*\*

> Where applicable, works of authorship created by [CMI] for the State in performance of the Contract shall be considered "works for hire" as defined in the U.S. Copyright Act.

This, then, begs three questions. First, did any of the source code that CMI conceived or originated **arise under the contract**? Second, if any of it did, **was it copyrightable**? Third, and finally, was it a work for hire?

The Taskforce answers these questions as follows. First, it believes that some, but by no means all, or even a significant portion, of the source code for the Minnesota version of the instrument may have arisen under the contract. (*Amicus* Br. of Minnesota DWI Taskforce ("Taskforce Br.") at 4.) Second, the source code for the Minnesota version of the instrument may be copyrightable as a derivative work, but the State would obtain an interest only in any source code that was created uniquely for the State. (*Id.* at 7-10.) Finally, the source code cannot be a work for hire under the Copyright Act because it does not fall within any of the statutorily defined categories of works for hire. (Taskforce Br. at 4-7.)

This analysis comports with both the law and a common sense reading of the contract. The application of the work for hire doctrine is expressly limited in the contract to circumstances "[w]here applicable…." By statute, the doctrine applies only to works by subcontractors in nine specific categories that are not present here. The source code is clearly not a work for hire. (Taskforce Br. at 6-7.) Likewise, it is uncontested that prior to awarding the contract to CMI, the State tested an existing instrument—a fully operational unit that obviously contained preexisting source code. (Affidavit of Toby Hall Supp. Joint Mot. Entry of Consent J. ("Hall Aff.") at 16 (Doc. 49).) Because the contract only assigns to the State copyrightable material that arose under the contract, it

makes sense that the State obtained, at most, only the limited lines of source code written specifically for it.

The Taskforce concludes that the compromise represented by the Conditional Settlement Agreement and the Proposed Consent Judgment is reasonable. (Taskforce Br. at 10-12.) The Taskforce correctly points out that even if the State owns a portion of the source code, "it is likely entwined with the preexisting source code and would make no sense standing alone." (*Id*. at 10.) It further notes that "CMI's authorization is necessary to release copies of the complete source code." (*Id.* at 11.) Given that the State might own and could produce, at best, a small portion of the source code, CMI's willingness to make the entire the source code available under the Consent Judgment is more than reasonable.

While CMI does not concede that any source code it modified to configure the the instrument to the State's specifications constitutes a derivative work, is otherwise independently copyrightable, or ever became the State's property, it agrees with the Taskforce's analysis in all other respects. Assuming, *arguendo*, that the State does own some part of the source code, the Taskforce correctly concludes that producing a small portion of the source code will not satisfy the Minnesota litigants who have asked for the "entire" source code in discovery, or the state district court judges who have deemed it discoverable. In short, the assignment clause cannot provide a solution to the source code issue.

### III. CMI STRONGLY DISAGREES WITH *AMICUS* THE MINNESOTA SOCIETY FOR CRIMINAL JUSTICE.

The Defense Bar opposes the Conditional Settlement and Permanent Injunction, but by way of solution, offers the Court nothing more helpful than "reject the proposed settlement and set a reasonable time frame for discovery." (Brief of *Amicus Curiae* – Minnesota Society for Criminal Justice ("Defense Bar Br.") at 18.) Of course, as noted above, this lawsuit cannot solve the problem, and this Court can approve the settlement between the State and CMI *and* allow the Plaintiff-Intervenors' case to go forward. There is no reason to hold the State captive in a case that it cannot win by litigation, when it has already obtained the very object of its suit by negotiation. Indeed, one must wonder why the Defense Bar so stridently opposes the Proposed Consent Judgment. It affords Minnesota litigants but one avenue to the source code. Minnesota litigants, like the Plaintiff-Intervenors in this case, who believe they have some other right or means to obtain the source code are free to pursue them. If they fail, the Consent Judgment still provides them with an alternative avenue to the source code. The Defense Bar and its clients say they want the source code. Why do they oppose an injunction that would compel CMI to make it available to them at no cost?

#### A. The Defense Bar's Arguments Lack Merit.

The Defense Bar presents six disjointed arguments against entry of the Proposed Consent Judgment. Some of their arguments stray far afield of the matters before this Court, while others misstate the facts, the law, or both. In the end, none of these arguments is persuasive. But they do reveal the Defense Bar's desperation to keep the

source code issue alive but in suspended animation—frozen in the *status quo*, where some judges will exclude Intoxilyzer evidence because the State is unable produce the source code. The Defense Bar's arguments are addressed in turn.

## 1. The Proposed Consent Judgment is Geographically Reasonable.

The Defense Bar argues that the Proposed Consent Judgment is unreasonable because it would make the source code available at CMI's headquarters in Kentucky. (Defense Bar Br. at 8.) It argues that a defendant who was arrested, charged, and will be tried in Minnesota will be required to travel to Kentucky to review the source code, which is true—if the defendant happens to be a qualified software engineer. The argument is a red herring. In point of fact, the Plaintiff-Intervenors in this case, and the Defense Bar itself, have relied extensively on the affidavit of a single, self-proclaimed source code expert, Thomas Workman, who resides in Taunton, Massachusetts. As far as CMI is aware, in two years of source code litigation, Minnesota defendants have never sought to introduce testimony from a single Minnesota-based expert. Obviously, bringing an out of state expert to Kentucky does not create a materially different or greater burden than bringing that expert to Minnesota.

The Defense Bar also argues "by analogy" (but without legal support) that somehow the minimum contacts analysis that determines personal jurisdiction over non-resident **parties** applies to compel **a non-party** to produce its highly sensitive trade secrets in remote a forum where it has no offices, no employees, and no documents. (*Id.*) With respect to non-parties, it is well-settled that a state court's subpoena power ends at the state's border. *See In re Nat'l Contract Poultry Growers' Ass'n,* 771 So. 2d 466, 467

(Ala. 2000). The extent of personal jurisdiction over a non-resident ***defendant*** on the basis of its minimum contacts is simply a different question than the power to compel a ***non-party*** to submit to foreign discovery. *See id.*; *Phillips Petroleum Co. v. OKC Ltd. P'ship,* 634 So. 2d 1186, 1187-88 (La. 1994). The Defense Bar's "analogous theory" has been considered and rejected. *See Syngenta Crop Protection, Inc. v. Monsanto Co.*, 908 So. 2d 121, 125-28 (Miss. 2005).

The Defense Bar also erroneously asserts that "[t]he source code could be safeguarded equally as well if it were kept under lock and key at the Minnesota BCA or the Commissioner's headquarters in Minneapolis." (Defense Bar Br. at 8.) It does not, and cannot, provide any factual support for this *ipse dixit* argument. A moment's reflection reveals its inherent falsity. As the Taskforce noted, the State has, at most, an extremely limited interest in the source code. It does not manufacture or sell the instrument and it has no pecuniary in the source code. Nor is it in the business of storing, managing, or maintaining computer software. It is also unlikely that the State could indemnify or otherwise protect CMI's interest in the event that the source code is improperly disclosed while under its care.

CMI, on the other hand, has a substantial pecuniary interest in the source code and in protecting the source code's trade secret status (Hall Aff. ¶¶ 8, 14-15), which, once lost, is generally lost forever. Minn. Stat. § 325C.01, subd. 5. CMI is in the business of managing and maintaining source code. It keeps the source code in a secured facility and it has the means to provide the controlled access described in the Proposed Consent Judgment. (Hall Aff. ¶¶ 10-14.)

Moreover, CMI's concern for the protection of its trade secrets is well-founded. Attacks on its and its competitors' trade secret source code occur frequently. During the November 2008 status conference, this Court was apprised of a recent New Jersey proceeding involving the source code for CMI's competitor's breath alcohol testing instrument. That competitor is Draeger Safety Diagnostics, Inc. ("Draeger"). Mr. Workman (who the Defense Bar and the Plaintiff-Intervenors rely upon here) was retained by the New Jersey Defense Bar. (Declaration of Jeffrey Schreiber ("Schreiber Decl.) ¶ 6.) Because he refused to execute the court-approved non-disclosure agreement, Mr. Workman was not permitted to review Draeger's source code.[2] (*Id*.) Mr. Workman nonetheless urged Draeger to "rely on his word as a gentleman." (*Id*.) Draeger wisely demurred. (*Id*.)

When a New Jersey Defense Bar expert was testifying about Draeger's source code on cross examination, counsel for the Defense Bar complained that its inability to see the source code hindered its ability to rehabilitate his witness on re-direct. (*Id*. ¶ 8.) Draeger's counsel permitted Mr. Workman to stand behind the witness solely to verify that the few specific lines of source code in issue were consistent with the Defense Bar's witness's testimony. (*Id*. ¶¶ 8-9.) Draeger's counsel expressly stated, on the record, that Mr. Workman was granted this extremely limited access to one or two lines of source code solely to expedite the hearing and that Draeger was not waiving any other rights in

---

[2] Remarkably, the fact that he had not actually reviewed the Draeger's source code did not stop Workman from filing a report; not surprisingly, he opined that the source code was flawed. (Schreiber Decl. ¶ 7.)

its source code. (*Id*. ¶ 10 & Ex. 1.) Nonetheless, Workman later wrote an article published in The Journal of High Technology Law in which he falsely claimed:

> During the remand hearings in *State v. Chun*, the New Jersey hearings to evaluate the source code of the Draeger Alcotest 7110 MK-IIIC, the author was permitted to stand behind defense expert John Wisniewski, and view portions of the source code on the laptop screen of the witness. ***This viewing portions of the source code was accomplished without any restrictions placed on the author by the Court or Draeger***. As to the destruction of the secret by disclosure without limitations, that destruction as to the Draeger source code has occurred.

(Schreiber Decl. ¶¶ 11-12 & Ex. 2, emphasis added.) This attack on Draeger's trade secrets is flatly refuted by the official transcript (*id*., Ex. 2), yet Mr. Workman had no compunction about publishing this clearly false statement.

Another example of the ongoing attacks on CMI's trade secrets, which is discussed in greater detail below, consists of the fallacious argument that CMI has patented its Intoxilyzer 5000 and, therefore, its source code is not a trade secret. The instrument has never been patented, so this argument is simply wrong. Once again, it is Mr. Workman who continues to perpetuate this unfounded claim.

These false and underhanded tactics justify the care with which CMI has endeavored to protect its valuable trade secrets, and demonstrate that making the source code available at CMI's headquarters in Kentucky is a perfectly reasonable condition.

## 2. *The Proposed Manner of Production is Also Reasonable.*

The Defense Bar also complains about the format in which the Proposed Consent Judgment would make the source code available. It first argues that the proposed digital and paper formats will not allow for meaningful analysis. (Defense Bar Br. at 9.)

However, it quickly backs off that claim, stating that, in fact, it "cannot determine whether a meaningful analysis of the code can occur." (*Id.*) The Defense Bar then says:

> *Amicus* would propose that a version of the code which would allow for the automated review referenced in paragraph 63 of Mr. Workman's Declaration **may suffice**.

(*Id.*, emphasis added.) This statement is remarkable because the Defense Bar and its clients have been clamoring for the source code for over two years. Now, after all that time, they admit that they are not even sure how they want it produced (because, of course, they do not want it at all). Then they claim that CMI's offer to give them access in both searchable digital form and printed, hardbound form is a "veiled tactic" to prevent access. (*Id.*) This argument is nothing short of ridiculous.

CMI has previously explained the risks inherent in providing electronic access to the source code. Electronic information is easily copied and transmitted, and virtually impossible to trace. (Affidavit of Mario D. Santana ("Santana Aff.") ¶ 10 (Doc. 50); Hall Aff. ¶¶ 22-24.) And while acknowledging that the proposed digital format is searchable, the Defense Bar complains that "merely searching the code will not reveal how the code actually works." (Defense Bar Br. at 9.) But to the contrary:

> while there are automated tools and techniques to gather statistical information about computer source code, **there is no automated method of analyzing source code to verify its function. Manual inspection is, therefore, the only reliable way of reviewing source code to understand exactly what it does and how it works.**

(Santana Aff. ¶ 11, emphasis added.) Mr. Santana testified that in the proposed format, the source code is "easily readable and understood by a programmer experienced in both assembly-language programming for the Z80 computer chip and the C programming

language." (*Id.* ¶ 15.) He described the various comments embedded in the source code that aid in understanding how the source code functions, along with the program logic, hierarchical structure, nesting, and labeling, all of which make the source code readable and analyzable by a qualified programmer. (*Id.* ¶¶ 15.2-15.6.) Mr. Santana also noted the straightforward, monolithic architecture of the source code, and the absence of confusing, complex multi-threaded or reentrant code. (*Id.* ¶ 15.7.) In sum, the Defense Bar and Mr. Workman, who have never seen the source code, say they do not know if it will be analyzable in the proposed format. (Defense Bar Br. at 9.) Mr. Santana, a qualified professional who has carefully reviewed the actual source code in the proposed format, says under oath that it is fully analyzable by any properly trained professional. (Santana Aff. ¶¶ 14-15.) Indeed, he states that actually reading the source code (whether on paper or in searchable digital format) is ***the only way*** to analyze it for function. (*Id.* ¶ 11.)

The Proposed Consent Judgment provides for ready and meaningful access to CMI's source code in not just one, but two fully analyzable formats. While the Defense Bar criticizes the manner in which the Proposed Consent Judgment would make the source code available, it cannot even say how it would like the source code produced. Once again, one must question just what it is that the Defense Bar really wants.

### 3. *The Question of the Constitutional Rights of Minnesota Defendants to "Confront Their Collective Accuser" is Not Before This Court.*

By far the lion's share of the Defense Bar's brief addresses an issue that is not before this Court. (Defense Bar Br. at 10-14.) The Defense Bar's real beef is obviously

with Minnesota's legislature and courts, not with CMI. It rails against the presumed validity of a test administered with the Intoxilyzer, claiming that the test results serve as "a de facto expert witness…not subject to cross examination." (*Id.* at 10; 13.) This Court, this case, and this motion are not the proper forum for this argument.

The federal courts are courts of limited jurisdiction. This Court's jurisdiction over a particular matter is derived entirely from federal statute and the cause of action before it. 28 U.S.C. § 1331. Federal courts exercise jurisdiction only over actual, live controversies that are properly before them. U.S. Const. art. III § 2. Here, the Court exercises jurisdiction under 28 U.S.C. § 1331, because the State brought a claim under the U.S. Copyright Act. The Court also exercises supplemental jurisdiction over directly related state-law claims. 28 U.S.C. § 1367. Those state-law claims are based on the Contract between the State and CMI. (Compl. ¶¶ 1, 11-17, 31-53.) The same is true of Plaintiff-Intervenors' single claim against CMI, which alleges a breach of a third party beneficiary contract. (Compl. in Intervention ¶¶ 1, 15-35.) Accordingly, the only issues before this Court are copyright and contract-based claims, not the constitutional rights of Minnesota defendants charged with criminal offenses by the State of Minnesota in other cases before other courts.

Whether Minnesota's presumption of reliability comports with the confrontation clause is a question to be answered, if at all, in a case between a Minnesota defendant and the State—not in a contract case between the State and CMI over the ownership of the source code to the Intoxilyzer 5000EN.

**4.** ***The Proposed Consent Judgment Does Not Call Upon This Court to Make Findings That Implicate the Rights of Minnesota Citizens, the Minnesota Constitution, the U.S. Constitution, or Minnesota Public Policy.***

The Defense Bar makes the sweeping but utterly unsupported assertion that the Proposed Consent Judgment requires findings that are inimical to various constitutional rights and public policy. (Defense Bar Br. at 14-15.) This argument is without merit.

The Proposed Consent Judgment and Permanent Injunction do not impose conditions upon, or otherwise limit, anyone other than the State and CMI. This Court has not been asked to dictate to Minnesota litigants, or, as importantly, to Minnesota courts. Minnesota courts and Minnesota litigants can and will do as they may, as evidenced by the Plaintiff-Intervenors' intervention in this case. In fact, the Proposed Consent Judgment and Permanent Injunction directs only the conduct of CMI. (Proposed Consent J. at 11-14.)

The Proposed Consent Judgment requires that CMI make the source code available to Minnesota litigants in specified circumstances. (*Id.*) Minnesota courts remain free, as always, to function entirely independent of this Court. They can continue to grant or deny motions for discovery of the source code and they may choose or decline to enter protective orders in the cases before them. Likewise, Minnesota litigants and their experts are free to pursue the source code in accordance with the terms of the Consent Judgment, or not. They do not forego any rights whatsoever. Indeed, as noted above, under the Proposed Consent Judgment, this Court expressly makes no findings or conclusions regarding the third party beneficiary claim, thereby fully preserving the

Plaintiff-Intervenors' present action.  (*Id*. at 9.)   The Defense Bar's claim that the Proposed Consent Judgment somehow impinges upon anyone's constitutional rights or otherwise implicates Minnesota's public policy is simply untrue.

**5.    *The Defense Bar's Assertion That the State Has Unclean Hands is as Offensive as it is Wrong.***

The Defense Bar goes beyond proper advocacy when it claims the State has "unclean hands."  (Defense Bar Br. at 16.)   It shamelessly miscites the Minnesota Supreme Court's holding in *Underdahl*, saying that the decision "put the State on notice that all copyright material associated with the Intoxilyzer machine is the State's property."  (*Id*.)  This is sheer fabrication.  The *Underdahl* Court expressly stated that it could not decide the copyright and assignment questions on the limited record before it. *Underdahl*, 735 N.W.2d at 712.   Based on its misrepresentation of the *Underdahl* decision, the Defense Bar accuses the State of unclean hands because it resisted motions to compel production of the source code.  (Defense Bar Br. at 16.)  This disparagement of the State's conduct and motives is unsupported and unwarranted.

**6.    *The Defense Bar's Argument That Minnesota Litigants' Constitutional and Property Rights Outweigh CMI's Copyright is Misplaced.***

The Defense Bar's final argument is legally incoherent.  It purports to weigh CMI's copyright interests against some undefined "Petitioner's" constitutional rights. (Defense Bar Br. at 17.)  This is like comparing real apples (albeit the wrong ones) with imaginary oranges.  In choosing not to hand out its proprietary source code willy-nilly, without appropriate protections, CMI is not relying solely on its copyrights, its trademark

rights, or, as suggested by the Defense Bar, its "monetary interests." (*Id.*) CMI owns the source code itself, not just a copyright in it, and CMI is not bound, contractually, constitutionally, or otherwise, to share it with others. CMI is not a state actor, it is not a party to any criminal cases, and it is not in a position to violate, or to vindicate, any individual defendant's Sixth Amendment rights. Judge Nordby's concerns (*see* Defense Bar Br. Exs. E & F), like the Defense Bar's, really target Minnesota's legislature, laws, and judicial decisions, not CMI's conduct or the matters presently before this Court.

**B.** **The Defense Bar's And Plaintiff-Intervenors' "Expert" Has Been Less Than Candid With This Court And Others And His Testimony And Theories Have Been Met With Significant Judicial Skepticism.**

The Defense Bar relies upon Thomas Workman, the self-proclaimed source code "expert" whose declaration (Doc. 55) was submitted to this Court by the Plaintiff-Intervenors in a Motion for Evidentiary Hearing that this Court denied. (Defense Bar Br. at 9.) For the reasons that follow, the Court should approach Mr. Workman's declaration with caution.

Although he claims to be a practicing attorney, Mr. Workman's principal occupation consists of consulting with, and where permitted, providing affidavits and testifying on behalf of, DWI attorneys and their clients. (Workman Decl. ¶ 2; Affidavit of William A. McNab ("McNab Aff.") Ex. 1 at 206:14-207:23.) By his own estimate, eighty to ninety percent of his income is derived from such expert consulting engagements. (McNab Aff. Ex. 1 at 207:20-23.) Since April 2007, he has authored or co-authored at least seven papers on the subject of source code and evidential breath alcohol testing. (McNab Aff. Ex. 2 at 5.) In his view, "many of the titular heads of

breath testing departments of state crime laboratories are incompetent and the companies that make the machines have trained them on how they can keep their jobs in spite of their incompetence." (McNab Aff. Ex. 1 at 214:20-215:1.) It would be an understatement to say that he has not been supportive of breath alcohol testing programs, breath alcohol testing instruments, or the people who manufacture them.

Mr. Workman tells this Court, under oath, that he has been "admitted to practice law in the Commonwealth of Massachusetts, before the United States Patent Office [sic], and before the United States First Circuit [sic]." (Workman Decl. ¶ 1.) While parsing his words carefully in the affidavit, Mr. Workman obviously intends to give the impression that he is a licensed patent attorney. He is less circumspect in the *curriculum vitae* currently posted on his website, where he claims outright, "I am licensed to practice…before the United States Patent Office [sic] as a Patent Attorney." (McNab Aff. Ex. 2 at 1.) Inexplicably, however, the U.S. Patent and Trademark Office's official website does not include Mr. Workman on its list of registered patent attorneys. (McNab Aff. ¶¶ 4-5 & Exs. 3 & 4.)

Whatever his true status as a patent attorney, Mr. Workman also attests, under oath and incorrectly, that "CMI applied for and obtained a patent from the United States Patent Office [sic] for the Intoxilyzer 5000," and on that basis, he claims the source code cannot be a trade secret. (Workman Decl. ¶ 101.) He is wrong on at least two levels. First, the now expired patent clearly reflects that CMI was a subsequent assignee, not the applicant. (McNab Aff. Ex. 5.) Second, and more importantly, the patent did not cover the Intoxilyzer 5000 instrument as a whole; rather, it covered a single feature in the

function of an earlier version of the instrument.  It is a "fundamental principle that claims define the scope of the patent…." *Johnson & Johnson Assoc. Inc. v. R.E. Serv. Co.,* 285 F.3d 1046, 1052 (Fed. Cir. 2002).  Here, the patent's narrow claims relate only to a method to filter out so-called "interferents."[3]  (McNab Aff. Ex. 5 at 8.)  CMI does not own, and has never owned, a patent on the Intoxilyzer 5000 instrument as a whole.

Further, a patent of this kind does not require disclosure of the instrument's source code.  A patentee need only disclose information that will "enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same…."  35 U.S.C. § 112.  In other words, he must only disclose information that is "sufficiently specific to enable a person skilled in the art to write the necessary source code to implement the claimed method." *Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 249 F.3d 1307, 1312 n.2 (Fed. Cir. 2001).  CMI has never had a patent on the instrument as a whole and the '427 patent did not vitiate the trade secret status of CMI's source code.

This is not the first time Mr. Workman has told a judge that he is a patent attorney, that CMI has a patent on the instrument as a whole, and that the source code is not a trade secret.   He made these same dubious claims to Judge Bernini in Tucson, Arizona. (McNab Aff. Ex. 6 at 76:22-77:6.)  As a result, she issued extra-jurisdictional orders from

---

[3]  Here, the claimed invention is:

> A system for determining the amount of a predetermined energy absorbing compound in a sample ***when unknown energy absorbing compounds are also present*** and where both the predetermined energy absorbing compound and the unknown energy absorbing compounds absorb both first and second predetermined wavelengths of energy….

(McNab Aff. Ex. 5 at 8, emphasis added.)

the Arizona court directly to CMI in Kentucky, which the Kentucky court promptly, and properly, quashed.  (McNab Aff. Exs. 7 & 8.)

As described above, Mr. Workman also falsely claimed in a published article that he was permitted to observe Draeger's source code without any limitation, which he then claimed in a published article had obviated its trade secret status.  (Schreiber Decl. Exs. 1 & 2.)  During that same hearing, he was caught surreptitiously passing an answer to a witness who was on the stand, under cross examination, in an in-court proceeding. (*Id.* ¶¶ 13-14 & Ex. 3.)  This conduct by officer of the court is nothing less than shocking.

Mr. Workman also tells this Court that he "supervised the review of the source code in the *State v. Chun* case in New Jersey."  (Workman Decl. ¶ 54.)  Yet, as noted above, he refused to execute the court-approved non-disclosure agreement and was prohibited from reviewing the source code.  (Schreiber Decl. ¶ 6.)  Moreover, he testified in the *Chun* case that he would have done things differently than Mr. Wisniewski and Base One, who reviewed Draeger's source code for the New Jersey Defense Bar. (McNab Aff. Ex. 1 at 200:4-8.)  Mr. Workman similarly misled Judge Bernini on this point, testifying "if you were to look at the source code, *as we did* in the Draeger machine" and "[b]y way of example, *when we evaluated the source code* in the state of New Jersey…."  (McNab Aff. Ex. 6 at 61:1-3; 72:1-2, emphasis added.)  He continued, "I can tell you *from looking at the source code for the Draeger machine* where it was claimed that it was a trade secret that *when we actually looked at it* we could not identify anything which was a trade secret in that particular source code."  (*Id.* at 142:24-143:3,

emphasis added.) To be clear, Mr. Workman never reviewed the Draeger source code, yet he made these claims, under oath, to the Arizona court.

He tells this Court that "in Minnesota, the simple safeguards in the design of the source code are missing so that those with less than the best intentions can and do falsify information relating to the operation of the Intoxilyzer machines." (Workman Decl. ¶ 71.) Mr. Workman makes this bold claim despite having never seen a single line of CMI's trade secret source code.

Mr. Workman claims that as a result of his testimony, Georgia courts have "require[d] that CMI provide the source code to Georgia attorneys." (Workman Decl. ¶ 80.) CMI has never been served with an order from a Georgia court ordering it to produce its source code. In fact, relying particularly upon Mr. Workman's testimony, one Georgia State Court declared that "the source code *would not be helpful*" to it and denied the defendants' motion to compel its production. *See State of Georgia v. Abney*, No. 06T-6261, *State of Georgia v. Mider*, No. 06T-7052, and *State of Georgia v. Denard*, No. 06T-9064 (May 4, 2007) (consolidated motions) at 5 (emphasis added) (submitted herewith as McNab Aff. Ex. 9). The Georgia Court of Appeals summarily denied the defendants' Application for Interlocutory Appeal of that decision. (McNab Aff. Ex. 10.)

Mr. Workman improperly *argues* in his declaration that "The State of Minnesota Request for Proposal requires transfer of ownership to the Plaintiff State of Minnesota any copyrighted or copyrightable material relating to the fleet of Intoxilyzer breath testing instruments." (Workman Decl. ¶ 95.) He also presents argument about the purpose of the assignment clause, without any personal knowledge or foundation. Not

only is this sort argument improper in a declaration or an affidavit, it absolutely misrepresents the express conditions and limitations in assignment clause in the Contract.

Mr. Workman compounds that error, arguing that the State owns the entire source code by virtue of a derivative copyright. (*Id.* ¶ 100.) As *amicus* Taskforce has made clear, the owner of a derivative copyright (assuming, *arguendo*, that one exists here) obtains no rights in the preexisting work. 17 U.S.C. § 103; *U.S. v. Wash. Mint, LLC*, 115 F. Supp. 2d 1089, 1099 (D. Minn. 2000).

Mr. Workman asserts that "Arizona and Florida courts have held that CMI's source code in its Intoxilyzer devices is not a protected trade secret." (Workman Decl. ¶ 106.) However, the Florida Court of Appeals recognized the source code's trade secret status in *Moe v. State*, 944 So. 2d 1096, 1097 (Fla. Ct. App. 2007), as did the New York Appellate Court in *People v. Robinson*, ---N.Y.S.2d---, 2008 WL 2389137, at *7 (N.Y.A.D. June 10, 2008). Even some of the Minnesota district courts that ordered the State to produce the source code recognized its trade secret status. *See, e.g., Bergstrom v. Comm'r of Pub. Safety*, Minnesota State District Court, File No. 27-CV-07-8280 at 7 (submitted herewith as McNab Aff. Ex. 11) (stating, "[t]he Court also recognizes that the information which petitioner seeks to discover is sensitive trade secret material.").

Finally, Mr. Workman's testimony has either been excluded or deemed unpersuasive by various courts. For example, as noted above, the Georgia state court found, on the basis of Mr. Workman's testimony, "that any failures or defects of the machine may be observed empirically from actual use of the machines." *State of Georgia v. Abney*, et al., No. 06T-6261 at 6. Accordingly, review of the source code was

unnecessary.  (*Id.*)  Similarly, the State Courts of Florida found that Mr. Workman's testimony and evidence failed to meet the *Frye* standard.  *See State of Florida v. Hawkes*, Thirteenth Florida Judicial Circuit, No. 3145-XAM, at *2 (submitted herewith as McNab Aff. Ex. 12).  That court found that his theories were neither peer reviewed nor scientifically reliable and, moreover, were "speculative."  (*Id.*)  It also found his contentions "meritless" and contrary to the evidence in the case.  (*Id.*)  The court ultimately concluded that Mr. Workman's "novel theory [was] incorrect."  (*Id.*)  Another Florida State Court found that Mr. Workman was not qualified, by virtue of training or experience, with respect to the subject matter of his "expert" testimony.  *See State of Florida v. Buswell, et. al.*, Sixth Florida Judicial Circuit, Case No. CTC 07-0496XDHANC, at *10 (submitted herewith as McNab Aff. Ex. 13.)  And in *State v. Chun*, the New Jersey case concerning the Draeger breath alcohol instrument, the Special Master expressly found Mr. Workman's testimony "unpersuasive."  (McNab Aff. Ex. 6 at 183:18-184:7.)

In sum, Mr. Workman:

- Is a "professional" expert who makes his living testifying against breath alcohol testing programs and instruments;

- Who has apparently misrepresented to this Court and to others that he is a licensed patent attorney;

- Who has misrepresented to this Court and to others that CMI's Intoxilyzer 5000 is or was patented and, therefore, its source code is not a trade secret;

- Who has published an article falsely stating that Draeger allowed him to observe its source code without limitation and, therefore, lost its trade secret status;

- Who, though an officer of the court, was caught in the act of passing the answer to a question to witness during live, in-court cross examination;

- Who has misrepresented to this Court that he supervised the review of Draeger's source code when, in fact, he refused to sign the non-disclosure agreement and did not receive or review the source code;

- Who has represented to this Court that CMI's source code is "missing basic safeguards," despite never having seen a single line of CMI's source code;

- Who has misrepresented to this Court that he caused CMI to receive orders to produce the source code from Georgia courts;

- Who has introduced improper, and erroneous, argument in a declaration, misrepresenting the content of CMI's contract with the State of Minnesota and misstating the substance of the U.S. Copyright Act;

- Whose testimony and theories have been excluded or found to be "unpersuasive," "without merit," and just plain "incorrect."

For each and all of these reasons, CMI respectfully urges the Court to consider any input from Mr. Workman with substantial skepticism.

## <u>CONCLUSION</u>

The Proposed Consent Judgment presents a fair and reasonable resolution of the source code issue. It accommodates the State's need to make the source code available to Minnesota litigants where district courts have deemed it discoverable and CMI's legitimate need to protect its valuable trade secrets. As importantly, the Proposed Consent Judgment accomplishes what the underlying lawsuit cannot—it makes the source code available to Minnesota litigants long after the contract between the State and CMI expired.

The Consent Judgment may not be perfect, and it may not completely satisfy everyone. That is the nature of a compromise. But the Consent Judgment makes the

source code available, at no cost, to every Minnesota litigant who has obtained an order deeming it discoverable, and for as long as the State uses the Intoxilyzer 5000EN for evidentiary purposes. It makes the source code available in printed and searchable digital formats that have been independently found to be fully readable and analyzable by any properly qualified professional. Minnesota DWI defendants and implied consent petitioners have been demanding access to the source code for over two years. As soon as the Court enters the Consent Judgment, they will have it.

Respectfully Submitted,

Dated: January 9, 2008            WINTHROP & WEINSTINE, P.A.

 s/William A. McNab
David M. Aafedt, MN #27561X
William A. McNab, MN #312071

WINTHROP & WEINSTINE, P.A.
225 South Sixth Street, Ste. 3500
Minneapolis, Minnesota 55402-4629
Tel: (612) 604-6400
Fax: (612) 604-6800
daafedt@winthrop.com
wmcnab@winthrop.com

ATTORNEYS FOR DEFENDANT
CMI OF KENTUCKY, INC.

4243419v1