UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
_____

State of Minnesota, by Michael Campion, its
Commissioner of Public Safety,

                                 Plaintiff,

v.

CMI of Kentucky, Inc.,
A Kentucky Corporation,

                                 Defendant

and

Robert J. Bergstrom, Craig A. Zenobian,
Shane M. Steffensen and Christopher D.
Jacobsen,

                               Plaintiffs-Intervenors.
_____

Civil No. 0:08-cv-00603-DWF-AJB

**PLAINTIFFS-INTERVENORS'
REPLY BRIEF TO BRIEFS FILED
BY AMICI CURIAE**

Plaintiff-Intervenors agree with the position of the Minnesota Society for Criminal Justice (MSCJ), but disagree with the unfounded opinions and conjecture of the Minnesota County Attorneys' Association (MCAA) and the Minnesota DWI Task Force (MDWITF).

In their effort to obtain convictions and incarcerations, both the MCAA and the MDWITF erroneously urge this Court to map a course for the Minnesota State Courts to follow which will trample the rights of those they want to convict. They do so in the name of convenience and expediency for the state, with little regard to the rights of those they want to incarcerate.

1

In their zeal, both the MCAA and the MDWITF attempt to mislead the Court into believing that because the state performed studies on the Intoxilyzer 5000EN, the less than reasonable and adequate access to complete Source Code review contemplated by the Proposed Consent Judgment is enough, when it is not. The MCAA and the MDWITF should not be rewarded for their tactics

The state's studies do not ensure valid, reliable or accurate results from the Intoxilyzer 5000EN.

I. **THE STATE OF MINNESOTA ADMITS THAT THE PURPORTED VALIDATION STUDIES OF THE INTOXILYZER 5000EN RELIED UPON BY AMICI CURIAE ARE NOT VALID AND RELIABLE AND THEREFORE FAIL TO VINDICATE THE CONSTIUTIONAL RIGHTS OF THE ACCUSED**

*Amicus curiae* tout the validation studies performed by the BCA to mislead the Court into believing that the test results from the Intoxilyzer 5000EN are valid and reliable. [*Amicus Brief of the Minnesota County Attorneys Association*, Docket No. 73, p 3]. In doing so, the MCAA hopes the Court will jump to the conclusion that Source Code review is irrelevant, and therefore the less than reasonable, less than adequate Source Code review contemplated by the Consent Agreement is acceptable. This is disingenuous, to say the least, given that the whole *reason* for releasing the source code is to review it.

It is not the place for prosecuting county attorneys to determine that the source code is irrelevant. It is not even the role of defense attorneys to make such determinations. The Minnesota judiciary has ruled numerous times that source code

review is required under the Due Process, the Confrontation Clause, and even under rudimentary civil and criminal discovery grounds. At issue here is the plain fact that the Consent Agreement that the prosecutors and their allies rally around actually obstructs and interferes with the very Source Code review that is essential to satisfy these obligations.

> A. **The State Of Minnesota's Own BCA Personnel Admit the Validation Testing Of The Intoxilyzer 5000EN Is Not Based On Any Scientific Standards And Failed To Test The Intoxilyzer 5000EN And Its Software.**

Although the Commissioner and Amicus MCAA assert the BCA's validation process ensures valid, reliable results, the validation process itself lacks any scientific standards and fails to test the breath test machine and its software. In fact, the BCA's validation testing appears to be nothing more than an ad hoc attempt to satisfy the state's formalities to legally certify the machine and its software.

The former supervisor of the BCA's toxicology section, Glen Hardin, admitted that the validation process the BCA used to formally approve the Intoxilyzer 5000 and its current version of software did not conform to *any* specific scientific standards, even though clear cut industry standards exist. This past June of 2008, Mr. Hardin testified in the Minnesota State Court that he supervised and participated in the validation studies for the current Intoxilyzer 5000EN and its software. Although he originally claimed the BCA's testing exceeded the National Highway Traffic Safety Administration's (NHTSA) standards for the testing of breath alcohol devices, Mr. Hardin admitted on cross examination that there is **no standard** with which the so called validation testing had to

3

comply and that he was only vaguely familiar with NHTSA standards that he originally claimed were being followed. Mr. Hardin testified:

> Q: Now for validation testing, those validation studies weren't performed to the NHTSA standards or National Highway Traffic Safety Administration standards?
> A: Well, we test some things that exceed the NHTSA standards and there are some areas that NHTSA tests that we don't test.
> Q: So the validation testing that you did did not comply with all of NHTSA standards, correct?
> A: **There is no standard with which it must comply**, so I don't believe that is a question that has any meaning.
> Q: **Are you familiar with NHTSA standards?**
> A: **Vaguely**.

(Emphasis added). [Ex. 2, Glenn Hardin, Transcript p. 3-4, *State v. Hunter*, Sherburne County Dist. Court File No. 71-CO-08-715, June 23, 2008].

Mr. Hardin admitted that the State of Minnesota's BCA did not comply with the NHTSA requirements for comparing breath results with blood or urine that was contemporaneously taken from the test subject. Instead, the State of Minnesota only compared the breath results with a **prior version of software that compared blood and urine.** Mr. Hardin testified:

> Q: With respect to the breath test results, you did … validation testing, **you didn't compare those breath test results with blood or urine in this particular case; isn't that correct?**
>
> A: **That is correct. We compared them with previous versions of software that had been compared with blood and urine**.

(Emphasis added). [Id.].

4

The testing the State of Minnesota has done, the State admits discovered fatal flaws in the software. Mr. Hardin testified:

> Q: With the validity testing you've done for previous versions, it's failed to find errors in the program or the software; is that right?
> A: **There were some issues associated with previous versions that we didn't catch in the validation testing, that's correct**.
> Q: **So that's a yes?**
> A: **Yes**.

(Emphasis added). [Ex. 1, Glen Hardin Transcript, p. 19 *Quigley v. Comm'r of Pub. Safety*, Sherburne Dist. Ct. File No. CO-07-506, (Nov. 6, 2007)].

Other examples, already presented to the Court, demonstrate known errors in the source code that have gone deliberately uncorrected. This evidence came not from open disclosure from the BCA, or transparent attempts to rigorously vet the Intoxilyzer 5000 – instead, this evidence came from a luckily-worded discovery request for all correspondence between CMI and the State of Minnesota. But for these e-mails (which the State continues to rationalize with half-explanations and half-truths) Minnesota drivers would have no idea that these problems with test acceptance, sample rejection and other errors were even occurring. [Ex. 3, E-mail correspondence dated September 27, 2006 and April 24, 2007]. Thus, credible source code review – unfettered and unrestricted access to the software – is the only way to insure that actual problems are adequately addressed and handled. It is not enough to trust that CMI is "doing their job" or that the State of Minnesota can be trusted as the be-all-and-end all judge of reliability.

### B. The Validation Testing Of The Intoxilyzer 5000EN Is Insufficient to Satisfy Due Process and Other Constitutional Concerns With Respect to Criminal Prosecutions.

The private interest in the accuracy of a criminal proceeding that places an individual's life or liberty at risk is almost uniquely compelling. *Ake v. Oklahoma*, 470 U.S. 68, 78, 105 S.Ct. 1087 (1985). Practices that directly threaten the accuracy of the fact-finding process betray these concerns and generally run afoul of due process requirements. *See e.g.*, *Thompson v. Louisville*, 362 U.S. 199, 80 S.Ct. 624 (1960); *Tot v. United States*, 319 U.S. 463, 63 S.Ct. 1241 (1943); *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340 (1935).

This is why due process requires that evidence be excluded wherever it is "essential to safeguard the integrity of the truth-seeking process." *Brewer v. Williams*, 430 U.S. 387, 425, 97 S.Ct. 1232 (1977)(Burger, J., dissenting); *Moore v. Illinois*, 434 U.S. 220, 227, 98 S.Ct. 458 (1977).

Reliance on constitutional due process means that the integrity of the adversary process depends both on the presentation of reliable evidence and the rejection of unreliable evidence. *Taylor v. Illinois*, 484 U.S. 400, 414-5, 108 S.Ct. 646 (1988). Due process does not permit a conviction based on evidence lacking the requisite degree of reliability. *California v. Green*, 399 U.S. 149, 163 n.15, 90 S.Ct. 1930 (1970); (Harlan, J., concurring). "[R]eliability is the linchpin in determining the admissibility" of evidence under the Fourteenth Amendment. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243 (1977). Exclusion of evidence is appropriate where it serves the legitimate interest

of "ensuring that only reliable evidence is introduced at trial." *U.S. v. Scheffer*, 523 U.S. 303, 309, 118 S.Ct. 1261 (1998).

Exactly this type of "reliable evidence" is at issue when dealing with the Intoxilyzer 5000EN. To prove to judges and juries the documented flaws in the software of the Intoxilyzer 5000EN about which the State of Minnesota has known yet still has been using to prosecute motorist requires full and complete disclosure of source code to the Intoxilyzer 5000EN.

Numerous judges have found the source code relevant, and have thus held that source code review is necessary to ensure the reliability described succinctly above. Especially in a prosecution for DUI, "our legal system has a particularly strong 'basic fairness' obligation to see that the evidence that is regularly used by the State…meets a threshold of well-established scientific reliability." *State v. Dilliner*, 569 S.E.2d 211, 224 (W.Va. 2002)(Starcher, J., concurring). "In order for the results of a blood alcohol test to be admissible, the state must prove that the reliability of the test satisfies due process and fairness." *State v. Honeyman*, 560 So.2d 825, 829 (La. 1990). Plainly put, unobstructed and reasonably accessible methods of source code review are all but essential to upholding a criminal defendant's constitutional rights.

Clearly, any evidence concerning simulator solutions, or breath test results dependant thereon, lacks the requisite degree of reliability to satisfy the constraints of due process. Accordingly, "[t]he important legal implications of forensic breath alcohol evidence is a critically important purpose requiring the highest level of quality control."

Rod Gullberg, *Methodology and Quality Assurance in Forensic Breath Alcohol Analysis*, 12 FORENSIC SCI. REV. 49 (2000).

## II. CONVENIENCE AND COST SAVINGS DO NOT TAKE PRECEDENCE OVER CITIZEN'S CONSTITUTIONAL RIGHTS.

The Amicus County Attorneys Association argue that because of the inherent danger of drinking and driving, the government's need to regulate the roadways is a compelling reason to override the Constitution. However, the Constitution cannot be subverted in the name of convenience or efficiency of law enforcement. *See Schilling v. Odlebak*, 224 N.W. 694, 695 (Minn. 1929) ("Constitutional rights may not be subordinated to administrative convenience); *see also Arkansas v. Sanders*, 442 U.S. 753 (1979).

Amicus go so far as to argue that the entire "source code" issue is just procedural posturing by criminal defendants and implied consent petitioners. Thus amicus confidently cite to "studies" that purport to demonstrate how immediate consequences for drivers suspected of being under the influence reduces rates of recidivism. *Amicus Brief of the Minnesota County Attorney's Association*, Docket No. 73, page 4. Such logic is disingenuous on at least two separate grounds.

### 1. Two of the Largest Counties in Minnesota (Ramsey and Hennepin) Have Standing Judicial Orders Which Contravene the Statute Requiring a Speedy Implied Consent Hearing, Which Further Postpones License Consequences for Arrested Drivers.

Plaintiff-Intervenors herein cite the relevant facts for a recent case heard in Minnesota – *State v. Wiltgen* 737 N.W.2d 561 (Minn.,2007). Wiltgen was arrested for

DWI and her driver's license was administratively revoked under Minnesota's implied consent law. Wiltgen challenged the license revocation by timely filing a petition for judicial review pursuant to Minn.Stat. § 169A.53, subd. 2 (2006).

Although Minn.Stat. § 169A.53, subd. 3 (2006), requires that the hearing be held on the license revocation "at the earliest practicable date, and in any event no later than 60 days following the filing of the petition for review," a district court Standing Order provided that the hearing date would not be scheduled until there had been a disposition of the associated criminal case. The effect of the Standing Order, at least in Wiltgen's case, was to eliminate the 60-day hearing requirement on her license revocation. *State v. Wiltgen* 737 N.W.2d at 565. During this time period, pursuant to Minn.Stat. § 169A.53, subd. 2(c), her driving privileges were fully restored, as is the standard procedure under these types of Standing Orders. *Id*.

Thus, two populous Minnesota Counties take such little stake in the position of Amicus (namely that quick punishment without an evidentiary hearing is key to creating long-term safety on our roads) that they have implemented policies that actually *delay* adjudication for the one and only "immediate" sanction offered by the Intoxilyzer 5000 – license revocation.

2. **The Fact That the Consequences for Failing a Test on the Intoxilyzer 5000 Are Immediate Supports the Fact that Transparent and Thorough Review of the Machine is Essential to Protect Drivers' Rights.**

At the time that someone is arrested at the discretion of a peace officer for driving under the influence, they are often asked to submitting to a breath test on the Intoxilyzer

9

5000. If, after the Intoxilyzer discards the breath sample and replaces it with a piece of testimonial evidence, the results read over the *per se* limit of .08, a driver's license is immediately revoked.1

In circumstances such as these, where a machine becomes the judge, jury and executioner, there simply cannot be enough transparency. "Circumstances such as these" include the fact that:

1. A breath test, unlike a blood or urine test, is administered by an individual without any forensics training whatsoever.

2. There is no ability to independently verify the test results of the breath sample.

3. All internal safeguards employed by the Intoxilyzer are of a 'self-reporting" nature i.e. everyone from the officer to the judge have no proof of a malfunction unless the Intoxilyzer itself deliberately chooses to report a malfunction.

4. All internal safeguards employed by the Intoxilyzer (breath profile slope agreement and ambient air fails are two of the most important) are controlled solely by the source code, which has purportedly never been examined by members of the BCA – thus, how accurately these

---

1 The exception, noted above, is in Hennepin and Ramsey Counties, where a request for judicial review of the revocation will typically result in full restoration of driving privileges pending a judicial determination of the revocation.

safeguards were programmed (or whether they have been removed or watered down) is impossible to precisely determine without seeing the actual source code.

When a property interest (a driver's license) can be immediately revoked based on the dictates of one machine, drivers are suddenly faced with the prospect of losing their jobs, strained family relationships, slipping into debt, and dealing with the associated guilt and stigma, all on the *assumption* that the machine that judged them guilty was incapable of error. When a liberty interest can be trampled on due to the dictates of one machine, these consequences are magnified a hundredfold – again, based upon the *assumption* that the Intoxilyzer can do no wrong.

In circumstances such as these, review of the source code becomes essential. Again, this is why Plaintiff-Intervenors ask for nothing more than what the State and CMI purport to be settling on – access to the source code. Plaintiff-Intervenors' only objection stems from the understanding that *review* of the source code should be the one and only goal of providing access. The current Consent Agreement does much to thwart source code review, and nothing by way of facilitating such analysis. Given the real, immediate, and almost unquestioned consequences that stem from the results of the Intoxilyzer 5000, Plaintiff-Intervenors cannot help but disagree with the illogical stance taken by Amicus.

### III. EVEN AMICUS IN "FAVOR" OF THE CONSENT AGREEMENT NOTE THE UNREASONABLE COSTS ASSOCIATED WITH THIS PURPORTEDLY LOW COST SETTLEMENT.

The State has represented to the Court that the proposed consent agreement makes the source code, "accessible on a very reasonable basis. The Permanent Injunction authorizes *no-cost access* to both written and digital versions of the Source Code at CMI's secured facility in Kentucky." *Plaintiff's Memorandum In Support of Entry of the Consent Judgment and Permanent Injunction*, Docket No. 44, page 8.

Plaintiff-Intervenors have responded by noting the massive and largely unnecessary costs that would accrue to each and every Minnesota litigant should the Court approve the Consent Agreement. *Declaration of Thomas E. Workman, Jr.*, Docket No. 55, page 10 (stating that source code review under the current Consent Agreement would entail paying an expert witness for approximately 30 years worth of work).

Oddly enough, Plaintiff-Intervenors' arguments are duplicated in the *amicus* brief submitted in favor of the Consent Agreement. *Amicus* DWI Task Force note in no uncertain terms that obtaining an expert to analyze the source code under the terms of this agreement would cost "tens of thousands of dollars" *per defendant*. *Amicus Brief of the Minnesota County Attorney's Association*, Docket No. 73, page 6. This succinctly stated fact prefaces the concern *amicus* have for their own wallets.

*Amicus* fear that attorneys from the public defender's office in Minnesota, as part of their duty to zealously represent their clients, may obtain relief for their clients under Minnesota Statute § 611.21. This statute provides indigent defendants with the right to

court-ordered fees for expert witnesses, and specifically states that:

> "The compensation to be paid [an expert] for such service rendered to a defendant under this section . . . may not exceed $1,000, exclusive of reimbursement for expenses reasonably incurred, unless payment in excess of that limit is certified by the court . . ."

Minnesota Statute § 611.21(b). Suddenly, when the State sees the real risk of having to pay travel expenses to Kentucky, the Consent Agreement is a "concern."

Plaintiff-Intervenors note that any Consent Agreement, if approved by the Court, should take into account the rights of *all* Minnesotans - not just those well-heeled defendants who can afford to hire experts to reside in Kentucky for most of their adult life, but also those defendants who are represented by the public defender's office and cannot afford to purchase the justice nominally provided by the Consent Agreement.

RAMSAY & ASSOCIATES, P.L.L.C.

Dated: January 11, 2009 /s/ Charles A. Ramsay
Charles A. Ramsay  ID No. 260277
2780 Snelling Avenue North, #330
Roseville, Minnesota 55113
651-604-0000

Dated: January 11, 2009 /s/ Daniel J. Koewler
Daniel J. Koewler   ID No. 388460
2780 Snelling Avenue North, #330
Roseville, Minnesota 55113
651-604-0000

GORES LAW OFFICE

Dated: January 11, 2009        /s/ John J. Gores
                               John J. Gores        ID No. 228928
                               7091 Highway 65 NE, Suite 201
                               Fridley, Minnesota 55432
                               763-571-4777

                               *Attorneys for Plaintiffs-Intervenors*