# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota,<br>by Michael Campion, its<br>Commissioner of Public Safety, | Civil Case No. 08-603 (DWF/AJB) |
| Plaintiff, | |
| and | **STATE OF MINNESOTA'S**<br>**MEMORANDUM OF LAW IN**<br>**SUPPORT OF ITS MOTION FOR** |
| Robert J. Bergstrom, Craig A.<br>Zenobian, Shame M. Steffensen,<br>and Christopher D. Jacobsen, | **PARTIAL SUMMARY JUDGMENT**<br>**AND AN ORDER FOR SPECIFIC**<br>**PERFORMANCE OR PERMANENT**<br>**INJUNCTION, OR IN THE** |
| Plaintiff- Intervenors, | **ALTERNATIVE FOR A**<br>**PRELIMINARY INJUNCTION** |
| vs. | |
| CMI of Kentucky, Inc.,<br>a Kentucky corporation, | |
| Defendant. | |

## INTRODUCTION

The State of Minnesota, by its Commissioner of Public Safety, Michael Campion ("State"), brings this motion for partial summary judgment on Counts III and IV of its Complaint as it relates to liability. It also seeks an Order of the Court requiring that Defendant CMI of Kentucky, Inc. ("CMI") comply with its contract with the State and provide to counsel in DWI and implied consent proceedings the source code for the Intoxilyzer 5000EN ("Source Code") if so ordered by a court. In the alternative, the State requests a preliminary injunction to that effect.

# FACTS

The State believes that the following facts are undisputed.

## A.    Background

Minnesota currently uses the Intoxilyzer 5000EN to conduct breath-alcohol tests on individuals arrested for violating the State's driving while impaired ("DWI") laws, *see* Minn. R. 7502.0420 (2008).  The Intoxilyzer 5000EN is manufactured by CMI.  Previous versions of the Intoxilyzer instrument have been used by law enforcement agencies in Minnesota since approximately 1984.  Affidavit of Commissioner Michael Campion ("Campion Aff.") ¶ 4 .

Prior to deploying the Intoxilyzer 5000EN into the field for use by law enforcement, the Minnesota Bureau of Criminal Apprehension ("BCA"), a division of the Minnesota Department of Public Safety, conducted extensive validation testing on the Intoxilyzer 5000EN.  The BCA concluded that the instrument provides consistently valid and reliable measurements of a test subject's breath-alcohol concentration.  Currently, there are approximately 264 Intoxilyzer 5000EN instruments being used by law enforcement agencies throughout Minnesota.  Affidavit of Frank Dolejsi ("Dolejsi Aff.") ¶ 7.

The use of breath testing is a valuable tool for addressing problems posed by drunk drivers.  Campion Aff. ¶ 5.  For example, research has shown that the sooner an individual arrested for DWI faces consequences, the less likely that person is to re-offend.  Unlike a blood or urine test, where the sample must be sent to the BCA for analysis, breath test results are known immediately.  Dolejsi Aff. ¶ 11.  Accordingly, a

failed breath test provides law enforcement with the timely information necessary for holding the driver for court and invoking the remedies under the implied consent law. Campion Aff. ¶ 5.

**B.    The Contract Between the State and CMI.**

In the fall of 1996, the State issued a Request for Proposal ("RFP") entitled "Evidentiary Breath Alcohol Test Instruments."  Affidavit of Emerald Gratz ("Gratz Aff.") ¶ 4, Exhibit A at BCA075[1].  The RFP requested proposals "to supply breath alcohol test instruments, related accessories, parts and services for use in the State of Minnesota by Sate, local, and other law enforcement and corrections agencies and the court system."  *Id.* at BCA092.  It further stated that the RFP "describes a relationship to be established between the State and a vendor which provides Evidentiary Breath Alcohol Test Instruments."  *Id.* at BCA091.

Among other things, the RFP imposed certain "special conditions," specific to the products and services being purchased.  The RFP stated in pertinent part:

<u>SPECIAL CONDITIONS</u>

REQUIREMENTS

PRODUCTS AND SERVICES REQUIRED FOR EVIDENTIARY BREATH ALCOHOL TEST INSTRUMENTS:

EACH VENDOR IN RESPONSE TO THIS RFP SHALL ENCLOSE A STATEMENT ADDRESSING EACH OF THE REQUIREMENTS LISTED BELOW.  THE STATEMENT SHOULD ADDRESS EACH REQUIREMENT IN THE SAME ORDER AS THE REQUIREMENT IS LISTED BELOW.

---

[1] "BCA075" references the bate-stamped numbers on the documents.  Because the contract documents are not consecutively paginated, this memorandum will refer to the bate-stamped numbers when citing specific pages of the contract documents.

. . . .

> 12.     Provision for information to attorneys supplied directly from manufacturer including statement of all non-disclosure/non-reproduction agreements required to obtain information, fees and deposits required, to be used by attorneys representing individuals charged with crimes in which a test with the proposed instrument is part of the evidence. This part of the contract to be activated with an order from the court with jurisdiction of the case and include a reduced fee schedule for defendant found by the court to be entitled to a publicly funded defense.

*Id.* at BCA096, ¶ 12.

The RFP also provided that "[t]he State is solely responsible for rendering decisions in matters of interpretation on all terms and conditions." *Id*. at BCA081, ¶ 32. The RFP stated that a vendor may seek to modify the RFP by "tak[ing] specific exception to one or more conditions." *Id.* at BCA080-81, ¶ 25. Additionally, "[a] vendor's proposal must include in the transmittal letter, a statement of acceptance of all terms and conditions unless otherwise taken exception to, as stated within [the] RFP." *Id.* at BCA081, ¶ 32. According to the RFP, a bidder could also request a modification or clarification of the RFP to resolve ambiguities:

> If a vendor discovers any significant ambiguity, error, conflict, discrepancy, omission, or other deficiency in the RFP, the vendor shall immediately notify the Contract Administrator, as specified in the introduction, of such error and request modification or clarification of the document.

*Id.* at BCA082, ¶ 35.

On October 25, 1996, CMI responded to the RFP and in its transmittal letter[2] stated:

---

[2] The RFP required that "a separate transmittal letter shall be inserted as part of each proposal." Gratz Aff. ¶ 4, Exhibit A at BCA081, ¶ 32.

**Acceptance of the State of Minnesota's Terms and Conditions**

> CMI hereby accepts the terms and conditions as stated in the state of Minnesota's Request for Proposal for Evidentiary Breath Alcohol Test Instruments without qualification. CMI understands that the terms and conditions as stated in the subject RFP shall become part of the contract between CMI and the state of Minnesota should CMI be the successful vendor in the award of contract.

Gratz Aff. ¶ 4, Exhibit C at BCA009. Although it sought to clarify provisions of the RFP relating to the technical requirements of the test instruments, Gratz Aff. ¶ 4, Exhibits B and C at BCA057-68, CMI did not seek to modify or clarify any of the contract provisions at issue in this case. In particular, it did not "take specific exception to" or otherwise request modification or clarification of Special Condition 12.

In its transmittal letter, CMI also stated:

> In a decision to acquire CMI's latest Intoxilyzer 5000, the state of Minnesota . . . will be taking advantage of literally thousands of Intoxilyzer 5000 user's [sic] experiences as well as the *volumes of court cases where the Intoxilyzer 5000 has successfully withstood aggressive defense challenges and attempts to discredit the instrumentation*. CMI is proud of this record, but more importantly, it is precisely this record that provides the state of Minnesota *the confidence it requires* in making the important decision of *partnering* with an instrument supplier in its alcohol testing program.

Gratz Aff. ¶ 4, Exhibit C at BCA003 (emphasis added). In addition, it listed "Ten Good Reasons to *Partner* with CMI" including partnering with "[a] company with a proven track record - to be *counted on for support* - both *Today and Tomorrow*" and partnering with the CMI team which is "highly motivated to help make the state of Minnesota's alcohol testing program *the best it can be*!" *Id.* at BCA008 (emphasis added; underlining in original).

In response to Special Condition 12 of the RFP, CMI represented to the State that it "has a standard procedure for release of information for legal purposes to attorneys." *Id.* at BCA036, ¶ 12. In accordance with Special Condition 12, CMI attached to its response a "CONFIDENTIALITY AGREEMENT" and "AFFIDAVIT." *Id.* at BCA069-71. The confidentiality agreement referenced "any pamphlets, manuals or any other documents containing information on the Intoxilyzer 5000" and the affidavit similarly referred to "any pamphlet, manual, or any other document containing information on the Intoxilyzer 5000." *Id.* at BCA070. CMI also attached a form letter referring to the operator's manual of the Intoxilyzer 5000. *Id.* at BCA069.

The State awarded CMI the contract on January 2, 1997. Gratz Aff. ¶ 4, Exhibit D at BCA104. The Contract Award states:

> The following documents, in order of precedence, are incorporated herein by reference and constitute the entire contract between you and the State: (1) this Notification of Contract Award, together with Exhibit A and any attachments or subsequent purchase orders, amendments or similar documents; (2) the request for proposal; and (3) your proposal and your Response to our letter requesting clarification.

*Id.* It also provided that the "[f]ee for attorney information to private attorneys (#12 of requirements)," is $250.00. *Id.* at BCA109. CMI signed the Contract Award on January 6, 1997. *Id.* at BCA104.

The initial contract period in the Contract Award was from January 2, 1997 to December 31, 2001, and was ultimately extended through January 31, 2008. *Id.* at BCA104-130. The contract period is referenced in the RFP provisions relating to pricing and insurance. Gratz Aff. ¶ 4, Exhibit A at BCA016, ¶ 24 and BCA089-90. All of the

approximately 264 Intoxilyzers 5000EN that are currently in use in Minnesota were purchased during the contract period.  Dolejsi Aff. ¶ 12.

### C. Court Orders Requiring Production Of The Source Code And The Impact Of CMI's Failure To Provide The Source Code.

In early 2006, the State began receiving demands for production of the Source Code from individuals arrested for DWI.  These individuals challenged the validity of their breath test results in both DWI and implied consent cases.  Various district court judges throughout Minnesota ordered production of the Source Code in hundreds of DWI and implied consent cases.  Gratz Aff. ¶ 6; Affidavit of William Lemons ("Lemons Aff.") ¶ 5.  The State alone sent hundreds of orders requiring production of the Source Code in implied consent cases to CMI, requesting that it produce the Source Code.  Gratz Aff. ¶ 6, Exhibits F-G.  Some criminal prosecutors similarly sent copies to CMI of state court orders requiring production of the Source Code in criminal DWI cases.  *Id.*, Exhibit H.  Even counsel for some defendants/petitioners sent CMI copies of orders they obtained requiring production of the Source Code and included a signed confidentiality agreement and affidavit in the form attached by CMI to its Response to the RFP and a check for $250.00.  *Id.* ¶ 7, Exhibit L.

CMI initially would not disclose the Source Code under any circumstances.  *Id.* ¶ 7.  After many discussions with the State, CMI changed its position and indicated that it would produce the Source Code, but only subject to a protective order it prepared.  Campion Aff. ¶ 6, Exhibit C at 2; Gratz Aff. ¶ 4, Exhibit I.  Most litigants and state court judges in cases where the Source Code was ordered to be produced found the CMI

protective order to be unreasonable and refused to agree to its terms. *Id.,* Exhibits F and K at 2. As stated by one state court judge:

> In short, [CMI's] proposed protective order and non-disclosure agreement are so overbearing that no sensible person would ever agree to be governed by them. . . . CMI is only willing to allow a review of the code by a person willing to sign a ridiculous non-disclosure agreement. No rational person would ever sign the agreement, and therefore, no rational analysis could ever be done. This Court is unwilling to allow CMI the pleasure of such a fiasco.

Affidavit of Michael Molenda ("Molenda Aff.") ¶ 4, Exhibit A at 9; *see also* Gratz Aff. ¶ 7, Exhibit F (representative court orders finding CMI protective order to be unreasonable).

Due to the broad-based unacceptability of the CMI protective order, the State proposed to CMI that the Minnesota Federal District Court's model protective order be utilized, but CMI would not agree to its use. Gratz Aff. ¶ 7, Exhibits J at 3 and K at 2. The State then suggested modifications to the model Minnesota Federal Court protective order, but CMI rejected this proposal as well. *Id.* ¶ 7 and Exhibit K at 2. Ultimately, CMI failed to produce the Source Code pursuant to the state court orders except in one isolated instance.[3] *Id.*; Molenda Aff. ¶ 5.

In numerous cases where state district courts ordered production of the Source Code, both DWI and implied consent cases were dismissed or rescinded because CMI failed to produce the Source Code. Gratz Aff. ¶ 8; Lemons Aff. ¶ 5. Just in 2007, more

---

[3] In late 2007, a hard copy of the Source Code was produced to one litigant in a criminal DWI case in Dakota County in response to a district court order. Molenda Aff. ¶ 5, Exhibit B. CMI's proposed protective order was agreed to by the state court judge and defense counsel in that case and the litigant paid CMI $1,675.00 for production. *Id.*

than 200 implied consent cases were rescinded based solely on the non-disclosure of the Source Code. Gratz Aff. ¶ 8. And since that time, hundreds of criminal DWI and implied consent cases have been dismissed or rescinded due to CMI's failure to produce the Source Code. Lemons Aff. ¶ 5; Gratz Aff. ¶ 8.

On November 30, 2007, Commissioner Campion wrote to the President of CMI, Toby Hall, regarding CMI's continued failure to produce the Source Code and law enforcement's resulting lack of faith in the admissibility of breath test results. Campion Aff. ¶ 6, Exhibit B. The letter stated, in part:

> This collapse of faith in the sustainability of Intoxilyzer results for all intents and purposes will end breath testing in Minnesota until the source code issue is resolved or new instruments are acquired. *This disruption in breath testing has enormous implications for the safety of Minnesota drivers,* not to mention substantial financial implications for our state.

*Id.* at 2 (emphasis added). The Commissioner further stated that "[w]e can no longer tolerate the recalcitrance with which you are responding to both judicial order and continued patient requests" and reiterated the State's request that CMI produce the Source Code. *Id.* By letter of December 21, 2007 to the Commissioner, Mr. Hall stated that CMI would only produce the Source Code if the production was subject to "CMI's version of the protective order and non-disclosure agreement." *Id.,* Exhibit C at 5. CMI continued to fail to produce the Source Code and consequently this case was commenced by the State. Hundreds of implied consent cases have been stayed, and continue to be stayed, by state courts pending resolution of this litigation. Gratz Aff. ¶ 8.

**ARGUMENT**

## I. STANDARD OF REVIEW ON SUMMARY JUDGMENT.

Summary judgment may be granted when there are no issues of material fact in dispute and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Tucker v. Evans*, 276 F.3d 999, 1001 (8th Cir. 2002). Only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48.

A federal court exercising supplemental jurisdiction over a state law claim applies the substantive law of the forum state. *Erie R. Co. v. Tompkins,* 304 U.S. 64, at 78-80 (1938); *Emmenegger v. Bull Moose Tube Co.*, 324 F.3d 616, 624 n.9 (8th Cir. 2003).

## II. CMI HAS BREACHED, AND CONTINUES TO BREACH, SPECIAL CONDITION 12 BY REFUSING TO PROVIDE THE SOURCE CODE TO ATTORNEYS WHEN ORDERED BY A COURT.

Count III of the Complaint seeks to require CMI to comply with Special Condition 12 so that CMI provides attorneys in Minnesota DWI and implied consent cases with the Source Code when ordered by a court. The contractual language, fundamental principles of contract law, the purpose of the contract, the State's interpretation of the contract and the public interest all mandate that such relief be granted by the Court.

**A.    The Contract Unambiguously Requires CMI To Produce Information Ordered By A Court.**

In accordance with the purpose of the contract, the plain language of Special Condition 12 clearly requires CMI to provide to counsel information regarding the Intoxilyzer that a court orders be produced.

**1.    The Purpose Of The Contract Is To Ensure The Admissibility, And Defend The Reliability, Of Breath Testing Results In The Enforcement Of The State's DWI And Implied Consent Laws.**

A contract must be interpreted to effectuate the intent of the parties which is gleaned from the purpose of the contract. *Cement, Sand & Gravel Co. v. Agric. Ins Co. of Watertown, N.Y.*, 30 N.W.2d 341, 345 (Minn. 1947) (stating the intent of the parties is to be ascertained by "a process of synthesis in which the words and phrases are given a meaning in accordance with the obvious purpose of the . . . contract as a whole"). The obvious purpose of this contract is to provide the State with products and services to ensure the admissibility of alcohol concentration test results for use in DWI and implied consent proceedings and to defend the reliability of those test results.

The contract is replete with references which establish this purpose. For example, the RFP itself is entitled "*Evidentiary* Breath Alcohol Test Instruments." Gratz Aff. ¶ 4, Exhibit A at BCA075 (emphasis added). It requested proposals "to supply breath alcohol *test instruments*, *related* accessories, parts and *services* for use in the State of Minnesota by State, local and other law enforcement and corrections agencies *and the court system*." *Id.* at BCA092 (emphasis added). In responding to the State's RFP, CMI highlighted the "volumes of court cases" in which the instrument "successfully withstood aggressive

defense challenges and attempts to discredit the instrument." *Id.,* Exhibit C at BCA 003.

The contract also imposes detailed specifications, performance, and testing requirements

for the instrument to ensure its reliability. *Id.,* Exhibit A at BCA095-99. Finally, Special

Condition 12 provides a mechanism, upon order of a court, for CMI to disclose

"information" to litigants' counsel so that the State can defend court challenges to the

admissibility of breath test results. *Id.* at BCA096, ¶ 12.

## 2. The Term "Information" In Special Condition 12 Includes Any Information Ordered To Be Produced By A Court.

Special Condition 12 of the RFP required the manufacturer to agree to provide:

> *Information* to *attorneys supplied directly from manufacturer* including statement of all non-disclosure/non-reproduction agreements required to obtain *information*, fees and deposits required, to be *used by attorneys* representing individuals charged with crimes *in which a test with the proposed instrument is part of the evidence.* This part of the contract to be *activated with an order from the court* with jurisdiction of the case and include a reduced fee schedule for defendants found by the court to be entitled to a publicly funded defense.

*Id.* (emphasis added). CMI agreed to this provision "without qualification." *Id.,* Exhibit

C at BCA009.

Production of court-ordered information is critical to the proper enforcement of

the State's DWI laws. Failure to produce the information undermines the admissibility of

test results and can result in the dismissal of a DWI or implied consent case. The State's

contract with CMI therefore requires CMI to produce any information ordered by a court.

Notably, the Minnesota Supreme Court recognized the broad scope of this

provision in *Underdahl v. Comm'r of Public Safety,* 735 N.W.2d 706 (Minn. 2007)

("*Underdahl I*"). In interpreting Special Condition 12 of the RFP, the court stated:

> [I]rrespective of whether the state owns any portion of the source code, CMI *agreed*, in the RFP, to provide the attorneys representing individuals charged with crimes in which a test with the [Intoxilyzer 5000EN] is part of the evidence *information necessary to comply with a court's order*.

753 N.W.2d at 713 (emphasis added). The court's comments reflect the plain and ordinary meaning of the provision. *See Turner v. Alpha Phi Sorority House,* 276 N.W.2d 63, 67 (Minn. 1979) (stating language in contract should be given its plain and ordinary meaning). The Source Code is clearly "information" within the meaning of Special Condition 12. CMI therefore must produce the Source Code when a court orders its production.

### 3. CMI Is Contractually Obligated To Comply With The State's Interpretation Of Special Condition 12.

It is also significant that CMI agreed in the contract that "[t]he State is *solely* responsible for rendering decisions in matters of *interpretation* on *all* terms and conditions." Gratz Aff. ¶ 4, Exhibit A at BCA081, ¶ 32. The State interprets the contract to require CMI to produce the Source Code when ordered by a court. Affidavit of E. Joseph Newton ("Newton Aff.") ¶ 2. CMI must therefore abide by that interpretation.

### 4. CMI's Response To The RFP Does Not Limit The Term "Information" To The Operator's Manual.

CMI argues that Exhibit E attached to its response to the RFP, Gratz Aff. ¶ 4, Exhibit C at BCA069-71, somehow limits the term "information" in the RFP to the operator's manual for the Intoxilyzer. Exhibit E does not limit the term "information" for several reasons.

First, CMI's Exhibit E includes a "CONFIDENTIALITY AGREEMENT" and an "AFFIDAVIT." The confidentiality agreement broadly references any "documents" and does not limit the scope of the agreement to the operator's manual. Gratz Aff. ¶ 4, Exhibit C at BCA070. Specifically, it refers to "any pamphlets, manuals or *any other documents* containing information on the Intoxilyzer 5000." *Id.* (emphasis added). Likewise, the affidavit states that the attorney has represented a client "in need of information of [sic] the Intoxilyzer 5000" and that the attorney has not copied any "pamphlet, manual, or *any other document* containing this information on the Intoxilyzer 5000." *Id.* at BCA071 (emphasis added).

Second, the RFP strictly limits the manner in which a vendor may modify the RFP. The vendor must "take specific exception" to the particular condition. Gratz Aff. ¶ 4, Exhibit A at BCA080, ¶ 25. CMI did not take specific exception to Special Condition 12. Consequently, as a matter of law, CMI's letter did not modify Special Condition 12 of the RFP.

Third, in its transmittal letter, CMI affirmatively accepted "[t]he terms and conditions as stated in the state of Minnesota's [RFP] without qualification." Gratz Aff. ¶ 4, Exhibit C at BCA009. CMI also agreed that "the terms and conditions as stated in the . . . RFP shall become part of the contract between CMI and the state of Minnesota should CMI be the successful vendor in the award of contract." *Id.*

Fourth, as part of the contract, CMI agreed to provide the State with ten copies of both the operator and service manuals. *Id.* at BCA036, ¶ 16. Because the operator's manual is in the State's possession, a contract provision requiring CMI to only produce a

document the State already has would be meaningless.[4]  *See, e.g., Chergosky v. Crosstown Bell, Inc.,* 463 N.W.2d 522, 526 (Minn. 1990) (stating courts presume that all of the language of a contract is intended to have effect and attempt to avoid interpretation that renders a contract provision meaningless).

Fifth, the Contract Award, which was issued after CMI's Response to the RFP, provides that a litigant must pay $250 to obtain information pursuant to Special Condition 12.  Gratz Aff. ¶ 4, Exhibit D at BCA109.  The stated cost does not mention or in any way indicate that the information to be produced pursuant to Special Condition 12 is limited to the operator's manual.  *Id.*  In fact, the Contract Award separately provides that the cost to the State of an additional operator's manual (beyond the ten free operator manuals provided for in Special Condition 16 of the contract) is $25.00.  *Id.* at BCA110.

Sixth, the information provision in the RFP and the reference to it in the Contract Award takes "precedence" over CMI's Response to the RFP.  The Notification of Contract Award makes clear that, "in order of precedence," the contract is comprised of the Notification of Award, then the RFP, and lastly, CMI's Response to the RFP.  Gratz Aff. ¶ 4, Exhibit D at BCA104.

Seventh, CMI apparently asserts that the significance of its form letter is its statement that "[t]he Operation Manual for the Intoxilyzer 5000 is the only manual that would be available to you."  *Id.* at BCA069.  Even this language does not preclude the

---

[4] The manual is also a public document, *see* Minn. Stat. § 13.03, subd. 1 (2008), and therefore the non-disclosure language in Special Condition 12 is superfluous.  Dolejsi Aff. ¶ 12.

production of "other documents" as referenced in the confidentiality agreement and affidavit attached to the letter.  In any event, the Source Code is not a "manual."

Eighth, the premise of CMI's argument is that at the time the contract was made CMI only intended to provide the operator's manual in response to a court order.  If that is true, then in light of representations made in its proposal to the State, CMI materially and intentionally misled the State to obtain the contract.  For example, CMI touted in its proposal to the State the "volumes of court cases where the Intoxilyzer 5000 has successfully withstood aggressive defense challenges and attempts to discredit the instrumentation."  Gratz Aff. ¶ 4, Exhibit C at BCA003.  CMI further stated that it had "a proven track record *to be counted on for support* both Today and Tomorrow," and it was "*highly motivated* to help make the State of Minnesota's alcohol testing program the *best it can be*!"  *Id.* at BCA008 (emphasis added, underlining in original.)  It also represented to the State, in response to Special Condition 12, that CMI "has a standard procedure for release of information for legal purposes to attorneys."  *Id.* at BCA036.  CMI's interpretation of the contract is simply inconsistent with the representations CMI made to the State at the time the contract was awarded.

CMI's argument that its form letter limits the term "information" to the operator's manual is baseless.  The contract clearly requires production of the Source Code if ordered by a court.

**B.** **If Special Condition 12 Is Deemed To Be Ambiguous, It Should Be Construed To Further The Public Interest By Requiring Production Of The Source Code.**

If a contractual provision is fairly susceptible to more than one interpretation, it should be construed by the Court to effectuate the public interest embodied in the contract. *See, e.g., Correct Piping Co. v. City of Elkins,* 308 F. Supp. 431, 433 (N.D. W. Va. 1970) ("[A]greements affecting the public and agreements with a governmental body on behalf of the public are construed in favor of the public."); *Continental Illinois Nat'l. Bank and Trust Co. of Chicago v. Washington*, 696 F.2d 692, 699 (9th Cir. 1983) (When the State is acting in its sovereign capacity "contracts which affect the public interest are interpreted so as to favor the State"); *Restatement (Second) of Contracts* § 207 ("In choosing among the reasonable meanings of a promise or agreement or a term thereof, a meaning that serves the public interest is generally preferred."); *Seman v. First State Bank of Eden Prairie*, 394 N.W.2d 557, 560 (Minn. Ct. App. 1986) (applying the Restatement).

The substantial public interest in this contract is to ensure that evidence of intoxication produced by the Intoxilyzer 5000EN is admissible in court so that drunk drivers can be effectively and timely prosecuted in criminal DWI and civil implied consent proceedings. The only reasonable way to construe this provision consistent with the public interest is to require CMI to produce the information ordered by the Court. Indeed, such a reading allows for the proper administration and enforcement of the State's drunk driving laws and recognizes the essential role of a state court judge in the litigation of these cases. Gratz Aff. ¶¶ 8-10; Lemons Aff. ¶¶ 4-6; Campion Aff. ¶¶ 5-7.

## C. The Information Provision Applies To Both Criminal DWI And Civil Implied Consent Proceedings.

Special Condition 12 provides that CMI must disclose information to "attorneys representing individuals charged with crimes in which a test with the proposed instrument is part of the evidence." Gratz Aff. ¶ 4, Exhibit A at BCA096, ¶ 12. It does not restrict the type of proceeding in which the individual may use the information. The only limit on the type of court proceeding is that the instrument must be "part of the evidence" in the proceeding. Thus, under the plain language of this provision, an attorney representing an individual who is charged with a criminal DWI violation may obtain information in any criminal or civil proceeding in which the instrument is part of the evidence.

In situations where an individual fails the breath test (i.e., has an alcohol concentration of 0.08 or more), an implied consent proceeding always accompanies a criminal DWI charge.[5] Gratz Aff. ¶ 3. The language of Special Condition 12 recognizes this interrelationship between DWI and implied consent cases. Moreover, in light of the contract's purpose of providing admissible evidence in all drunk driving cases, there is no rational basis for distinguishing between criminal DWI and civil implied consent proceedings.

In addition, *Underdahl I* strongly supports the applicability of Special Condition 12 to implied consent proceedings. *Underdahl I* involved a *civil implied consent proceeding* in which the Minnesota Supreme Court examined Special Condition 12 and

---

[5] *See* Minn. Stat. § 169A.52, subd. 2 (2008) (providing that an individual who has an alcohol concentration of 0.08 or more commits an implied consent violation); Minn. Stat. § 169A.20, subd. 1(5) (2008) (providing that driving with an alcohol concentration of 0.08 or greater constitutes DWI).

noted that "CMI agreed, in the RFP, to provide the attorneys representing individuals charged with crimes 'in which a test with the [Intoxilyzer 5000EN] is part of the evidence' information necessary to comply with a court's order." *Underdahl I*, 735 N.W.2d at 713. The court then concluded that the Commissioner had an adequate remedy at law based on the ability to sue CMI to enforce Special Condition 12. *See id*. By so concluding, the Minnesota Supreme Court necessarily agreed that Special Condition 12 applies to implied consent proceedings.

The State likewise interprets Special Condition 12 to apply to implied consent proceedings. Newton Aff. ¶ 3. As discussed above, in accordance with the terms of the contract, this interpretation is binding on CMI. Gratz Aff. ¶ 4, Exhibit A at BCA081, ¶ 32.

This interpretation also furthers the important public interest underlying the contract. See *supra* at 17.

**D.** **The Expiration Of The "Contract Period" On January 31, 2008 Does Not Relieve CMI Of Its Contractual Obligation To Provide Information.**

CMI argues that the contract expired on January 31, 2008 and therefore CMI has no continuing contractual obligation to provide information when ordered by a court. This argument is also without merit.

The "contract period" is only mentioned in the pricing and insurance provisions of the contract. Gratz Aff. ¶ 4, Exhibit A at BCA080, ¶ 24. Other contractual provisions impose continuing obligations on CMI based on the State's purchase of test instruments during the contract period. For example, the performance relating to the 2-year warranty

or even delivery of the Intoxilyzer may occur outside of the contract period. *Id.* at BCA095, ¶ 1. The requirement that CMI provide information pursuant to a court order also has a temporal element that may occur outside of the contract period. It "is activated with an order from the court with jurisdiction of the case." *Id.* at BCA096, ¶ 12. CMI must therefore comply with court orders requiring production of information regarding the Intoxilyzer as long as results from the instruments purchased during the contract period are used as evidence in court proceedings.

Contract rights can also continue beyond the expiration of a contract even if the contract does not expressly provide for continuation of these rights. For example, in *Litton Financial Printing Division v. National Labor Relations Board,* 501 U.S. 190, 206 (1991)*,* the Court stated that contract rights are continuing if (1) they "accrued or vested under the agreement," or (2) "under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." Both of these standards are satisfied with respect to Special Condition 12.

The State fully complied with the contract by paying CMI approximately $1.9 million under the contract for Intoxilyzer instruments, parts, software, and service. Dolejsi Aff. ¶ 12. In return, CMI agreed not only to provide the Intoxilyzers, but also to comply with Special Condition 12. Therefore, the State's right to have CMI perform under Special Condition 12 accrued and/or vested under the contract. *See Yaeger v. Delano Granite Works*, 84 N.W.2d 363, 366 (Minn. 1957) (stating a right is vested when it has "been so far determined that nothing remains to be done by the party asserting it"). *See also Premier Corp. v. Econ. Research Analysts, Inc.*, 578 F.2d 551, 554 (4th Cir.

1978) (stating expiration of a brokerage contract with an indemnity clause "did not discharge the broker's obligation to indemnify Premier for the loss arising from illegal sales made while the contract was in effect."); *Long v. General Motors Acceptance Corp.*, 17 B.R. 251, 253 (Bankr. N.D. Ohio 1982) ("[R]ights prior in time to the termination or cancellation of a contract survive the act which puts an end to the contract."); *First Nat'l Bank of Highland Park v. Mid-Central Food Sales, Inc.,* 473 N.E.2d 372, 374 (Ill. Ct. App. 1984) (concluding that taxes assessed during lease were payable by lessee even though the lease expired before taxes became due). CMI must therefore comply with Special Condition 12 even though the contract period expired.

The intent of the contract, manifested by its purpose, further confirms that Special Condition 12 is effective beyond the contract period. As indicated above, the central purpose of the contract, i.e., to ensure the admissibility of the Intoxilyzer breath testing results, is entirely undermined if CMI does not produce information regarding the Intoxilyzer that is ordered by a court. See *supra* at 11-12. Moreover, the language of Special Condition 12 does not expressly preclude application of the provision after the contract's term. *See Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionery Workers Union,* 430 U.S. 243, 252-53, (1977) (in determining whether arbitration clause applied to grievances after contract expiration, Court noted that "even though the parties could have so provided, there is nothing in the arbitration clause that expressly excludes from its operation a dispute which arises under the contract, but which is based on events that occur after its termination.")

In light of the contract's clear purpose, CMI's obligation to comply with Special Condition 12, an essential provision of the contract, continues until the Intoxilyzers are no longer in use in the State of Minnesota. *See, e.g., Litton,* 501 U.S. at 208 ("We presume as a matter of contract interpretation that the parties did not intend a pivotal dispute resolution provision to terminate for all purposes upon the expiration of the agreement"); *Nolde Bros.,* 430 U.S. at 253 (in concluding that arbitration clause applied after expiration of contract, Court stated "there are strong reasons to conclude that the parties did not intend their arbitration duties to terminate automatically with the contract"); *In re Doctor's Health, Inc.,* 238 B.R. 594, 606 (Bankr. D. Md. 1999) (concluding that contract's purpose established that provision of contract "does not cease simply because the 'Agreement' was terminated.")

The Uniform Commercial Code ("UCC")[6] also supports this result. It provides that on "termination"[7] of a contract "all obligations which are still executory on both sides are discharged but any right based on prior breach or *performance* survives." Minn. Stat. § 336.2-106(3) (2008) (emphasis added); *see also Sid Richardson Carbon & Gasoline Co. v. Interenergy Res. Ltd.,* 99 F.3d 746, 754 (5th Cir. 1996) (stating under UCC termination of contract "does not extinguish vested rights"). The State has fully performed its part of the bargain by paying for the Intoxilyzers. As discussed above, the

---

[6] The State/CMI contract provides that "except to the extent that the provisions of this Agreement are inconsistent therewith, this Agreement shall be governed by the Uniform Commercial Code (UCC) as adopted by the State of Minnesota." Gratz Aff. ¶ 4, Exhibit A at BCA081, ¶ 31.

[7] In this case the contract was not "terminated" because termination occurs when either party puts an end to the agreement. *See* Minn. Stat. § 336.2-106(3) (2008). However, section 336.2-106(3) is instructive on the issue of an expired contract.

consideration for that payment was not only the evidentiary breath testing machines, but also CMI's commitment that it would provide information necessary to respond to defense challenges and ensure that test results are admissible. See *supra* at 11-12, 21-22.

CMI's continuing contractual obligation is further established by the fact that Special Condition 12 is intended to benefit third parties. *See, e.g., Doctor's Health,* 238 B.R. at 607. In *Doctor's Health,* a health maintenance organization ("HMO") entered into a contract with Doctor's Health to provide medical services to its members. *Id.* at 596. The contract obligated Doctor's Health to pay any external providers who rendered services to the HMO's members. *Id.* at 597-98. The HMO could pay external providers directly and therefore had a right to indemnity from Doctor's Health which was secured by collateral in a reserve fund. *Id.* at 598. The agreement provided that on termination specific contract provisions would continue. The reserve fund was *not* one of the provisions that was referenced as surviving termination. *Id.* at 605.

The court found that in light of the contract's purpose, the reserve provision continued after the contract expired and it was unnecessary to specifically provide in the contract that the reserve provision survived termination of the contract. *Id.* at 606-607. The court also concluded that "[t]his is *particularly* the case because the reserve was intended to protect *third parties*, the unpaid external providers." *Id.* (emphasis added).

Special Condition 12 is similarly intended to benefit third parties. It states that the information ordered by the Court is to be provided directly to the litigants, through their counsel who obtained the court order. Gratz Aff. ¶ 4, Exhibit A at BCA096. Special

Condition 12's benefit to third parties is further reason to conclude that CMI must produce the Source Code even after expiration of the contract period.

In addition, as indicated previously, the State's interpretation of the "contract period" and CMI's continuing obligation to comply with Special Condition 12 is binding on CMI. Newton Aff. at ¶ 4; *supra* at 13.

Finally, any ambiguity regarding application of the "contract period" must be resolved in favor of the public interest. As discussed above, contracts which involve the public interest and the State acting in its sovereign capacity such as to prosecute drunk drivers, should be construed to further the public interest. See *supra* at 17. The public interest in maintaining a proper system to enforce the State's drunk driving laws is entirely undermined by CMI's argument. In contrast, the State's interpretation allows for the effective enforcement of these important public safety laws.

## III. CMI HAS BREACHED, AND CONTINUES TO BREACH, THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

Count IV of the Complaint provides that, consistent with the requirement that CMI act in good faith and deal fairly in the implementation of the contract, CMI must comply with state court orders requiring production of the Source Code. Indeed, CMI's failure to provide any information pursuant to court order, other than the operator's manual, is contrary to the common purpose of the contract and the State's justified expectations.

Every contract is subject to an implied covenant of good faith and fair dealing. *See In re Hennepin County 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995). The State's contract with CMI also expressly includes the covenant of good faith

and fair dealing in the Minnesota UCC. RFP at 7, ¶ 31; Minn. Stat. § 336.1-304 (2008).

"To allege an implied covenant claim [a party] need not first establish an express breach of contract claim . . ." *In re Hennepin County*, 540 N.W.2d at 503. Minnesota law imposes a subjective standard for measuring good faith. *See White Stone Partners, LP v. Piper Jaffray Cos.*, 978 F. Supp. 878, 884 (D. Minn. 1997).

"According to the Restatement, good faith performance of a contract includes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *White Stone Partners,* 978 F. Supp. at 881. The duty of good faith and fair dealing embraces "an implied obligation that neither party shall do anything to injure or destroy the right of the other party to receive the benefits of the agreement." 23 Samuel Williston et. al, *A Treatise on the Law of Contracts* § 63.22 (West 2002) (citing *Logan v. Bennington College Corp.*, 72 F.3d 1017 (2d Cir. 1995)). "Good faith" typically "means honesty in fact and observance of reasonable commercial standards of fair dealing." *See* Minn. Stat. § 336.1-201(20) (2008).

As discussed in detail above, the undisputed purpose of this contract was to supply the State with breath testing instruments and related services to provide admissible evidence for use in DWI and implied consent proceedings. See *supra* at 11-12, 21. The contract therefore contains a provision for the disclosure by CMI of information ordered by courts in cases where the Intoxilyzer 5000EN breath test results are to be entered into evidence.

CMI's failure to provide this information, notwithstanding the issuance of hundreds of state court orders and repeated requests of the State, has deprived the State of

the benefits of its agreement with CMI by interfering with the State's ability to use results from these instruments in DWI and implied consent proceedings. See *supra* at 7-9; *infra* at 27-30. Evidence establishing CMI's lack of good faith includes CMI's contrived argument that it is only obligated to provide the operator's manual, see *supra* at 13-16; the representations it made to the State to obtain the contract, especially in light of its claim that it only intended to produce the operator's manual, see *supra* at 5-6, 16; CMI's refusal to abide by the State's interpretation of Special Condition 12, even though CMI agreed in the contract that it would do so, see *supra* at 13, 19, 24; and CMI's insistence on a protective order that was determined to be unreasonable by many state court judges, see *supra* at 7-8.

CMI simply has not been faithful to the agreed common purpose of the contract and the justified expectations of the State that CMI provide information to ensure admissibility of test results obtained from their breath testing instruments. It therefore has breached its duty of good faith and fair dealing owed to the State. *See White Stone Partners,* 978 F.2d at 881.

## IV. THE STATE IS ENTITLED TO AN ORDER OF SPECIFIC PERFORMANCE OR A PERMANENT INJUNCTION REQUIRING CMI TO PRODUCE THE SOURCE CODE.

If this Court grants the State's motion for summary judgment, CMI should be required to produce the Source Code in implied consent and DWI cases when a court orders production of the Source Code. The remedy can take the form of an order for specific performance or a permanent injunction. *See Restatement (Second) of Contracts*, § 357; Minn. Stat. § 336.2-716 (2008) and cmt. 1 thereto. If the standards for both

specific performance and a permanent injunction are met, an order of specific performance appears to be the preferred remedy in a case of this kind. *See Restatement (Second) of Contracts*, § 357(2)(b).

Specific performance is an equitable remedy which compels compliance with the terms of a contract and is imposed at the discretion of the Court. *See, e.g., Fred O. Watson Co. v. United States Life Ins. Co. in City of New York,* 258 N.W.2d 776, 778 (Minn. 1977). In determining whether to order specific performance, the Court balances the equities of the case. *See, e.g., Metro. Sports Facilities Com'n v. Minnesota Twins P'ship.,* 638 N.W.2d 214, 227 (Minn. Ct. App. 2002).

A district court considering entry of a permanent injunction also balances the equities. In so doing, a federal court analyzes the following three factors: (1) the threat of irreparable harm; (2) the balance between the irreparable harm and the injury that granting the injunction will inflict on other interested parties; and (3) the public interest. *See, e.g., Oglala Sioux Tribe v. C & W Enters., Inc.,* 542 F.3d 224, 229 (8th Cir. 2008).

In this case, the equities clearly support the issuance of an order for specific performance or a permanent injunction. An irreparable injury occurs when the movant has no adequate remedy at law. *See, e.g., Watkins Inc. v. Lewis,* 346 F.3d 841, 844 (8th Cir. 2003). Here, there is clear evidence of irreparable harm to the proper enforcement of Minnesota's drunk driving laws as a result of CMI's failure to produce the Source Code. Hundreds of drunk driving cases have been dismissed or rescinded because CMI did not produce the Source Code. Gratz Aff. ¶ 8; Lemons Aff. ¶ 5. Disposition of these cases without an adjudication on the merits jeopardizes public safety. It allows people who

may present safety risks to the public to suffer no consequence and continue to drive on our roads. The rehabilitative effects of prompt enforcement of the law are also undermined. Gratz Aff. ¶ 10.

Hundreds of implied consent cases are currently stayed, and others continue to be stayed, pending resolution of this litigation. Gratz Aff. ¶ 8. These stayed cases are at significant risk of being dismissed if CMI does not produce the Source Code. The delay in adjudicating these cases also compromises public safety because, as indicated above, immediate consequences for drunk driving promptly removes unsafe drivers from the roads and facilitates rehabilitation. The backlog of cases also has a detrimental effect on the court system. *Id.* ¶¶ 9-10.

CMI's failure to produce the Source Code has also caused some law enforcement agencies to use alternative forms of alcohol concentration testing (urine and blood). Dolejsi Aff. ¶ 11. Alcohol concentration results for these forms of tests are significantly delayed in comparison to breath testing. The results from urine or blood tests may not be known for up to two weeks after the sample is taken, whereas breath test results are known instantaneously. Dolejsi Aff. ¶ 11. As a consequence, law enforcement and the courts cannot act as quickly to get unsafe drivers off the roads and commence the rehabilitation process, as it could if breath testing was used. Campion Aff. ¶ 5; Gratz Aff. ¶ 10; Lemons Aff. ¶¶ 5-6.

Money damages cannot adequately compensate[8] the State for the harm caused by CMI's breach of the contract. The only way to remedy the irreparable harm and to allow the State to effectively enforce its DWI laws is to require that CMI perform its contractual obligations and produce the Source Code when ordered by a court.

In balancing the irreparable harm to the State against any injury to CMI, the balance weighs decidedly in the State's favor. The harm the State has suffered to its ability to enforce drunk driving laws is great and involves a matter of public safety. In contrast, CMI will merely be required to retain the Source Code as long as Minnesota is using the Intoxilyzer 5000EN instruments (something it presumably would have done) and provide the information when ordered by a court. Although CMI asserts the Source Code is a trade secret, disclosure is subject to CMI's confidentiality agreement and affidavit, as well as the terms of a protective order that may be imposed by a court.

Finally, the public interest in enforcing the DWI laws and effectively and efficiently prosecuting drunk drivers will be served by granting the requested relief. Criminal DWI and civil implied consent cases will not be dismissed or rescinded by state court judges like they have been in the past when CMI has failed to comply with the court orders requiring production. Gratz Aff. ¶ 8; Lemons Aff. ¶ 5. Law enforcement and the court system will also proceed sooner and more efficiently to remove unsafe drivers from our streets and highways and rehabilitate offenders. Dolejsi Aff. ¶ 11; Lemons Aff. ¶ 5; Campion Aff. ¶ 5; Gratz Aff. ¶¶ 8-10. Accordingly, those individuals

---

[8] The State reserves all rights in this or any other case to seek economic relief against CMI as otherwise provided by law.

who violate Minnesota's DWI laws will immediately and fully face appropriate consequences, resulting in the necessary protection of public safety.

Based on the foregoing, the State requests that the Court issue an order for specific performance. A proposed order is attached. If the Court determines that an order for specific performance is inappropriate, the State requests that the Court enter a permanent injunction requiring CMI to comply with the contract. A proposed permanent injunction is also attached.

## V. IF THE COURT DENIES THE STATE'S SUMMARY JUDGMENT MOTION, A PRELIMINARY INJUNCTION SHOULD BE ISSUED REQUIRING CMI TO PRODUCE THE SOURCE CODE.

A preliminary injunction is also an equitable remedy. *See Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109, 113 (8th Cir. 1981) (en banc). In balancing the equities, a court considers "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Id*.

No single factor is determinative. *See id.* A party seeking preliminary injunctive relief need not prove a greater than fifty percent likelihood of success on the merits if the other factors weigh strongly in the party's favor. *See id.* For example, "where the movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less." *Id*.

For the reasons stated above, *Dataphase* factors (1), (2) and (4) weigh heavily in the State's favor. See *supra* at 27-30, As for the fourth factor, the State has shown that it

is, at least, likely to prevail on the merits.  See *supra* at 1-26.  Accordingly, a preliminary injunction should issue requiring CMI to comply with the "information" provision of its contract with the State.  A proposed order is attached.

The State also requests that, pursuant to Fed. R. Civ. P. 65(a)(2), the Court "advance the trial on the merits and consolidate it with the hearing" on the State's motion for preliminary injunction if necessary.  In the event the Court believes that an evidentiary hearing is needed to decide the merits of Counts III or IV of the State's Complaint, it can schedule such a hearing as part of the alternative motion for preliminary injunction.  As a result, the Court would significantly expedite resolution of this case by deciding whether an order of specific performance or a permanent injunction should be issued, rather than an interim order.

As stated in the Advisory Committee Notes to Rule 65(a)(2):  "[T]o consolidate the proceedings will tend to expedite the final disposition of the action.  It is believed that consolidation can be usefully availed of in many cases."  *See also* 11A  C. Wright & A. Miller, *Federal Practice and Procedure* § 2950, p. 233 (West 1994) ("It has long been recognized that an accelerated trial on the merits often is appropriate when a preliminary injunction has been requested.")  The public interest and public safety in Minnesota clearly benefit from an expeditious decision regarding CMI's contractual obligation to produce the Source Code.

## CONCLUSION

Based on the foregoing, the State respectfully requests that the Court grant its motion and issue either the proposed order of specific performance or permanent

injunction. Alternatively, the State requests that the Court advance any necessary trial on the merits and consolidate it with the State's preliminary injunction motion and thereafter issue the proposed order of specific performance or permanent injunction. As a further alternative, the State requests that the Court issue the attached order for preliminary injunction.

Dated: April 17, 2009

Respectfully submitted,

LORI SWANSON
Attorney General
State of Minnesota

s/ **Alan I. Gilbert**

Alan I. Gilbert
Solicitor General
Atty. Reg. No. 0034678
al.gilbert@state.mn.us

Emerald Gratz
Assistant Attorney General
Atty. Reg. No. 0345829
emerald.gratz@state.mn.us

Daniel L. Abelson
Assistant Attorney General
Atty. Reg. No. 0327554

Thomas C. Vasaly
Assistant Attorney General
Atty. Reg. No. 0112501

445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
Telephone: (651) 296-9717
Fax: (651) 282-5832

ATTORNEYS FOR PLAINTIFF STATE OF MINNESOTA

AG: #2410231-v1