UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota, by Michael Campion, its Commissioner of Public Safety,<br>    Plaintiff,<br>and<br>Robert J. Bergstrom, Craig A. Zenobian, Shame M. Steffensen, and Christopher D. Jacobsen,<br>    Plaintiff- Intervenors,<br>    vs.<br>CMI of Kentucky, Inc., a Kentucky corporation,<br>    Defendant. | Civil Case No. 08-603 (DWF/AJB)<br><br>**AFFIDAVIT OF FRANK DOLEJSI IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND AN ORDER FOR SPECIFIC PERFORMANCE OR PERMANENT INJUNCTION, OR IN THE ALTERNATIVE FOR A PRELIMINARY INJUNCTION** |

COUNTY OF RAMSEY    )
                                     )ss.
STATE OF MINNESOTA   )

Frank Dolejsi, being first duly sworn, deposes and states that:

1.    I am the Director of the Forensic Science Service at the Minnesota Bureau of Criminal Apprehension ("BCA"), a division of the Minnesota Department of Public Safety ("DPS"), and submit this affidavit in support of Plaintiff's Motion for Partial Summary Judgment and an Order for Specific Performance or Permanent Injunction, or in the alternative for a Preliminary Injunction.

2.    I have been employed by the BCA since 1984. In my capacity as the Director of the Forensic Science Service at the BCA, I have knowledge and experience with the chemical testing done to enforce Minnesota's driving while impaired ("DWI") and implied consent laws. Under current Minnesota law, three types of biological specimens are used to determine alcohol concentration for DWI purposes: blood, breath,

or urine. The BCA is responsible for instituting and maintaining all three types of DWI testing.

3. Since approximately 1955, the Minnesota Legislature has authorized the administration of breath alcohol tests to individuals arrested for DWI. These breath testing procedures were established and implemented by individual counties and municipalities. In 1967 the Legislature authorized the establishment of the first state-wide breath testing program, to be administered by the BCA. The first alcohol breath testing instrument approved for use was known as the Breathalyzer. The BCA maintained a fleet of Breathalyzer instruments until approximately 1984, when it purchased its first fleet of Intoxilyzer-brand breath testing instruments from CMI of Kentucky, Inc. ("CMI"). The Intoxilyzer instrument uses infrared technology to measure a test subject's breath alcohol concentration and a number of its functions were computer-automated, which added to the ease of operation.

4. In the fall of 1996, the State issued a Request for Proposal ("RFP") seeking bids for a new fleet of breath test instruments to replace the aging Intoxilyzer-brand instruments purchased in 1984. This RFP was open to proposals from all manufacturers. The RFP required cost information and set out detailed technical specifications that the instruments would be required to satisfy, as well as outlining other requirements, such as maintenance and technical support, ownership of copyrighted material, and the production of information to attorneys when ordered by a court.

5. CMI submitted its response to the RFP representing that the State's needs could be met either by the stock version of the Intoxilyzer, known as the Intoxilyzer

5000, or by a version of the Intoxilyzer 5000 specially configured for the State of Minnesota.

6. The State elected to accept Defendant CMI's response to the RFP and ordered a version of the Intoxilyzer 5000 which was custom-configured for the needs of the State's breath testing program; the "Minnesota model" of the Intoxilyzer 5000, or the Intoxilyzer 5000 "EN."

7. Prior to deploying the Intoxilyzer 5000EN into the field for use by law enforcement, the BCA conducted extensive validation testing on the Intoxilyzer 5000EN, concluding that the instrument provides consistently valid and reliable measurements of a test subject's breath alcohol concentration. Currently, there are approximately 264 Intoxilyzer 5000EN instruments being used by law enforcement agencies throughout Minnesota.

8. The specific Intoxilyzer test record, a computer-generated "usage and maintenance report" for each individual instrument, and the results of the validation studies performed by the BCA on the instrument are available to any person taking a breath test. Any person wishing to examine an actual Minnesota model Intoxilyzer 5000EN may do so by making an appointment at BCA headquarters and posting a bond equivalent to the cost of a new instrument.

9. While the Intoxilyzer 5000EN is based on infrared technology to determine a subject's breath alcohol concentration, its functioning is controlled by binary computer code contained in two "Z80" microchips which are installed on each Intoxilyzer 5000EN breath testing instrument. This binary code is, in turn, derived from a program written in

"assembly language." This assembly language program is commonly referred to as the "Source Code" to the Intoxilyzer 5000EN. The State has never had a copy of the Source Code to the Minnesota model of the Intoxilyzer 5000 in its actual possession or custody.

10. The issue of access to the Source Code first arose in early 2006, when the State began receiving demands for production of the Source Code from individuals arrested for DWI and challenging the validity of their breath test results in both criminal DWI and implied consent cases in state district court. Based on these requests, district courts throughout Minnesota ordered production of the Source Code in hundreds of criminal DWI and implied consent cases. Although repeatedly requested to produce the Source Code by the State, CMI failed to produce the Source Code except in one isolated instance. Attached as Exhibit A is a true and correct copy of a letter from the BCA to CMI dated August 21, 2007, again requesting that CMI produce the Source Code.

11. Because breath test results could be suppressed based on the failure of CMI to produce the Source Code, some criminal prosecutors in Minnesota advised their police departments to stop using the Intoxilyzer 5000EN and to instead opt for either blood or urine testing. The affects of fewer breath tests are: (1) blood and urine tests cost more money to process than breath tests; (2) the added blood and urine tests for DWIs are competing for resources with BCA fluid tests for other criminal cases, including drug testing related to DWIs, sexual assaults, and other crimes against persons; and (3) the increased number of blood and urine tests for DWIs has caused the length of time needed for BCA analysis to increase. In the past, DWI blood or urine test results took a few days, but now it can take up to two weeks to receive a DWI blood or urine test result.

12. Pursuant to the terms and pricing set forth in the RFP, the BCA has paid CMI approximately $1.9 million for Intoxilyzer instruments, parts, software, and service related thereto. As part of the State's contract with CMI, the BCA has acquired the Operator's Manual for the Intoxilyzer 5000EN. The BCA considers the Operator's Manual to be a public document.

Further your affiant sayeth not.

s/ Frank Dolejsi  
FRANK DOLEJSI

Subscribed and sworn to before me
this <u>16th</u> day of <u>April</u>, 2009.

s/ Carolyn R. Robinson
Notary Public