_____

State of Minnesota, by Michael Campion,
its Commissioner of Public Safety,

Court File No. 0:08-cv-00603-DWF-AJB

Plaintiff,

v.

**PLAINTIFFS-INTERVENOR MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS OR SUMMARY JUDGMENT AND IN SUPPORT OF THE STATE'S MOTION FOR PARTIAL SUMMARY JUDGMENT, SPECIFIC PERFORMANCE, AND INJUNCTION**

CMI of Kentucky, Inc.,
A Kentucky Corporation,

Defendant

Robert J. Bergstrom, Craig A. Zenobian,
Shane M. Steffensen and Christopher D.
Jacobsen,

Plaintiffs-Intervenor

_____

## INTRODUCTION

Plaintiffs-Intervenor oppose Defendant CMI's motion for Judgment on the

Pleadings or Summary Judgment. Plaintiffs-Intervenor support the State's motion for

Partial Summary Judgment, Specific Performance and injunction, to the extent it requires

Defendant to produce the source code to the Intoxilyzer 5000EN in a format that will

permit meaningful review as determined by Plaintiffs-Intervenor's experts.

1

Plaintiffs-Intervenor seek access to the Source Code to the Intoxilyzer 5000EN that Defendant manufactured and sold for profit to the State of Minnesota and which the State uses to prosecute Minnesota motorists. Plaintiffs-Intervenor's need the source code to establish at trial in their underlying Minnesota cases the invalidity and unreliability of the machine's results.

Fatal flaws in the Intoxilyzer 5000EN's operating software were discovered with use of the machine, as testified to by the former supervisor of the Minnesota BCA toxicology, Mr. Glen Hardin in 2008. (**Ex. 6**, p. 19). BCA e-mails bore out problems occurring with test acceptance, sample rejection and other errors. (**Ex. 8**). Only meaningful source code review will allow Plaintiffs-Intervenor, and others similarly situated, to adequately exercise their rights to establish the machine's invalidity and unreliability.

While the State claims it engaged in a validation process to conclude the machine was acceptable to the State, the former BCA supervisor Hardin admitted that the "validation" process the BCA used to formally approve the Intoxilyzer 5000EN and its current version of software did not conform to any specific scientific standards even though clear cut industry standards exist. (**Ex. 7**, pp. 3-4). The validation testing appears to have been nothing more than an ad hoc attempt to satisfy the State's formalities to legally certify the machine and its software. So, Plaintiffs-Intervenor seek access to the raw source code on a disc and in a format determined by Plaintiffs-Intervenor's experts that can be delivered to its experts' laboratory for meaningful professional analysis.

The plain, express language of the "information clause" contained in Special Condition No. 12 of the contract entered between Defendant and the State of Minnesota requires Defendant to produce the source code to Plaintiffs-Intervenor, and others similarly situated, upon the issuance of a court order requiring its production. (**Ex. 1**, p. 22).[1]

However, as part of its nationwide campaign to keep secret the source code defects, Defendant attempts to shirk its obligations under the "information clause" and brings this motion urging the Court to misconstrue the "information clause" to limit the information Defendant must produce to just an operation manual. In doing so, Defendant would have this Court disregard basic rules of contract construction and put a seal of approval on Defendant's actions that have been inconsistent with the State's ownership rights in the full source code, which Defendant assigned to the State in contract Condition No. 29.

Then, to eliminate from this action the parties with the greatest need to obtain and review the complete source code for the defects Defendant wants to keep secret, Defendant next makes the incredible claim Plaintiffs-Intervenor are not third-party beneficiaries contrary to the plain language of the "information clause," while urging the Court to make unreasonable distinctions. Then Defendant claims the contract expired, and, therefore it no longer has a duty to produce the source code to Plaintiffs-Intervenor. This, even though the obligation to produce this information vested upon Defendant's

---

[1] References to the page numbers of the RFP are those marked in the original RFP and are located in the left or right corner of the page.

delivery of the Intoxilyzers to the State.

Finally, in its last ditch effort to keep the flaws in the source code secret, Defendant boldly asserts it is a trade secret. However, Defendant's 1986 patent of the machine as well as Defendant's wholesale, unrestricted assignment of the complete source code to the State destroyed any trade secret status. Defendant's trade secret claims fails as a matter of law.

The time has come for Defendant to comply with its contractual obligations. Plaintiffs-Intervenor join the State in its motion for Partial Summary Judgment, Specific Performance and injunction, to the extent it requires Defendant CMI to produce the source code to the Intoxilyzer 5000 in a format that will allow for meaningful review as determined by Plaintiffs-Intervenor's experts. Defendant's motion for summary judgment should be denied.

## MATERIAL FACTS

1. **The Parties**.

   A. **Plaintiff**

Plaintiff is the State of Minnesota which uses Intoxilyzer 5000EN breath alcohol machines to prosecute motorists under Minnesota's drinking and driving laws.

   B. **Defendant CMI**

Defendant CMI is the manufacturer of the Intoxilyzer 5000EN that it sold to the State for use in prosecuting motorists under Minnesota's drinking and driving laws.

### C.    Plaintiffs-Intervenor

Plaintiff-Intervenor Robert J. Bergstrom is an individual being prosecuted by Plaintiff State of Minnesota based on evidence from the Intoxilyzer 5000EN.  Mr. Bergstrom has an order requiring the production of the source code in his Minnesota litigation.  (**Ex. 9**).

Plaintiff-Intervenor Craig A. Zenobian is an individual being prosecuted by Plaintiff State of Minnesota based on evidence from the Intoxilyzer 5000EN.  Mr. Zenobian has an order requiring the production of the source code in his Minnesota litigation.  (**Ex. 10**).

Plaintiff-Intervenor Shane M. Steffensen is an individual being prosecuted by Plaintiff State of Minnesota based on evidence from the Intoxilyzer 5000EN.  Mr. Steffensen has an order requiring the production of the source code in his Minnesota criminal prosecution and implied consent litigation. (**Exs. 11 & 12**).

Plaintiff-Intervenor Christopher D. Jacobsen is an individual being prosecuted by Plaintiff State of Minnesota based on evidence from the Intoxilyzer 5000EN. Mr. Jacobsen has an order requiring the production of the source code in his Minnesota criminal prosecution which was issued on March 25, 2008. (**Ex. 13**).

### 2.    The Intoxilyzer 5000EN.

The Intoxilyzer 5000EN is a machine that purports to measure the amount of alcohol in a person's body based upon the receipt of samples of breath. This machine consists of both mechanical and computer components. (**Ex. 14, ¶'s 9-11**). The machine

will not function properly without all of the software.  The portions of software customized specifically for Minnesota are insufficient to operate the Intoxilyzer. (Second Workman Declaration ¶ 18).

**3.      CMI Patented The Intoxilyzer 5000 and Now Admits A Patent Defeats Trade Secret Status.**

On May 6, 1986, Defendant received patent number 4,587, 427 for the Intoxilyzer it invented. (**Ex. 15**).

The President of Defendant CMI, Mr. Toby Hall, admitted in direct questioning from the Honorable Deborah Bernini, Judge of Arizona Superior Court, that a patent deprives an Intoxilyzer machine's source code of trade secret status.  President Hall testified:

> THE COURT:       Is the 8000 patented?
> THE WITNESS:     No, it is not.
> THE COURT:       Why not?
> THE WITNESS:     We chose to go the route of trade secret for the source code. And as far as patents for the Intoxilyzer 8000, there are other infrared breath devices that were prior to ours.

(**Ex. 16**, p. 175).

**4.      The State of Minnesota And Defendant CMI Enter Into A Requirements Contract For Evidentiary Breath Alcohol Machines.**

**A.      The State's Request For Proposal For Evidentiary Breath Alcohol Machines.**

In the fall of 1996, the State of Minnesota issued a Request for Proposal ("RFP") seeking bids for a new fleet of "evidentiary" breath alcohol test machines.  (**Ex. 1**).

The stated purpose of the RFP was to establish a requirements contract whereby

the State of Minnesota and its political subdivisions could order evidentiary breath

alcohol test machines, accessories, and parts for a firm price during the life of the

contract[2] and for the provision of other specified services, even after the contract term.

The RFP states:

> **PURPOSE OF RFP**:
>
> <u>This is a request for proposals</u> for a contract of five years duration <u>to supply breath alcohol test instruments, related accessories, parts and services for use in the State of Minnesota by State, local and other law enforcement and corrections agencies and the court system</u>. An evaluation of proposals will allow the state of Minnesota to select a breath alcohol test instrument in part on the basis of the ability of instruments offered by manufacturers to meet a set of performance criteria and to develop from the successful proposal a contract to purchase this equipment and related accessories and services. Instruments and equipment will be purchased under this contract as quickly as possible after execution of the contract. Such a contract would also establish a price at which additional instruments could be purchased by the State or by local or other governmental jurisdictions (subdivisions) in the state when and if needed over the life of the contract.

(Emphasis added) (**Ex. 1**, p. 18).

The RFP states it describes a relationship between the State of Minnesota and

CMI. (**Id**. at p. 17). As part of that relationship, the RFP's Condition No. 29 requires the

vendor who is awarded the contract to assign to the State of Minnesota the ownership of

all copyrightable materials the vendor originates or conceives and which "arises out of"

the performance of the contract. RFP Condition No. 29 states:

---

[2] Requirements contracts are authorized by the Minnesota Uniform Commercial Code, which Contract condition 31 states governs this contract. See Minn. Stat. § 336.2-306. See also *Porous Media Corp. v. Midland Brake, Inc*., 220 F.3d 954, 962-963 (8th Cir. 2000); *Upsher-Smith Labs., Inc. v. Myland Labs., Inc.*, 944 F.Supp. 1411, 1427 (D. Minn. 1996).

All right, title, and interest in all copyrightable material which Contractor shall conceive or originate, either individually or jointly with others, and which arises out of the performance of this Contract, will be the property of the State and are by this Contract assigned to the State along with ownership of any and all copyrights in the copyrightable material. Contractor also agrees, upon request of the State to execute all papers and perform all other acts necessary to assist the State to obtain and register copyrights on such materials. Where applicable, works of authorship created by Contractor for the State in performance of this Contract shall be considered "works for hire" as defined in the U.S. Copyright Act.

(Emphasis added) (**Ex. 1**, p. 7).

To assure good and clear ownership of all intellectual property assigned to the State, the RFP's Condition No. 16 required the vendor/contactor to warrant that the materials or products provided, produced, or used by the contractor/vendor in the performance of the contract do not infringe or violate any patent, copyright, trade secret, or other proprietary right of any third party and to defend and indemnify the State from any such claims. RFP Condition No. 16 states:

> **INTELLECTUAL PROPERTY INDEMNIFICATION**. The primary contractor warrants that any materials or products provided or produced by the contractor or utilized by the contractor in the performance of this contract will not infringe or violate any patent, copyright, trade secret, or any other property right of any third party. In the event of such a claim by any third party against the State, the State shall promptly notify the primary contractor and, the primary contractor at the contractor's expense shall indemnify and defend the State against any losses, cost, expense or liability (including attorney's fees arising out of such a claim, whether or not such a claim is successful against the State).

(**Ex. 1**, p. 5).

The RFP's Special Condition No. 12 also required CMI to warrant the provision of information to attorneys of individuals charged with crimes in which the machine is part of the evidence any information a Court orders be produced. RFP Special Condition No.

8

12 states:

> The provision of information to attorneys supplied directly from the manufacturer including statement of all non-disclosure/non-reproduction agreements required to obtain information, fees and deposits required, to be used by attorneys representing individuals charged with crimes in which a test with the proposed instrument is part of the evidence. This part of the contract to be activated with an order from the court with jurisdiction of the case and include a reduced fee schedule for defendants found by the court to be entitled to a publicly funded defense.

(Emphasis added). (**Ex. 1**, p. 22, No. 12).

The RFP's "General Proposal Terms and Contract Conditions/Instructions" mandates that the minimum requirements of the RFP must be included in the contract awarded to the vendor and that all general terms, contract conditions, specifications and special conditions of the RFP shall apply to any proposals entered into:

> The following terms set forth minimum requirements of the State and must be included in contract entered into by the State and the successful vendor. Any materials submitted may be incorporated by reference into the final contract.

> All general proposal terms and contract conditions attached hereto, as well as all specifications and special contract conditions enclosed herewith, form a part of the proposal and shall apply to any contract(s) entered into as a result of this proposal.

(**Ex. 1**, p. 3).

The RFP's Condition No. 25 requires that a vendor is presumed to be in agreement with the RFP's terms and conditions unless the vendor "takes specific exception" to the condition and that the mere submission of the vendor's standard form shall not be viewed as an exception unless the vendor specifically states in its proposal that the standard form is intended to supersede the State's terms and conditions. RFP Condition No. 25 states:

> A vendor shall be presumed to be in agreement with these terms and conditions

unless the vendor takes specific exception to one or more conditions. Submission by the vendor of its **standard form contract <u>shall not</u> be viewed as <u>an exception unless</u>** the vendor **<u>specifically states</u> in the proposal** that provisions in the form contract are intended to supersede the State's terms and conditions.

VENDORS ARE CAUTIONED THAT BY TAKING ANY EXCEPTION THEY MAY BE MATERIALLY DEVIATING FORM THE PROPOSAL SPECIFICATION. IF A VENDOR MATERIALLY DEVIATES FROM A PROPOSAL SPECIFICATION, ITS PROPOSAL MAY BE REJECTED.

**A material deviation is an exception** to the proposal which:
1. Gives the vendor taking the exception a competitive advantage over other vendors, or
2. **Gives the State something significantly different from that which the State requested**.

(Emphasis added). (**Ex. 1**, p. 6, No. 25).[3]

To take exception to any of the State's terms and conditions contained in the RFP, RFP Condition No. 32 requires the vendor to state those specific exceptions in its letter transmitting the vendor's acceptance and proposal. RFP Condition No. 32 states:

**ACCEPTANCE OF PROPOSAL OF CONTENT:** The contents of this RFP and the response of the successful vendor will become contractual obligations, along with the final contract. The vendor's proposal **<u>must include in the transmittal letter</u>**, a statement of acceptance of all terms and conditions, **unless otherwise taken exception to**, as stated within this RFP. Any proposal which fails to comply with this requirement may be disqualified as non-responsive. The State is solely responsible for rendering decisions in matters of interpretation on all terms and conditions.

(Emphasis added). (**Ex. 1**, p. 7, No. 32).

In the event a vendor discovered any ambiguity, error, discrepancy, omission, or other deficiency in the RFP, the RFP permitted vendors to request a modification or clarification of the RFP. RFP Condition No. 35 states:

---

[3] These requirements track with Minn. Stat. § 336.2-207(2).

If a vendor discovers any significant **ambiguity**, error, conflict, discrepancy, omission, or **other deficiency** in the RFP, the vendor shall immediately notify the Contract Administrator, as specified in the introduction, of such error and request modification or clarification of the document.

(Emphasis added). (**Ex. 1**, p. 8, No. 35).

### B.     **Defendant CMI's Unqualified Acceptance Of The RFP**.

By transmittal letter dated October 25, 1996, Defendant accepted the State of Minnesota's RFP **without qualification** and understood that the terms and conditions of the Request for Proposal shall become a contract between CMI and the State of Minnesota. (**Ex. 2**, p. 8). Defendant stated:

> CMI hereby **accepts the terms and conditions** as stated in the state of Minnesota's Request for Proposal for Evidentiary Breath Alcohol Test Instruments **without qualification.** CMI understands the terms and conditions as stated in the RFP shall become a contract between CMI and the State of Minnesota should CMI be the successful vendor in the award of Contract.

(Emphasis added).  (Id.).

Defendant's eight page transmittal letter to the State of Minnesota nowhere takes exception to any of the RFP's terms and conditions. (**Ex. 2**).  Defendant CMI's Proposal also contains no such exceptions. (**Ex. 3**).  Defendant also did not request any modification or clarification of the RFP terms and conditions.

Instead, Defendant incorporated verbatim into its proposal (among all others) the RFP Condition Nos. 12, 16, 25, 29, 32, and 35, along with the RFP's "General Proposal Terms and Contract Conditions/Instructions" (**Ex. 3**, pp. 3, 5, 7, 8).

In response to the RFP's Special Condition No. 12 requirement that Defendant

11

provide a "statement of all non-disclosure/non-reproduction agreements required to obtain information," Defendant attached a "Confidentiality Agreement" and an "Affidavit" which both indicate Defendant knew there was a very broad range of materials encompassed by the term "information." This information includes "pamphlets, manuals, **<u>or other documents containing information</u>** on the Intoxilyzer 5000." (**CMI Exs. 10 & 11**).

Defendant, also represented in its response to RFP Special Condition No. 12, that it "has a standard <u>procedure</u> for release of information for legal purposes to attorneys." (**Ex. 3**, Response to Special Condition No. 12). To illustrate its "procedure," CMI attached a "standard cover letter" that identified CMI's guidelines:

> So you understand **<u>our guidelines</u>** as to obtaining such a manual, please find enclosed the necessary documents to be signed by you and returned to our office prior to any release of this material. <u>Please return the signed original Confidentiality Agreement and check in the amount of $250.00 made payable to CMI, Inc.</u>, to my attention. <u>We will send a signed copy of the Confidentiality Agreement back to your office</u> for your records along with the Operations Manual. <u>Upon conclusion of this case, the manual is to be returned to our office along with the signed original Affidavit stating that no copies or photocopies had been produced by you or any of your staff</u>.

(**CMI Ex. 9**).

Although this form letter is in the context of a response to a specific request for manuals, this form fails to state it was limiting the broad term "information" to merely an operation manual.

Defendant's transmittal letter of acceptance represented it possessed a wealth of information about the Intoxilyzer 5000's sophisticated computer instrumentation,

hardware and software. Defendant stated:

> The **Intoxilyzer 5000®** is capable of using modern data entry methods. The Minnesota Instrument will be configured with a standard computer-style keyboard with a built-in magnetic stripe card reader, compatible with Minnesota driver's license magnetic storage capacity.

(**Ex. 2**, p. 2).  Defendant emphasized the machine's computer capabilities, stating:

> The **Intoxilyzer 5000®** is capable of communicating with the 'outside world' e.g. printers, <u>other computers,</u> etc. – whether direct connect or over the phone lines. All data stored within the instrument's memory can be accessed, downloaded, and managed.

(Emphasis added). (**Ex. 2**, p. 2).

Defendant represented the new state of the art communication/data transmission

and acquisition **software package** is an integral part of the product offering to the state of

Minnesota and wrote:

> CMI's new state of the art communications/data transmission and acquisition software package - **COBRA®** (**C**omputer **O**nline **Br**eath **A**rchiving) is an integral part of the product offering to the state of Minnesota.

(**Ex. 2**, p. 3).  This "state of the art" software package, Defendant represented:

> [N]ot only provides <u>Computer-to-Intoxilyzer® 5000</u> communications, allowing downloading of data to a central computer at convenient times, but also provides <u>Computer to Computer</u> (COBRA-to-COBRA) communications so multiple computers can be used to manage sub-groups on **Intoxilyzer® 5000's**.

> This software package, Defendant boasted:

> [U]tilizes full logic search capabilities to generate custom reports and graphs obviating the need to purchase and use additional software to report and graphically view alcohol testing data statistics.

(**Ex. 2**, p. 3).

Defendant also promoted the experience of its software engineers who "will"

13

design the State's Intoxilyzer 5000EN's operating software:

> The **Intoxilyzer 5000®** user interface **software will be designed** to be fully compatible with the needs of Minnesota's alcohol testing program. CMI's software engineers have a combined 120+ years of software development experience ready to serve the special needs of the state of Minnesota's alcohol testing program needs.

(**Ex. 2**, p. 3).

Defendant assured the State in its "Ten Good Reasons to Partner With CMI" that it was "highly motivated to help make the State of Minnesota's alcohol testing program the best it can be," had a "wealth of knowledge to thwart defense challenges to Minnesota's alcohol testing program," and was "A company with a proven track record – to be counted on for support – both Today and Tomorrow," was (**Ex. 2**, p. 7).

### C.   The State Of Minnesota Awards The Contract To CMI.

On January 2, 1997, the State awarded CMI the contract.  The Notification of Contract Award (Ex. 4), states the terms of the State's Notification of Contract Award and the RFP take precedence over Defendant's proposal:

> The following documents, in order of precedence, are incorporated herein by reference and constitute the entire contract between you and the State: (1) this Notification of Contract Award, together with Exhibit A and any attachments or subsequent purchase orders, amendments, or similar documents; (2) the request for proposal, and (3) your proposal and your "Response to our letter requesting clarification."  In the event of a conflict in language among any of these documents, the terms and conditions set forth and/or referenced in this Notification and any later executed documents shall prevail over conflicting terms and conditions contained in the earlier documents, in their original form, or as amended

(**Ex. 4**, p. 1).

The Notification of Contract Award states that fee for the provision of court

14

ordered information to private attorneys is $250.00 while the fee to provide this same information to publicly funded attorneys is $125.00. (**Ex. 4**, p. 2, Nos. 10 & 11 – Pricing sheet).[4] The Notification of Award states the cost of each operation and maintenance manual beyond the 10 originally provided to the State is only $25.00 each. (**Ex. 4**, p. 3, No. 16).

The Notification of Award states the initial contract term was through January 2, 1997 through December 31, 2001. (**Ex. 4**, p. 2). However, only the firm "Pricing" and "Insurance" provisions of the RFP and Notification of Award are limited to the contract term. (**Ex. 1**, p.6, No. 24 and pp. 15-16).[5] No other provisions of the RFP or Notification of Award expressly limit any performance obligations to the contract term.

The State of Minnesota and Defendant subsequently negotiated four amendments to the contract, three of which extended the time periods during which prices would remain firm or reduced. (**Ex. 5**).[6] The fourth amendment extended this period to January 31, 2008.

The Notification of Award also states that Defendant would deliver breath alcohol test instruments, accessories, and parts 90 days after Defendant's receipt of order from the State of Minnesota and its political subdivisions. The contract states:

---

[4] This fee is within the market rate for having the digital version of source code for breath alcohol machines placed on a CD. (**Ex. 17**).

[5] The RFP also required CMI to confirm the percentage of savings the State of Minnesota would realize under the contract than what would be paid without the contract, which CMI stated was 20%. (**Ex. 3**, p. 13 – Contract Savings & Usage Report).

[6] The second amendment increased the firm prices for two accessories and training while extending the period during which the prices would remain firm or reduced.

> Delivery: Delivery of 20 or more units per month starting March 15, 1997 until the number of units specified in the initial purchase order have been delivered; <u>thereafter 90 days after receipt of order</u>.

(Emphasis added). (**Ex. 4** at exh. A and p. 1). By operation of this language, for orders CMI received between November 3, 2007 and January 31, 2008, CMI agreed to the delivery up to 90 days <u>after</u> January 31, 2008.

**5.** <u>**The States' Validation Process And Known Flaws With The Intoxilyzer 5000EN's Source Code**</u>.

The State claims that before it deployed the Intoxilyzer 5000EN into the field for use, it "conducted extensive validation testing on the Intoxilyzer 5000EN" and "concluded that the instrument provided consistently valid and reliable measurements."

However, in June of 2008, former supervisor of the BCA's toxicology section, Glen Hardin, admitted that the validation process the BCA used to formally approve the Intoxilyzer 5000 and its current version of software did not conform to any specific scientific standards. Mr. Hardin testified in the Minnesota State Court that he supervised and participated in the validation studies for the current Intoxilyzer 5000EN and its software. Although he originally claimed the BCA's testing exceeded the National Highway Traffic Safety Administration's (NHTSA) standards for the testing of breath alcohol devices, Mr. Hardin admitted on cross examination that there is <u>no standard</u> with which the so called validation testing had to comply and that he was only vaguely familiar with NHTSA standards that he originally claimed were being followed. Mr. Hardin testified:

> Q: Now for validation testing, those validation studies weren't performed to the NHTSA standards or National Highway Traffic Safety Administration standards?
>
> A: Well, we test some things that exceed the NHTSA standards and there are some areas that NHTSA tests that we don't test.
>
> Q: So the validation testing that you did, did not comply with all of NHTSA standards, correct?
>
> A: <u>There is no standard with which it must comply</u>, so I don't believe that is a question that has any meaning.
>
> Q: <u>Are you familiar with NHTSA standards?</u>
>
> A: <u>Vaguely.</u>

(Emphasis added). (**Ex. 7**, pp. 3-4).

Mr. Hardin admitted that the State of Minnesota's BCA did not comply with the NHTSA requirements for comparing breath results with blood or urine that was contemporaneously taken from the test subject. Mr. Hardin testified:

> Q: With respect to the breath test results, you did … validation testing, you didn't compare those breath test results with blood or urine in this particular case; isn't that correct?
>
> A: That is correct….

(Id.).

The validation testing the State of Minnesota performed failed to reveal flaws in the software which were later discovered with use in the field. Mr. Hardin testified:

> Q: With the validity testing you've done for previous versions, it's failed to find errors in the program or the software; is that right?
>
> A: There were some issues associated with previous versions that we didn't catch in the validation testing, that's correct.
>
> Q: So that's a yes?
>
> A: Yes.

(Emphasis added). (**Ex. 6**, p. 19).

Additionally, BCA e-mail correspondence in September of 2006 and April of 2007 revealed known problems and fatal errors with test acceptance, sample rejection and other errors have been occurring with use of the Intoxilyzer 5000EN in the field depending on the software version being used. (**Ex. 8**).

## ARGUMENT

## I.    STANDARD FOR JUDGMENT ON THE PLEADINGS AND SUMMARY JUDGMENT.

A motion for judgment on the pleadings is appropriate  "only where the moving party has clearly established that no material issue of fact remains and the moving party is entitled to judgment as a matter of law." *Waldron v. Boeing Co.*, 388 F.3d 591, 593 (8th Cir. 2004); *Potthoff v. Morin*, 245 F.3d 710, 715 (8th Cir. 2001); *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999); *Lion Oil Co., Inc. v. Tosco Corp.*, 90 F.3d 268, 270 (8th Cir. 1996); *Westcott* 901 F.2d at 1488.

 All facts pled by the non-moving party are accepted as true and all reasonable inferences from the facts are drawn in favor of the non-moving party, in this case Plaintiffs-Intervenor. *Id*.; *Potthoff*, 245 F.3d at 715; *Porous Media Corp.*, 186 F.3d at 1079; *Lion Oil Co., Inc.,* 90 F.3d at 279; *Westcott* 901 F.2d at 1488.

In a motion for judgment on the pleadings, a Court may consider materials that are part of the public record, those embraced by the pleadings, and exhibits attached to the pleadings. *Porous Media Corp.*, 186 F.3d at 1079.

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986). The record is viewed in the light most favorable to the non-moving party and giving that party the benefit of all reasonable inferences. *Keathley v. Ameritech Corp.*, 187 F.3d 915, 919 (8th Cir. 1999) (Reversed grant of summary judgment). The task of the court at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Yates v. Rexton, Inc,* 267 F.3d. 793, 800. (8th Cir. 2001). Thus, an opposing party need not prove his case by a preponderance of evidence, but merely prove that a genuine issue exists as to one or more material facts. *Oldham v. West*, 47 F.3d 985, 988 (8th Cir. 1995) (Reversed grant of summary judgment).

Considering the well pleaded facts, matters contained in the record, the Contract documents between the State of Minnesota and Defendant CMI, and drawing all inferences in favor of Plaintiffs-Intervenor, Defendant's motion for summary judgment should be denied.

The State's motion for partial summary judgment and injunction should be granted to the extent it allows for meaningful review as determined by Plaintiffs-Intervenor experts.

**II. THE PLAIN LANGUAGE OF THE CONTRACT AS A WHOLE COMBINED WITH THE PURPOSE FOR THE CONTRACT REQUIRES THE DENIAL OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS-INTERVENOR THIRD-PARTY BENEFICIARY CONTRACT CLAIM.**

The fundamental principle of contract construction is to determine the intent of the parties and effectuate that intent. *Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 66 (Minn. 1979); *Midway Center Associates v. Midway Center, Inc.*, 306 Minn. 352, 237 N.W.2d 76 (1975); *Koch v. Han-Shire Investments, Inc.*, 273 Minn. 155, 140 N.W.2d 55 (1966); *Downing v. Independent School District No. 9, Itasca County*, 207 Minn. 292, 291 N.W. 613 (1940).

Intent is ascertained from the language of the contract construed as a whole, with effect given to all of its provisions. *Advantage Consulting Group, Ltd. v. ADT Sec. Systems, Inc.*, 306 F.3d 582, 586 (8th Cir. 2002); *Schleiff v. Bennitt*, 175 F.2d 890, 893 (8th Cir. 1949); *Koch*, 273 Minn. At 165, 140 N.W.2d at 62; *Telex Corp. v. Data Prods. Corp.*, 271 Minn. 288, 292, 135 N.W.2d 681, 685 (1965); *Lawton v. Joesting*, 96 Minn. 163, 167, 104 N.W. 830, 832 (1905); *Oster v. Medtronic, Inc.*, 428 N.W.2d 116, 119 (Minn. App. 1988).

The language and terms of a contract are given their plain and ordinary meaning. *Mapes v. MTR Gaming Group, Inc*, 299 F.3d 706, 707 (8th Cir. 2002); *Bob Useldinger & Sons, Inc. v. Hangsleben*, 505 N.W.2d 323, 328 (Minn. 1993); *Employers Mutual Liability Insurance Co. v. Eagles Lodge*, 282 Minn. 477, 479, 165 N.W.2d 554, 556 (1969); *Telex Corp. v. Data Prods. Corp*., 271 Minn. 288, 135 N.W.2d 681, 686-687

(Minn. 1965);*Bass v. Ring*, 215 Minn. 11, 15, 9 N.W.2d 234, 236 (1943); *Buchwald v. Univ. of Minnesota*, 573 N.W. 2d 723, 726 (Minn. App. 1998); *Davis by Davis v. Outboard Marine Corp.*, 415 N.W.2d 719, 723 (Minn. App. 1987).

The meaning given to words and phrases, however, must be in accordance with the purpose of the contract as a whole. *Opus Corp. v. International Business Machines Corp.*, 141 F.3d 1261, 1266 (8th Cir. 1998); *Republic Nat. Life Ins. Co. v. Lorraine Realty Corp.*, 279 N.W.2d 349, 354 (Minn. 1979); *Employers Liability Assur. Corp. v. Morse*, 111 N.W.2d 620, 624, 261 Minn. 259, 264 (Minn. 1961); *Cement, Sand & Gravel Co. v. Agric. Ins. Co. of Watertown, N.Y.*, 225 Minn. 211, 216, 30 N.W.2d 341, 345 (1947); *Kauffman Stewart, Inc. v. Weinbrenner Shoe Co., Inc.*, 589 N.W.2d 499, 502 (Minn.App. 1999); *Davis by Davis*, 415 N.W.2d at 723.

The plain, ordinary terms of the contract, guided by the obvious purpose of the contract establishes the parties intended Defendant to produce to Plaintiffs-Intervenor, and those similarly situated, any information ordered by a Court with jurisdiction of a case where a test from the Intoxilyzer 5000EN is part of the evidence.

**A.** **The Plain, Ordinary, Unambiguous Meaning Of "Information" In Special Condition No. 12 Includes Any Information Ordered By A Court, Including The Source Code.**

The plain meaning of the express language of the RFP's Special Condition No. 12 requires Defendant to provide any information ordered by a court in which the Intoxilyzer 5000EN is a part of the evidence to attorneys representing those accused by the machine. (**Ex. 1**, p. 22, No. 12). *See Underdahl v. Comm'r of Public Safety*, 735

N.W.2d 706, 713 (Minn. 2007).

In *Underdahl*, the Minnesota Supreme upheld the discoverability of the Intoxilyzer 5000EN source code in a Minnesota implied consent proceeding. *Underdahl*, 735 N.W.2d at 713. In so holding, the Minnesota Supreme Court noted the broad, express language of the RFP's Special Condition No. 12 requires Defendant to provide that source code:

> Further, given the express language of the RFP that requires CMI to provide the state with 'information'… to be used by attorneys representing individuals charged with crimes in which a test with the [Intoxilyzer 5000EN] is part of the evidence' when production of the information is mandated by court order 'from the court with jurisdiction of the case,' it is not clear to us that the commissioner is unable to comply with the district court's order. Accordingly, we cannot conclude that the district court ordered the production of information that is clearly not discoverable.

*Id.*

The Minnesota Supreme Court noted that Defendant, through RFP's Special Condition No. 12, agreed to provide any information necessary to comply with a court's order:

> **CMI agreed**, in the RFP, to provide the attorneys representing individuals charged with crimes "in which a test with the [Intoxilyzer 5000EN] is part of the evidence" **information necessary to comply with a court's order**.

(Emphasis added). *Id.*

Thus, the plain meaning of the RFP's broad, unqualified, unrestricted term "information" includes the source code. Defendant agreed to this Special Condition without qualification.

**B.     Construing The Term "Information" In  Special Condition No. 12 To Mean Any Information Ordered By A Court, Including The Source Code, Is Consistent With Defendant's Assignment Of All Ownership In The Source Code To The State Under Contract Condition No. 29**.

That the term "information" is construed to mean any information ordered by a Court, including the source code, is consistent with Contract Condition No. 29, wherein Defendant assigned all ownership in the full source code to the State.

Defendant, in its signed proposal, accepted RFP Condition No. 29 which mandated:

> All right, title, and interest in all copyrightable material which Contractor shall conceive or originate, either individually or jointly with others, and which arises out of the performance of this Contract, will be the property of the State and are by this Contract assigned to the State along with ownership of any and all copyrights in the copyrightable material."[7]

(**Ex. 3**, p. 7).[8]

This language is more than sufficient to transfer the ownership of the complete source code to the State under the U.S. Copyright Act.  Pursuant to the Act, copyright may be may be transferred in whole or in part by <u>any means of conveyance</u>:

**Transfer of Ownership.**
(1) The <u>ownership of a copyright may be transferred in whole or in part by any means of conveyance</u> or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.

---

[7] While Plaintiff and Defendant quibble over the meaning of "works for hire" in the last sentence of Condition No. 29, the operative language for the transfer of copyrightable material is this first sentence.

[8] In this motion, Defendant does not dispute that the State owns the full source code as it brought no motion for summary judgment on Count I of the State's Complaint.

(Emphasis added). 17 U.S.C.A. § 201(d)(1). *Taylor Corp. v. Four Seasons Greetings, LLC.*, 403 F.3d 958, 963 (8th Cir. 2005).

For a conveyance other than by operation of law, the conveyance must be made in a writing and signed by the owner or the owner's agent.   17 U.S.C.A. § 204(a); *Taylor Corp.*, 403 F.3d at 963.   There are no required words or phrases for the writing. The writing must only demonstrate a transfer of the copyright. *Thomsen v. Famous Dave's of America, Inc*, 2009 WL 397972 (D. Minn. 2009) (citing *Radio Television Espanola S.A. v. New World Entm't, Ltd*. 183 F.3d 922, 926 (9th Cir. 1999)) (**Ex. 18**).   The writing "doesn't have to be the Magna Charta; a one-line pro forma statement will do." *Id.* at n. 5 (citing *Effect Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990)). (**Ex. 18**).

 Source code is "copyrightable material." *See e.g. Apple Computer v. Franklin Computer Corp.*, 714 F.2d 1240 (3rd Cir. 1983).   Defendant, through its software engineers created the source code at issue. (**Ex. 2**, pp. 2-3,7) Thus, the Intoxilyzer 5000 source code was originated or conceived by Defendant individually or jointly with others.

The full source code, including that which was created before the date of the contract "arises out of the performance of this Contract."   The majority of jurisdictions broadly construe the language "arises out of." *Spiritas Co. v. Federal Insurance Co*., 521 F.3d 833, 837 (8th Cir. 2008).   In the federal courts even the making of a contract "arises out of" the contract.   *Sound Check, Inc. v. American Federation of Television and Radio Artists*, 204 F.3d 801, 804 (8th Cir. 2000).

Minnesota broadly construes the language "arising out of" to include even

preparatory activities done before the contract work. *See Oster v. Medtronic, Inc.*, 428 N.W.2d 116, 120 (Minn. App. 1988). Thus, source code work done before the contract "arises out of" the performance of the contract.

This is supported by the stated "purpose" for which the contract was to be performed. The purpose was "to supply breath alcohol test instruments, related accessories, parts and services **for use** in the State of Minnesota by State, local and other law enforcement and corrections agencies and the court system." (**Ex. 1**, p. 18).

However, an Intoxilyzer without all of the source code, but only the small pieces specifically customized for Minnesota will not function. (Second Workman Declaration, ¶ 18). The performance of the contract, by necessity contemplated the full source code for use.

Thus, the full and complete source code (including that which was created before the date of the contract in this case) "arises out of the performance of this contract" and, therefore, its ownership was transferred outright to the State of Minnesota.

In light of the transfer of ownership of the full source code, Defendant warranted in Condition No. 16 that no one else had any intellectual property rights in it and agreed to defend and indemnify the State against any such claims. (**Ex. 1**, p. 5).

The assignment of ownership was intended to protect the State Minnesota, from incidents where the manufacturer goes out of business, files for bankruptcy, or the ongoing product design and maintenance is involuntarily transferred to another party. (First Workman Declaration ¶98; Second Workman Declaration ¶'s 13-17).

**C.** **Construing The Term "Information" To Mean Any Information Ordered By A Court, Including The Source Code, Is Consistent With The Notification of Contract Award.**

The Notification of Contract Award, just like the RFP, uses the broad term "information" and not operation manual when identifying the fees for providing information to attorneys. The Notification of Contract Award sets the fee for "information to private attorneys" at $250.00 and "information for publicly funded" attorneys at $125.00. (**Ex. 4**, p. 2 - Pricing).

The State, when it issued the Notification of Award did not change the term "information" to "operation manual." Pursuant to Condition No. 32, "The State is solely responsible for rendering decisions in matters of interpretation on all terms and conditions" of the RFP. (**Ex. 1**, p. 7, No. 32). Defendant admits the State had the right to make this decision during the "RFP and proposal process."[9]

The Notification of Award and the RFP, are given precedence over Defendant's proposal. (**Ex. 4**, p. 1).[10]

**D.** **Construing The Term "Information" In Special Condition No. 12 To Mean Any Information Ordered By A Court, Including The Source Code, Is Consistent With Defendant's Representations In It's Transmittal Letter Of Acceptance**.

In its transmittal letter of acceptance to the State, Defendant represented it possessed a wealth of information about the Intoxilyzer 5000's sophisticated computer

---

[9] Docket # 150, p. 8.

[10] Defendant's claim [Docket #150, p. 12] that its attempted change or limitation of the term "information" to just "an operation manual" does not a conflict with the RFP and Notification of Award is disingenuous since such a change materially alters what gets produced.

26

instrumentation, hardware and operating software, and that it had experienced software engineers at the ready. (**Ex. 2**, pp. 2-3, &7).

With this arsenal of information, Defendant represented to the State in its "Ten Good Reasons to Partner With CMI" that it was "highly motivated to help make the State of Minnesota's alcohol testing program the best it can be," had a "wealth of knowledge to thwart defense challenges," and was "a company with a proven track record – to be counted on for support – both Today and Tomorrow." (**Ex. 2**, p. 7).   Defendant's representations demonstrate it knew the source code was information it would have to provide if the State as the owner of the source code was ordered to produce it.

     **E.**    **Defendant Did Not Unilaterally Limit The Term Information To Just An Operation Manual With Its Form Letter.**

Defendant's curious claim that its "**standard** cover letter," buried in its proposal to the RFP, somehow materially limited the broad term of "information" to just an "operation manual" is without merit.

     **1.**    **Defendant failed to follow the RFP requirements and take specific exception to the term "information."**

The contract at issue is governed by the Minnesota Uniform Commercial Code. (**Ex. 1**, p. 7, No. 31).  Pursuant to the Minnesota Uniform Commercial Code, the State was permitted to limit Defendant's acceptance of the RFP to only the terms and conditions of the State's RFP.  The Minnesota Uniform Commercial Code states in pertinent part:

**Additional terms in acceptance or confirmation**
(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
 (2) <u>The additional terms are to be construed as proposals for addition to the contract</u>. Between merchants such terms become part of the contract <u>unless:</u>
       (a) <u>The offer expressly limits acceptance to the terms of the offer;</u>
       (b) <u>They materially alter it; or</u> ….

(Emphasis added) Minn. Stat. § 336.2-207.  *See also TRWL Financial Establishment v. Select Intern.,Inc.*, 527 N.W.2d 573 (Minn.App.,1995) (Forum selection clause inserted into acceptance without notice dropped out of the agreement).

The RFP's "General Proposal Terms and Contract Conditions/Instructions" expressly limit Defendant acceptance to the minimum requirements of the RFP's terms and contract conditions. (**Ex. 1**, p. 3).  RFP Condition No. 25 states CMI is "<u>presumed</u> to be in agreement with these [the RFP's] terms and conditions."  (**Ex. 1**, p. 6, No. 25).  Because the RFP limited acceptance to the RFP's terms and conditions, just like in *TRWL Financial Establishment*, Defendant's after the fact attempt to change the term "information" drops out of the agreement. *TRWL Financial Establishment* 527 N.W.2d 573 (Minn. App. 1995); Minn. Stat. § 336.2-207(2)(a).

Defendant's after the fact attempt to limit the term "information" to just an operation manual is a surprise that thwarts the production of information needed to comply with court orders which works a hardship on both the State and Plaintiffs-Intervenor.  This constitutes a material deviation from the terms of the RFP.  *N & D Fashions, Inc. v. DHJ Indus., Inc.*, 548 F.2d 722, 726 (8th Cir. 1977) (quoting U.C.C. § 2-

28

207 cmt 4); Minn. Stat. § 336.2-207 Cmt. 4 (1966).

If Defendant wanted to deviate from the RFP's terms and conditions with its standard form letter, RFP Condition Nos. 25 and 32 required Defendant to alert the State of this intention by taking "specific exception" to the condition in both Defendant's proposal and transmittal letter and by stating its standard form would supersede the RFP's terms and conditions. (**Ex. 1**, pp. 6 & 7).

This, Defendant did not do. Defendant did not even request a modification or clarification of the term "information" pursuant to RFP Condition No. 35.  (**Ex. 1**, p. 8, No. 35).  Defendant simply accepted the State's RFP without qualification instead.  (**Ex. 2**, p. 8).  As a matter of law, Defendant's form letter did not alter or limit the broad term "information" to just an operation manual.

2.      **The plain language of Defendant's standard form letter and attachments construed with the Defendant's other proposal terms demonstrates Defendant did not intend to limit the term "information" to just an operation manual**.

Defendant's "standard cover letter," buried in its proposal, is nothing more than an illustration of Defendant's "**procedure**" for the release of information in the context of a response to specific request for manuals. (**Ex. 3**, p. 3).  This letter states it is to "understand **our [CMI's] guidelines**" to release information and identifies the three step process.  (**CMI Ex. 9**).  There is nothing in the form letter to  indicate any intent to alter or change the RFP term "information."  The Confidentiality Agreement and Affidavit attached to the Defendant's form letter broadly refer to "other documents," not just an "Operation Manual." (**CMI Exs. 10 &11**).

Defendant's stated fees also demonstrates CMI did not intend to change the term "information." In Response to Special Condition Requirement No. 16, Defendant agreed to provide the State with "Ten copies of both the operating manual and service manual" at no additional cost. (**Ex. 3**, p. 22, No. 16). Defendant's pricing sheet lists the cost of additional copies of the operation manual and service manual at only <u>$25.00 per manual</u>. (**Ex. 3**, p. 327 No. 17 – Pricing sheet; **Ex. 4**, p. 3, No. 16). Conversely, the cost of court ordered information to private attorneys is <u>ten times that amount, or $250.00</u>. [11] (**Ex. 3**, p. 26, No. 11 – Pricing sheet; **Ex. 4**, p. 2, No. 10 – Pricing sheet). Defendant fully understood the term "information" consisted of more than just a $25.00 operation manual and included the Source Code.

### 3. Limitation of the term "information" to just an operation manual would render numerous contract provisions meaningless.

Defendant's proffered construction of the contract to change the broad term "information" to just an operation manual when it did not take specific exception to the term "information" would render the RFP's "General Proposal Terms and Contract Conditions/Instructions," as well as RFP Condition Nos. 25 and 32 meaningless.

Defendant's construction of the contract to limit the term "information" to just an operation manual would render Special Condition No. 12 itself meaningless, because the State is in possession of the $25.00 operation manuals for the Intoxilyzer 5000EN. (**Ex. 3**,

---

[11] While CMI admits to the State of Minnesota that there is both an operation manual and a service manual, CMI's "standard cover letter" marked as Exhibit E to CMI's proposal incorrectly suggests the operation manual is the only manual available.

p. 22, No. 16).[12]  The State, as the owner of all copyrights (as discussed below), is fully capable of producing that information to attorneys itself.  Defendant's proposed limitation would result in Defendant having no obligation to produce anything, rendering the information clause a nullity.

Contracts are not construed to nullify contractual provisions. Rather contracts are construed so as to give meaning to and effect to all contract provisions.  *Advantage Consulting Group, Ltd. v. ADT Sec. Systems, Inc.*, 306 F.3d 582, 586 (8th Cir. 2002); *Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 526 (Minn. 1990); *Lawton v. Joesting*, 96 Minn. 163, 167, 104 N.W. 830, 832 (1905); *Oster v. Medtronic, Inc.*, 428 N.W.2d 116, 119 (Minn. App. 1988).

### 4.  Limitation of the term "information" to just an operation manual" would defeat the purpose of the contract.

The stated purpose of the contract is to provide "Evidentiary Breath Alcohol Instruments" for use in the court system.  In light of an accused's right to challenge the reliability and validity of the machine, evidence for use in court necessarily includes the wealth of computer software information generated by Defendant's software which Defendant represented it would provide as support, and which in the past withstood aggressive defense challenges.

---

[12] While Defendant admits to the State of Minnesota that there is both an operation manual and a service manual, CMI's "standard cover letter" marked as Exhibit E to CMI's proposal incorrectly suggests the operation manual is the only manual available.

31

Special Condition No. 12 is the mechanism for providing the evidentiary information. Limiting the term "information" to just an operation manual defeats this purpose of providing necessary evidentiary information.

### 5. At best, Defendant's claim that it limited the term "information" to just an operation manual renders the term "information" ambiguous to require denial of summary judgment.

CMI's feeble claim that it somehow limited the term information through the use of its standard form contrary to the express language of the RFP, merely suggests the term "information" is ambiguous to warrant the denial of CMI's motion for summary judgment. *See Matter of Turners Crossroad Development Co.*, 277 N.W.2d 364 (Minn. 1979); *Emerick on Behalf of Howley Sanchez*, 547 N.W.2d 109 (Minn. App. 1996).

### C. Plaintiffs-Intervenor Are Intended Third Party Beneficiaries To The Contract.

A person is a third-party beneficiary with a sufficient legally protectable interest if the contract "was intended for his direct benefit, in either all or **part** of its contemplated performance." *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 48 S. Ct. 134, 72 L. Ed. 290 (1927). In addition to the "intent to benefit" standard, a person is a third-party beneficiary if the promisor's performance under the contract discharges a duty the promisee otherwise owed to the third party. *Servais v. T.J. Management of Minneapolis, Inc.*, 973 F.Supp. 885 (D. Minn. 1997) citing *Cretex Cos. v. Construction Leaders. Inc.*, 342 N.W.2d 135, 139 (Minn.1984). *See also*; *Brix v. General Accident & Assurance Corp.*, 254 Minn. 21, 93 N.W.2d 542, 544 (1958).

The plain language of the contract establishes Plaintiffs-Intervenor are intended beneficiaries to the contract.

### 1.  RFP special condition no. 12 applies to both criminal DWI and civil implied consent proceedings.

Special Condition No. 12 requires CMI to produce information to attorneys representing individuals charged with crimes in which a test with the proposed instrument is part of the evidence and a court with jurisdiction over the case issues an order to produce the information. Contrary to CMI's claim, the contract is devoid of any language that the provision of information under Special Condition No. 12 is limited to "criminal cases."

The express language of Special Condition No. 12 simply requires CMI to provide "information to attorneys … to be used by attorneys representing individuals charged with crimes in which a test with the proposed instrument is part of the evidence." (**Ex. 1**, p. 22, No. 12). This language does not limit the type of proceeding to a criminal one. Rather, the language describing the proceeding for which information must be provided is merely one "in which a test with the proposed instrument is part of the evidence."[13]

This intent is supported by the plain language of the second sentence of Special Condition No. 12 which states "This part of the contract to be activated with an order

---

[13] An individual charged with a DWI crime may also be "represented by an attorney" for a contemporaneous civil implied consent proceeding in which the Intoxilyzer 5000EN is part of the evidence. *See* Minn. Stat. §169A.52, Subd. 2 and Minn. Stat. § 169.20, Subd. 1(5).

from the court with jurisdiction of the case….”  In Minnesota, district courts have "original jurisdiction over all civil and criminal cases.”  Minn. Const. art. 6, § 3.

A plain reading of both sentences of Special Condition No. 12 is that an attorney representing an individual charged with a criminal DWI may obtain information in any criminal or civil proceeding in which the Intoxilyzer 5000EN is a part of the evidence.  If it were intended that information be produced only in criminal proceedings, then Special Condition No. 12 would have stated so. It did not.

In *Underdahl*, when the Minnesota Supreme upheld the discoverability of the Intoxilyzer 5000EN source code in a Minnesota implied consent proceeding, the Minnesota Supreme Court also noted RFP Special Condition No. 12, to which CMI agreed, provided the mechanism for CMI to produce it in the implied consent proceeding. *Underdahl*, 735 N.W.2d at 713.

Given this plain reading of Special Condition No. 12, CMI’s reliance upon the language that information is provided to attorneys who represent individuals “charged with crimes,” for the proposition that the court order to provide information must come from a criminal proceeding is misplaced.

In accordance with Minn. Stat. §169A.52, Subd. 2 and Minn. Stat. § 169.20, Subd. 1(5) individuals charged with a criminal DWI are deemed to have committed an implied consent violation subject to judicial review in accordance with Minn. Stat. § 169A.53. Criminal prosecutions and civil implied consent proceedings go hand in hand. (Gratz Aff. ¶3).

Additionally, Minnesota courts have labeled the civil implied consent proceeding as "quasi criminal." See, E.g., Prideaux v. State, Dept. of Public Safety, 247 N.W.2d 385 (Minn. 1976); Goldsworthy v. State Dept. of Public Safety, 268 N.W.2d 46 (Minn. 1978); Piotrowski v. Commissioner of Public Safety, 453 N.W.2d 689 (Minn. 1990); Friedman v. Commissioner of Public Safety, 473 N.W.2d 828 (Minn. 1991).

Further, as a result of civil implied consent license revocation, drivers must pay a reinstatement fee of $698, are subject to enhanced subsequent criminal DWI charges (Minn. Stat. Sec 169A.09 and 169A.095), face forfeiture of their automobile (Minn. Stat. Sec 169A.63) and license plate impoundment (Minn. Stat. Sec 169A.60).

In either event, the same Minnesota district courts exercise original jurisdiction of these criminal and "quasi criminal" matters. CMI offers no reasonable explanation for making a distinction between these proceedings.

Similarly, Defendant's reference to a reduced fee schedule for those who can only afford a publicly funded defense does not suggest an intent to limit the provision to those who obtain an order only in criminal proceedings. This language only suggests an intent to minimize the public's expense to obtain information when the public is paying for the criminal defense of an indigent person.

The plain language of this provision demonstrates that the State and CMI intended to benefit Plaintiffs-Intervenor who have obtained court orders requiring the production of information in cases where the Intoxilyzer 5000EN is part of the evidence, whether the proceeding is civil or criminal. All Plaintiffs-Intervenor satisfy the intent to benefit test.

Plaintiffs-Intervenor Jacobsen and Steffensen also have court orders from criminal proceedings, therefore were intended to be benefitted under even under Defendant's argument.

Defendant's claim that Plaintiffs-Intervenor fail to meet the duty owed test also is without merit. Contrary to Defendant's suggestion, the duty owed test applies to any duty owed, not just the payment of money. *See Sernak v. Krenzen Cadillac, Inc.*, 415 N.W.2d 92, 94 (Minn. App. 1987); *Chard Realty, Inc. v. City of Shakopee*, 392 N.W.2d 716, 721 (Minn. App. 1986).

The contract in this case expressly identifies the duty the State owes Plaintiffs-Intervenor – the duty to produce information when ordered to do so by a court. CMI is to perform that duty for the State. All of the Plaintiffs-Intervenor are intended beneficiaries under the contract under the duty owed test. Defendant's motion should be denied. Defendant's claims are without merit.

**B.      Defendant Is Obligated To Provide Source Code Information, Notwithstanding Expiration Of The Contract On January 31, 2008.**

Defendant's claim that the contract expiration on January 31, 2008 terminated Defendant's obligation to provide information and other vested obligations under the contract is without merit.

Plaintiffs-Intervenor incorporate the arguments made by Plaintiff-Intervenor Jacobsen in Defendant's motion to dismiss Jacobsen's Complaint-in-Intervention, to wit: Defendant's obligation to provide information is based in warranty, was also an

obligation to perform that vested upon delivery of the machines to the State, and that Defendant's claim would render meaningless other contract terms.

Plaintiffs-Intervenor also agree with the State's arguments on this issue as set forth in the State's Memorandum in support of motion for Summary Judgment, Doc. # 127 at pp.19-24 and incorporate those arguments herein.

## III. **DEFENDANT'S TRADE SECRET CLAIM FAILS AS A MATTER OF LAW**.

Defendant fails to establish the source code is a trade secret that can be kept hidden from scrutiny. To be a trade secret, the information must be 1) not generally known or readily ascertainable; 2) derive independent economic value from secrecy; and 3) reasonable efforts must be taken to keep the information secret. Minn. Stat. § 325C.01, Subd. 5; *Electro-Craft Corp. v. Controlled Motion, Inc*, 332 N.W.2d 890, 899-902 (Minn. 1983).

Preliminarily, however, the party asserting trade secret must be the owner of what is claimed to be a trade secret. *See e.g. Jostens v. Inc. v. Nat'l Computer Sys., Inc.* 318 N.W.2d 691, 698 (Minn. 1982); Minn. 325C.01, Subd. 5. Defendant does not own the source code. Defendant assigned the complete source code to the State in Contract Condition No. 29. Because Defendant is not the owner of the source code, Defendant's trade secret claim fails as a matter of law.

Even if Defendant were the owner of the source code (which it is not), its trade secret claim must fail because Defendant cannot satisfy the required three elements for

trade secret status. Defendant obtained a patent for the Intoxilyzer 5000 in 1986. Once the patent was issued any secrecy attached to the patented invention was lost:

> If a discovery is one which constitutes invention and for which a patent is issued, the right of further secrecy is, of course, lost, for a legal disclosure and public dedication have then been made, with a right of limited and temporary monopoly granted as the reward.

*Sandlin v. Johnson*, 141 F.2d 660, 661 (8th Cir. 1944). *See also Ocean Science & Engineering, Inc. v. U.S.*, 505 F.2d 527, 582 (1979).

Secrecy is lost because the U.S. Patent Act required Defendant to submit a "written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as <u>to enable any person skilled in the art</u> to which it pertains, or with which it is most nearly connected, <u>to make and use the same</u>, and shall set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C.A. § 112. Any failure to make full disclosure necessary to make the patented invention operative would have resulted in the rejection of the patent. *Id. See also*, *Ocean Science & Engineering, Inc*, 505 F.2d at 582.

Defendant's patent defeats each of the three elements required for trade secret status. First, the patent renders the invention generally known. Second, the economic value of the patented invention derives directly from the total lack of secrecy and monopoly that was given in exchange for the loss of secrecy. Third, the patent negates any claim of reasonable efforts to keep the information secret. Accordingly, the patent defeats Defendant's trade secret claim. Defendant's President, Mr. Hall, admits that a

patent negates trade secret status, which is why Defendant did not patent its later

Intoxilyzer 8000. (**Ex. 16**, p. 175).

Similarly, Defendant's assignment ownership in the full source code to the State in

the subject contract defeats the three elements required for trade secret status.

Defendant's trade secret claim fails as a matter of law, and, therefore requires the denial

of Defendant's motion for summary judgment.

## IV.   PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND INJUNCTION SHOULD BE GRANTED.

Plaintiffs-Intervenor join the State in its motion for Summary Judgment and

injunction. In addition to the reasons set forth by the State, the important fundamental

Constitutional rights of individual drivers favors granting the State's motion.

### A.   The Source Code Is Necessary To Vindicate Driver's Due Process Rights.

The due process clause of the United States Constitution provides that "[n]o State

shall make or enforce any law which shall abridge the privileges or immunities of citizens

of the United States; nor shall any State deprive any person of life, liberty or property

without due process of law." U.S. Const., Amend. XIV. Likewise, the Minnesota

Constitution provides that no person "shall be deprived of life, liberty or property without

due process of law." Minn. Const., Art. I, § 7.

### 1.   Plaintiffs-Intervenor's Rights to be Afforded a Meaningful Opportunity to Prepare and Present a Complete Defense.

A criminal defendant has an absolute right to prepare and present a defense. *See*

*State v. Paradee*, 403 N.W.2d 640, 642 (Minn. 1987); *State v. Wildenberg*, 573 N.W.2d

692, 697 (Minn. 1998) (quoting *Trombetta*, 467 U.S. at 485, 104 S. Ct. at 2532). Due process requires that criminal defendants be afforded a meaningful opportunity to present a complete defense, which includes the right to receive evidence from the state that is relevant to the defendant's guilt or punishment. *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532 (1984). The State has approved the Intoxilyzer 5000EN and the current software that it uses. Access to this information is fundamental to the philosophy of discovery and the constitutional right to due process of law.

**2. <u>Failure to Provide Plaintiffs-Intervenor with the Source Code Violates The Right of Confrontation.</u>**

Confrontation is basic to the constitutional criminal process and must be zealously protected. *State v. Page*, 386 N.W.2d 330 (Minn. Ct. App. 1986); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). It is a procedural rather than a substantive guarantee in that it commands not that evidence be reliable, but that its reliability be assessed in a particular way - that is by testing in the crucible of cross-examination. *State v. Burrell*, 697 N.W.2d 579 (Minn. 2005); *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The fact that an out-of-court statement satisfies the requirements of a hearsay exception does not in itself mean there is no violation of the right to confrontation. *State v. Hansen*, 312 N.W.2d 96, 102 (Minn. 1981), citing, *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). In other words, a showing of reliability is neither sufficient nor relevant in the absence of an opportunity to cross-examine.

According to the Minnesota Supreme Court in *Caulfield,* the *Crawford* decision removed the flexibility courts had to balance the state's interests, however legitimate, against the need for prior cross-examination and unavailability of the witness before testimonial evidence can be admitted. *Compare Maryland v. Craig,* 497 U.S. 836, 110 S.Ct. 3157 (quoting *Mattox v. United States,* 156 U.S. 237, 243, 15 S.Ct. 337, 39 L.Ed. 409 (1895), for the proposition that confrontation rights must occasionally give way to considerations of public policy and the necessities of the case), *with Crawford,* 541 U.S. at 61, 124 S.Ct. 1354 (noting that confrontation is a procedural, not a substantive, requirement, because the Confrontation Clause commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination).

In state court cases, the Intoxilyzer 5000 is the only chemical test in Minnesota that may be admitted into evidence without antecedent expert testimony. See, Minn. Stat. Sec. 634.16. Furthermore, unlike cases where a blood, hair or urine sample is tested, the Intoxilyzer 5000's method of breath testing is unique in that it *does not* retain a portion of the tested sample for further, independent testing. See, *Trombetta*.

The government relies only on the unscientific testimony of police officers who administered the Intoxilyzer breath test. Therefore, Defendants are denied a fair opportunity to confront the witness – the Intoxilyzer 5000. With such a low burden of admissibility for breath test results, The accused should be entitled to a look behind the

black curtain to make this a fair fight and to vindicate their constitutional confrontation right.

Drivers charged with DWI have the right to fully investigate the evidence against them. Given the enormous consequences that befalls someone with a DWI conviction, drivers must be given meaningful access to the machine and software in question to attempt to replicate the results on their own. Otherwise, drivers are unable to mount a meaningful defense.

Notably, no person in the State of Minnesota – even the BCA scientists – currently knows how the Intoxilyzer 5000 is programmed. This machine tests an immediately discarded breath sample, and the end result of this analysis is to replace this breath sample with one sheet of printed paper. **No other evidence of drivers specific tests exist**. Validity tests could be run *ad nauseam*, but recreation of the original circumstances surrounding *individuals'* tests are gone forever. Given the random nature of software bugs, which often crop up randomly or sporadically, the only way to gain insight into whether faulty programming resulted in an incorrect calculation of drivers' breath volume would be through careful, line by line analysis of the source code, to determine if any of the bugs that exist would have come into play during a test.

Plaintiffs-Intervenor and other similarly situated persons should be given access to the only information with which they can meaningfully and effectively prepare and confront their accuser – the mysterious Intoxilyzer machine that determines their fate. The time to effectuate the rights of the accused is now.

The State's motion for partial summary judgment should be granted to the extent it provides Plaintiffs-Intervenor with the source code to the Intoxilyzer 5000EN in a format that will permit meaningful review as determined by Plaintiffs-Intervenor's experts.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs-Intervenor respectfully requests Defendant's motions be denied and Plaintiff's motions be granted as set forth above.

CHARLES A. RAMSAY & ASSOC., P.L.L.C.

Dated: May 15, 2009          /s/ Charles A. Ramsay
Charles A. Ramsay  ID No. 260277
2780 Snelling Avenue North, #330
Roseville, Minnesota 55113
651-604-0000

Dated: May 15, 2009          /s/ Daniel J. Koewler
Daniel J. Koewler    ID No. 388460
2780 Snelling Avenue North, #330
Roseville, Minnesota 55113
651-604-0000

GORES LAW OFFICE

Dated: May 15, 2009          /s/ John J. Gores
John J. Gores          ID No. 228928
7091 Highway 65 NE, Suite 201
Fridley, Minnesota 55432
763-571-4777

*Attorneys for Plaintiffs-Intervenor*