State of Minnesota, by Michael Campion, its
Commissioner of Public Safety,

Court File No. 0:08-cv-00603-DWF-AJB

Plaintiff,

v.

CMI of Kentucky, Inc.,
A Kentucky Corporation,

**SECOND DECLARATION OF THOMAS E. WORKMAN, JR. IN OPPOSITION TO CMI'S MOTION FOR SUMMARY JUDGEMENT**

Defendant

Robert J. Bergstrom, Craig A. Zenobian,
Shane M. Steffensen and Christopher D.
Jacobsen,

Applicants

| | |
|---|---|
| STATE OF MASSACHUSETTS | } |
| | } SS. |
| COUNTY OF BRISTOL | } |

I, Thomas E. Workman Jr., under oath, do depose and testify as follows:

1. I am an attorney, licensed to practice law in the Commonwealth of Massachusetts, with an office at 120 Ingell Street, Taunton, Massachusetts. I have been admitted to practice law in the Commonwealth of Massachusetts, before the United States Patent Office, and before the United States First Circuit.

2. I make this Second Declaration to supplement the Declaration previously filed in this matter on October 30, 2008.

3. I am familiar with contracting for systems with significant software components (such as the Intoxilyzer 5000EN), and I am familiar with contracting that transfers copyright in source code to a purchaser. I have managed organizations that have negotiated such contracts.

4. Interest in the software, which is represented by the copyright interest in the source code, may be represented by either a license or by a transfer of the copyright to the purchaser.

5. A license agreement can be ineffective when the company selling equipment subsequently declares bankruptcy, as a Bankruptcy Trustee can and does set aside such agreements in order to protect the best interest of the creditors. When this occurs, the purchaser is left without a valid license for the source code.

6. The transfer of copyright to the purchasing entity cannot be set aside by a Bankruptcy Trustee, because an ownership interest has already been transferred. This is the only practical way to protect the procuring organization so that the purchaser has the option of hiring another company to modify the source code to meet the needs of the purchaser.

7. If the manufacturer of the Intoxilyzer 5000EN were to either become insolvent, or were to decide to no longer support the Intoxilyzer 5000EN as deployed in Minnesota, the State would own a significant number of systems which would soon become obsolete and unusble.

8. Obsolescence would occur with the next changes to Minnesota alcohol driving offenses law, because without the source code, the machines could not modified so as to operate in conformance with any laws that required changes to the software in the machines used to test the breath of citizens.

9. Upon interest and belief, the Minnesota version of the Intoxilyzer 5000EN has been purchased exclusively by the state of Minnesota. Only the state of Minnesota has an interest in maintaining the machine, to correct defects or to modify machines in order to comport with changed requirements necessitated by changes to Minnesota laws.

10. Changes to correct defects or to incorporate changed requirements are accomplished by making changes to the source code.

11. If CMI were to become insolvent, the financial value of the Intoxilyzer 5000EN machines in Minnesota would evaporate. The machines would have little or no value by virtue of the collapse of the market for machines that are no longer supported by the manufacturer. Minnesota would be forced to purchase replacement machines and would discard the 5000EN machines because they would have no financial value.

12. The insolvency of CMI is more than a speculative possibility. Upon information and belief, CMI is obligated to pay contempt fines to the state of Florida because of CMI's refusal to meet their obligation to provide Source Code for the Intoxilyzer to attorneys in Florida. The fine for their contempt has accrued at the rate of $3,200 a day since August of 2007 through the current date. CMI has appealed the contempt, and lost. Contempt fines now exceed $2,000.000 for one court in Florida.

13. To protect against the scenario described in the preceding paragraphs of this Declaration, it is common for businesses and governmental entities who procure systems with imbedded computers, such as the Intoxilyzer 5000EN (for which they are the sole consumer) to protect their investment by obtaining a non-revocable right to the source code for the programs that make the machine operate.

14. With this purpose in mind, the transfer of the copyright for the source code would only protect the state of Minnesota if "all" of the source code were transferred to the State of Minnesota. A transfer of only changed or newly developed material would be ineffective to accomplish the purpose of protecting the interest of the taxpayers of the state of Minnesota.

15. I have assumed that the Contract provision for copyright transfer is as follows:

    > "All right, title and interest in all copyrightable material which Contractor shall conceive or originate, either individually or jointly with others, and which arises out of the performance of this Contract, will be the property of the State and are by this Contract assigned to the stte along with the ownership of any and all copyrights in the copyrightable material[.] Contractor also agrees, upon the request of the State to execute all papers and perform all other acts necessary to assist the State to obtain and register copyrights on such materials. Where applicable, works of authorship created by Contractor for the State in performance of the Contract shall be considered 'works for hire' as defined in the U.S. Copyright Act" Underdahl I, 735 N.W. 3d 708.

16. The Source Code would only be useful to the state of Minnesota, in order to protect the state's investment and allow the state to support the Intoxilyzer 5000EN in the event of CMI's demise, if the full and complete Source Code were provided to the state.

17. Having negotiated, through procurement organizations that I was responsible for, agreements like the one contained in the Contract between CMI and Minnesota, I have never seen such an agreement construed narrowly to mean only new instructions written for the customer's customized application, as is suggested by CMI.

18. Source code is only useful when it can be used to either correct a problem or to add new functionality, and the result is then utilized to change the machines in which the software operates. In this situation, the full and complete source code must be utilized. The Intoxilyzer machine will not function properly without all of the software. The portions of software customized specifically for Minnesota are insufficient to operate the Intoxilyzer.

19. In addition to the state of Minnesota's interest in protecting their investment in the purchased Intoxilyzer 5000ENs, the original contract is believed to reference the transfer of the source code in order to supply the source code to defense attorneys as required by Minnesota discovery rules in criminal cases.

20. In this second context, the definition of "source code" is defined by the community of defense attorneys who, after the Intoxilyzer 5000EN procurement contract was negotiated, would seek the source code in order to defend clients accused of alcohol related criminal offenses.

21. Both CMI and the state of Minnesota knew or should have known that defense attorneys would require the full and unredacted source code in order to conduct an analysis that could develop evidence concerning mistakes in the programming of the machines.

22. Construing the copyright transfer clause to be anything less than the transfer of the full and complete source code required to maintain and enhance the software inside every Intoxilyzer 5000EN would seriously inhibit the ability of both the state of Minnesota (in maintaining and enhancing the machines owned by Minnesota) and defense attorneys (seeking to examine how the Intoxilyzer 5000EN operates).

23. Such a narrow construction for "source code" (e.g. that source code is defined as just the changed information) would be counter to the general interpretation of such clauses within the industry, and

24. Such a narrow construction for "source code" (e.g. that source code is defined as just the changed information) is not supported by any evidence that I have seen filed in this matter. Such evidence, if I exists, is likely in the possession of either the state of Minnesota and/or CMI, and has not yet been provided through discovery mechanisms available to all the parties.

25. CMI's COBRA program allows test results to be uploaded to a PC for record-keeping and data management. COBRA also provides remote diagnostic and calibration verification.

Sworn and subscribed to under oath this fifteenth day of May, 2009,

                                                            /s/ Thomas E. Workman Jr.
                                                         THOMAS E. WORKMAN JR.