UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| State of Minnesota, by Michael Campion, its Commissioner of Public Safety,<br><br>Plaintiff,<br><br>v.<br><br>CMI of Kentucky, Inc., a Kentucky corporation,<br><br>Defendant,<br><br>and<br><br>Robert J. Bergstrom, Craig A. Zenobian, Shane M. Steffensen, and Christopher D. Jacobsen,<br><br>Plaintiff-Interveners. | File No. 08-CV-603 (DWF/AJB)<br><br>**BRIEF OF AMICUS CURIAE - MINNESOTA SOCIETY FOR CRIMINAL JUSTICE** |

## I. INTRODUCTION

Pursuant to the Court's Order of June 3rd, 2009 the Minnesota Society for Criminal Justice as *Amicus Curiae* hereby opposes the current proposed settlement between the State and CMI, Inc.

The Minnesota Society for Criminal Justice is an organization whose interests include promoting the vigorous defense of Minnesota citizens charged with crimes.

## II. ANALYSIS OF THE PROPOSED SETTLEMENT

Citizens charged with a DWI crime in Minnesota are entitled to a full and fair trial based on evidence that is correct, objective, and subject to review. This is especially true where the most damning evidence against the citizen consists of a number calculated by a machine.

Throughout this suit, *Amicus* and the Interveners have been painted as obstructionists to any proposed settlement between CMI and the State of Minnesota.[1] The cynical view is that the criminal defense bar does not *really* want access to the code, but merely wants to cause discord and disruption in the current legal climate. This is simply untrue.

*Amicus'* aim has always been to ensure that citizens charged with a DWI crime are treated with *fairness*. The pursuit of fairness necessarily means keeping a watchful eye on any and all authority figures, including the State, police officers,

---

[1] Interestingly, in crafting their proposed settlements, neither the State nor CMI has ever requested or welcomed input from either Plaintiff/Intervener's counsel or anyone else representing the interests of citizens accused of DWI in Minnesota.

and government contractors, to ensure that none over-step or misuse their authority where the rights of the citizen accused are involved.

*Amicus* understands that the State has placed itself in an awkward position between advocating on behalf of its citizens and reaching accord with its contract partner. Moreover, the State has an additional concern of balancing individual liberties with protecting public safety. *Amicus* also understands CMI's purported interest in protecting what it considers to be its trade secret.

The State and CMI have clearly made progress in their combined efforts to come to a workable agreement. *Amicus* applauds the willingness of both parties to provide the source code in its native electronic format. Now that CMI is willing to make this version of the source code available, the next step is to make it available in a *meaningful* way that will provide reasonable access to authorized Minnesota litigants.

Given the latest version of the proposed settlement, *Amicus* is hopeful that the interests of all parties involved, including those of *Amicus* and the Interveners, will eventually be balanced and taken into account. However, the current proposed settlement is still woefully deficient in numerous aspects. *Amicus* suggests seven key points of concern with the current proposed settlement.

First and foremost, *Amicus* is concerned that the full electronic version of the code is only being made available in Kentucky at CMI headquarters. The Court indicated it shares this concern, as noted on page seven of its February 9, 2009 Order:

> The Court cannot approve a settlement that would require Minnesota litigants, some undoubtedly eligible for public defender services, to travel to Kentucky to obtain discovery regarding the source code. The Court declines to find, at this time, that such access would make the Source Code reasonably and readily available to Minnesota litigants. The Court respectfully suggests that the parties attempt to determine a method by which the Source Code could be made available, subject to appropriate protective orders and conditions on inspection, at the Minnesota Department of Public Safety or the Minnesota Bureau of Criminal Apprehension.

(Doc. No. 95.)

While *Amicus* appreciates that CMI will allow a bound paper version of the source code to be stored in Minnesota, *Amicus* submits that such a copy would be of minimal value and practically useless for analytical purposes.

Thinking about this logically, either CMI is willing to provide a useful version of the source code in Minnesota or it is not. Why CMI would agree to allow one version of the source code to be provided in Minnesota (directly to litigants, no less) and only allow access to another version under lock and key in the state of Kentucky is a perplexing question. It appears that CMI is either reluctant or unwilling to provide a useful version of the source code in Minnesota, and is merely trying to appease the Court with an empty showing of something less than good faith.

The original Thomas Workman Declaration makes clear that only the native electronic version of the full source code will truly provide meaningful review. (*See* Doc. No. 55 at ¶ 64.) Accordingly, anything less than meaningful review cannot be regarded as fair.

4

This same analysis applies to the "Minnesota only" portion of the source code being made available in Minnesota in electronic and bound formats. The State, CMI, and the MCAA will all contend that this access in Kentucky is "good enough" to be considered fair for Minnesota litigants.

Key to this discussion is that none of these parties have expressed any real desire or interest in having the source code meaningfully analyzed. Each have their own vested interest to parse out the bare minimum of access – giving the appearance of fairness - while still limiting meaningful access to the source code as much as possible. Judicial approval of this practice sets a dangerous precedent. New technologies are introduced into law enforcement every year; outsourcing these technologies to companies that aim to insulate their software from meaningful and full review will continue if this Court approves the settlement in its current form.

*Amicus* concedes that an expert could, in theory, travel to and temporarily reside in Kentucky to conduct analysis of the source code. However, this is an unreasonably expensive proposition that should neither be lightly regarded nor accepted as a valid option.

This added expense is nothing more than an "arbitrary and unreasonable financial barrier" that will effectively continue to block access to the source code. This phrase is taken from paragraph 29 of the State's own Complaint in this matter, where the State accused CMI of raising "arbitrary and unreasonable financial barriers" by asking Minnesota litigants to pay $1,600.00 for the hard-

5

bound paper copy of the source code. Travel and lodging costs for an expert to analyze the source code in Kentucky will exceed this figure exponentially.

The State obviously recognized this barrier in the latest proposed settlement, being that one of its negotiated terms calls for a $50,000 payment from CMI to help fund the State's expert analysis. While the State has negotiated its own funding for its expert analysis budget, MCAA, CMI and the State simultaneously characterize *Amicus'* complaint about excessive cost as obstructionist and unreasonable. Accordingly, the true duplicity of this proposed settlement comes to light.

Second, *Amicus* is concerned with the above-noted $50,000 "expert fund." A $50,000 payment to hire an expert to "analyze *and defend* CMI's Source Code in Minnesota" does not serve the public interest and make the source code readily and reasonably available. (Emphasis added.) (Mutual Release and Settlement Agreement ("Settlement Agreement") at ¶ 15.)

Instead, this proposition clearly demonstrates that the State and CMI are not so much concerned with fairly representing the interests of the 40,000 drivers charged with DWI each year, but rather are more concerned with protecting the money already invested in the Intoxilyzer 5000EN. Fairness dictates that CMI provide the same amount of money to the Plaintiff/Interveners or the defense bar to conduct their own independent analysis of the machine.

If CMI truly stands by the validity and accuracy of its machine, it should have no issue with allowing the Plaintiff/Intervener to choose its own expert.

Third, *Amicus* is concerned with the monetary cost of a single analysis under the settlement. Assuming that access to the code were made available, either through this proposed settlement, a future proposed settlement, or through a final order following a trial, the average individual defendant will still face an unduly burdensome (at best) or insurmountable (at worst) cost to complete a full analysis.

Additionally, who will pay for this one-time analysis is not at all clear. The consent judgment currently assumes that *some* analysis of the code will occur.

However, no single litigant is going bear the burden of independent analysis for a single case. That the defense bar will be pooling money for an analysis, is pure speculation which has no basis in fact at this time.

The State has the ultimate power to choose the method of testing when DWI drivers are arrested; the State prefers to test drivers using the Intoxilyzer in lieu of blood or urine tests. Unlike certain other states (i.e. California), the driver is not offered a choice. The driver is told that she will submit to testing on this machine or she will face up to one year in jail, a $3,000 fine and the loss of her driver's license for one year for refusing to test.

Analyzing data used to run this complex machine is a very expensive proposition for the driver. A driver can have a blood or urine sample retested and can have a forensic toxicologist review the lab work at minimal cost. At most, those testing methods require $1,000-$3,000 to mount an effective and thorough

7

challenge, which includes the cost of re-analyzing a sample and hiring an expert to testify in court.

Our State Supreme Court has found the source code to be a relevant piece of the discovery puzzle for defendants facing Intoxilyzer evidence. The cost to have it properly analyzed will be between $50,000-$200,000. The cost to have experts fly to Minnesota to testify in court to support that analysis will likely also be expensive. If a driver cannot afford this (whether they are represented by private counsel, public defenders, or *pro se*), then the test result will still be admitted into evidence without antecedent expert testimony under 32 C.F.R. 634.14.[2]

This game of financial 'chicken' puts drivers at an enormous disadvantage. The State is entitled to pick the testing method, but it chooses the one test which no single litigant can afford to properly analyze. The State is then able to have that result admitted without a scientific challenge to its validity.

Under the current settlement, access is not being provided in the most cost-effective or efficient manner for DWI defendants. As the State originally alleged

---

[2] 32 C.F.R. 634.14 is entitled, "Restoration of driving privileges upon acquittal of intoxicated driving." It states, "The suspension of driving privileges . . . shall be restored if a final disposition indicates a finding of not guilty, charges are dismissed or reduced to an offense not amounting to intoxicated driving, or where an equivalent determination is made in a nonjudicial proceeding. The following are exceptions to the rule in which suspensions will continue to be enforced. (a) The preliminary suspension was based on refusal to take a BAC test. (b) The preliminary suspension resulted from a valid BAC test, (unless disposition of the charges was based on invalidity of the BAC test). In the case of a valid BAC test, the suspension will continue, pending completion of a hearing as specified in 634.11. In such instances, the individual will be notified in writing that the suspension will continue and of the opportunity to request a hearing within 14 calendar days."

in its Complaint against CMI, this settlement raises "arbitrary and unreasonable financial barriers" for defendants. The State used that language when complaining about the $1,600 CMI was charging for the hard copy of the source code. Keeping the digital source code in Kentucky will arbitrarily and unreasonably increase the cost of analysis well north of $1,600.00. The extensive Protective Order CMI seeks should adequately and effectively protect the digital source code, regardless of whether it physically remains in Kentucky or is transferred to Minnesota. Clearly the proposed settlement unfairly stacks the deck against the individual driver in favor of CMI.

Fourth, *Amicus* believes the proposed settlement will improperly bind district courts and require continuous oversight by this Court. This Court has stated that the previous

> permanent injunction contemplates a continuing role for this Court in overseeing access to the Source Code for Minnesota litigants. The contemplated process appears unnecessarily cumbersome, unduly burdensome, and injects the federal court into an area most likely best overseen by state courts. The Court suggests that a better approach might be to establish a protocol that state courts could adopt in such situations.

(Doc. No. 95 at 7-8.)

Unfortunately, the current proposed settlement will necessarily involve this Court. If a defendant persuades a district court judge that he or she is entitled to analyze the source code to look for exculpatory information and a state court judge issues such an order allowing discovery of the code, that defendant will be requested to comply with this specific federally-approved protective order, even if

the district court judge deems a protective order to be unnecessary. If this Court approves this settlement, it is also agreeing to settle any disputes regarding the adequacy of access as well as maintain continuing jurisdiction over the enforcement of the Consent Judgment—a task the Court noted it was unwilling to perform in its previous order. (*Id.*)

Fifth, *Amicus* is wary that the Proposed Consent Judgment and Permanent Injunction only provide access to the current version of the software. (Proposed Consent J. at 6.) It is fair and just that any agreement should allow analysis of the code currently in use and also allow for analysis of future versions of the code used in Intoxilyzer machines in Minnesota.

Sixth, the provisions of the proposed protective order that specifically allow for disclosure of information do not allow for information to be disclosed as evidence in jury trials. (*See* Exhibit 1 of Proposed Consent J.) This oversight is important as such information would be vital in allowing a finder of fact to make a conclusion regarding the reliability of the machine. Further, it appears that there is no language that CMI will agree to honor subpoenas for testimony or to appear for depositions.

Finally, *Amicus* is concerned with this Court finding "that the manner and extent of access to the Source Code provided for under the Settlement Agreement and this Consent Judgment and Permanent Injunction constitutes a fair and reasonable resolution . . . ." (Proposed Consent J. at ¶ 3.) The State and CMI are proposing this finding, yet there has been no discovery in this case. Further, the

10

parties are choosing not to litigate the core issue of who owns the source code and there has been no input by the Interveners or anyone representing other citizens accused.

The State and CMI cannot deem what is fair for accused citizens when the State has an inherent conflict with their interests. The State's key purpose is to prosecute Minnesota citizens, put them in jail, and take away their driver's licenses. No one other than the Interveners and *Amicus* are speaking for the 40,000 drivers a year affected by this decision.

If this Court finds that this agreement is "fair and reasonable", most assuredly, the State will wave the above-quoted language in front of every district court judge and declare that the matter is now resolved. The State's view of what is fair and reasonable differs greatly from *Amicus'* view, the Intervener's view, and the Minnesota Supreme Court's view of what is fair and reasonable. For the State, it is fair and reasonable to settle this case because the settlement allows it to end this litigation, potentially turn the tide of *Underdahl II* and *Crane* and net $50,000 to defend against future claims. The accused citizens of Minnesota would disagree

Such changes are necessary and must be incorporated into any settlement agreement before it can be properly considered by the Court.

At the hearing on January 14th of this year, the Court asked why a source code "test case" had not traveled up to the Minnesota Supreme Court. On April 30, 2009 the Minnesota Supreme Court issued its decision in *Underdahl II* and

11

stated that a defendant is *entitled* to see the code if he or she makes a sufficient showing of relevance. *State v. Underdahl*, ___ N.W.2d ___, 2009 WL 1150093 (Minn. Apr. 30, 2009) (*Underdahl II*). This Court now has a test case from Minnesota's highest state court which has ruled that, regardless of who *owns* the code, it was proper for a district court judge to *order* the code to be produced. Further, a recent appellate case found that it was clear error for a district court to conclude that the state did not have the code in its possession, custody, or control. *State v. Crane*, ___ N.W.2d ___, 2009 WL 1515264 (Minn. Ct. App. June 2, 2009). No protective order was issued in either of those cases. Clearly, our state judiciary deems this code important, relevant, and discoverable. It is *ordering* CMI to produce the code without a protective order. This Court should not allow the settlement to go forth in its current form and should require less restrictive means more in keeping with the spirit of *Underdahl I, Underdahl II, and Crane*.

### III. THERE IS NO NEED FOR THIS COURT TO RUSH A DECISION

#### A. The scope and purpose of the case before this court has shifted.

This Federal litigation was originally based upon a contract theory to answer the question "Who owns the Source Code?" The case has now shifted to a completely different approach - "Judge, there is a DWI crisis out there and we need you to step beyond the contract terms to solve this crisis regardless of who owns the Source Code."

However, there is no "crisis" that requires this Court to step beyond the original legal issue before it—ownership of the source code.

### B. There is no crisis in the speedy DWI prosecution of criminal offenders.

The State has failed to cite any DWI case that was not *charged* or where a person was not convicted because of the lack of an Intoxilyzer result. The State must concede that all DWI cases can still be prosecuted and people can still be convicted without a breath-test result. Impaired driving is based upon three *separate* charges of which a defendant can be independently charged and found guilty:

1. Driving while under the influence (independent of a test);
2. Driving with .08 or more concentration (as measured within two hours);
3. Refusal to take a chemical test.

These are three separate charges to punish illegal driving activity. A test result is not necessarily vital to any or all DWI prosecutions. All DWI offenders in Minnesota can still be handed a citation on the date of their arrest charging them with driving under the influence of alcohol. Again, all DWI suspects can still immediately be charged with or without a chemical test.

DWI offenders, with or without a test, can still be held for bail, they can be held for an appearance before a judge, future court dates can be set, and conditions of release can be imposed.

There will be no delay in prosecuting DWI cases as a result of this litigation.

### C. There is no crisis without breath test results causing delays in driver's license suspensions.

13

Proponents of the settlement have argued that failure to swiftly suspend driver's license poses a serious public safety concern compelling this court to approve the settlement. *Amicus* is not aware of the exact percentage of DWI cases that occur in Hennepin and Ramsey Counties. It is fair, however, to assume at least 25% to 35% of all DWI cases occur in one of those two counties. Yet both of those counties have adopted immediate driver's license reinstatement policies. Under these policies people charged with a DWI (with or without a test) can write a letter to the Chief Judge of the County and ask for full reinstatement of his or her driving privileges until the criminal case is completed. This process is routinely followed and temporary full reinstatement of driver's licenses routinely occurs.

As such, under Minnesota practices today and prior to the 'source code crisis' many people charged with DWI do not have their driver's license suspended until months after they have committed a DWI offense. Regardless of whether breath tests are used, many DWI offenders currently have a process to maintain their driving privileges after an alleged violation.

There is no crisis based upon delayed license suspensions and there is no evidence to suggest that those with temporarily-reinstated licenses are more likely to re-offend during the reinstatement period.

### D. There is no crisis for cities and counties to effectively prosecute DWIs without breath tests.

Some jurisdictions in Minnesota have halted breath testing and stopped using the Intoxilyzer ever since the source code issue arose two years ago. Two

diverse examples include Carver County (one of the seven metro counties) and Aitkin County (in northern Minnesota). Neither jurisdiction has used the Intoxilyzer (with rare exceptions) for almost two years. Yet each continues to prosecute and seek convictions against their DWI offenders just like every other county.

Breath tests are not critical to DWI prosecution. They may be sufficient, but not necessary.

### E. There is no crisis in prosecuting gross misdemeanor or felony DWI cases.

Traditional first-time offenders of DWI laws are prosecuted for misdemeanor offenses. Cases are prosecuted as more serious gross misdemeanor of felony charges in one of four circumstances:

1. A second DWI charge or .08 charge w/in ten years;

2. A refusal to take any test;

3. A child in the car;

4. A high test of .20 or greater.

Under any of the four circumstances a DWI offender can still be charged with a gross misdemeanor or felony offense regardless of the existence of a breath test result.

While it is true that blood and urine tests will take approximately three to six weeks to analyze, this does not delay charging. Charging is based upon probable cause. Many jurisdictions currently charge .20 cases based upon the

15

portable breath test (PBT) result obtained at the roadside. This is not a concern to defendants because the test result will still return prior to the scheduled omnibus date. If the test result is .20 or higher, the charge continues. If the test result is under .20, but .08 or more, the case continues as a misdemeanor.

There is no crisis in charging more serious DWI offenders.

**F.     There is no crisis regarding the BCA lab being unable to handle the increasing number of blood and urine tests.**

Attached as exhibit A is a memo issued from the BCA within the past several weeks. As noted in paragraph five, "[t]he BCA is well prepared for the possibility of law enforcement agencies conducting more blood and urine tests."

The memo goes on to explain there are currently 20,000 usable test kits in the field and that the BCA is adjusting laboratory staff assignments to handle the increased volume of blood and urine testing.

There is no crisis for the BCA.

**G.     There is no crisis in temporarily forgoing breath testing as one of the options for chemical testing.**

As discussed above, the State of Minnesota is not in a crisis as a result of this prolonged litigation. The greater crisis would be that of basing criminal prosecutions upon a source code process that is expensive, time consuming, and clouded in secret programming. The criminal process must be affordable, accessible and transparent. The "crisis" in Minnesota is in the eyes of the State alone.

### H. Flawed public relations (PR) posturing is woven into every push to obtain settlement approval.

Proponents of the settlement always make the following argument:

1. DWI defendants are bad.

2. We, the State, want to prosecute and convict DWI defendants.

3. Intoxilyzer results help prosecute and convict DWI defendants.

4. Therefore, those actions promoting Intoxilyzer results are good, and those actions opposing Intoxilyzer results are bad.

This logic is emphasized in every argument made by proponents of the settlement. As an example, the amicus of MCAA on page 6 & 7 make this "serious public safety concern" argument.

Likewise, the Department of Public Safety News Release of June 1, 2009 (Exhibit B) weaves the following statement into the settlement approval discussion. "Law enforcement needs the Intoxilyzer 5000EN to keep drunk drivers off our roads." Translation: "Actions and court orders that oppose the settlement are bad."

A final example of flawed public relations (PR) posturing is in paragraph 15 of the settlement agreement where the parties state the reason for the $50,000 payment was not to jointly defend against any attacks on the machine, but rather "[b]ecause CMI shares Minnesota's commitment to public safety and keeping drunk drivers off the roads...." Those opposed to the settlement can still be interested in preserving public safety, but also seek fairness in our judicial system.

17

The other public relations argument presented for appeal of the settlement is: "The war is over just sign the treaty."

One might be reminded of the World War II history of Japanese soldiers fighting on remote pacific islands in the decades after Japan had surrendered to the allied forces. CMI and the State have tried to portray that the settlement is all but done but for a small formality – the Court's seal of approval. As noted in the BCA's letter to law enforcement, "The agreement is not immediately effective. It must first be approved by the Federal Court. However, both parties are optimistic and expect that this settlement will likely be accepted by the court." This position by the State gives the public the improper perception that this settlement is a done deal and the problem has been solved. The PR spin is that if this Court denies the settlement, Your Honor has defied common sense and ignored all the hard work involved to reach a settlement.

Similarly, the DPS news release states, "We are very pleased that we have **given the defense attorneys everything they need** to analyze the Source Code." (Emphasis added.) (Exhibit B.) Again, the war is over. Yet has the government "given the defense attorneys everything they need?" How about easy access to the code? Answer: Go to Kentucky. Inexpensive access? Answer: We don't know what it will cost, but the State gets $50,000 to defend against your defense challenges.

## III. CONCLUSION

We have no reason to believe that the State is not sincere in its belief that the Intoxilyzer is an accurate machine. The Bill of Rights is rooted in a basic mistrust of government power against its citizenry. Accordingly, defense attorneys play a vital role in keeping our government in check and questioning key evidence. This role is guaranteed by and set forth in the Constitution. No amount of spin will diminish the need for a balanced settlement, which this settlement agreement fails to provide. There is no 'crisis' that requires this court to rush to judgment and approve a settlement with serious flaws – many of which have already raised concerns for this court in the previous settlement that remain unchanged.

MSCJ requests this Court to reject the proposed settlement and set a reasonable time frame for discovery to occur.

Dated this 12th day of June, 2009
*Amicus Curie* - Minnesota Society of Criminal Justice (MSCJ)

s/ Marsh J. Halberg
Marsh J. Halberg
Attorney ID# 39548
3800 American Boulevard W.
Ste. 1590
Minneapolis, MN 55431
(952) 224-4848