# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

State of Minnesota,
by Michael Campion, its
Commissioner of Public Safety,

    Plaintiff,

 v.

CMI of Kentucky, Inc.,
a Kentucky corporation,

    Defendant,

 And

Robert J. Bergstrom, Craig A. Zenobian,
Shane M. Steffensen, and Christopher D.
Jacobsen,

    Plaintiff-Intervenors.

File No. 08-CV-603 (DWF/AJB)

**DEFENDANT'S OMNIBUS
RESPONSE IN SUPPORT OF
MOTIONS FOR ENTRY OF
PROPOSED CONSENT JUDGMENT
AND ADDITIONAL FINDINGS OF
FACT AND CONCLUSIONS OF
LAW**

Defendant CMI of Kentucky, Inc. ("CMI") respectfully submits this Omnibus Response in Support of its Motions for Entry of the Proposed Consent Judgment and Additional Findings of Fact and Conclusions of Law.

## <u>INTRODUCTION</u>

These motions present narrow issues for the Court's consideration: 1) whether the Settlement Agreement and proposed Consent Judgment and Permanent Injunction ("Settlement") represent a fair and reasonable settlement of the contract dispute between the State of Minnesota ("State") and CMI, and 2) whether the Court should adopt the

Additional Findings of Fact and Conclusions of Law. CMI submits that the Settlement is exceedingly fair, granting the State and Authorized Minnesota Litigants, as defined in paragraph 3 of the Consent Judgment, unprecedented access to CMI's Source Code ("Source Code"), access that is not required by the contract ("Contract") between the State and CMI. Further, the Additional Findings of Fact and Conclusions of Law are appropriate and supported by the evidence in the record.

The Plaintiff-Intervenors ("Intervenors") and the Minnesota Society for Criminal Justice ("MSCJ") attempt to cloud the issues before the Court by raising evidentiary and criminal procedure concerns that are neither before this Court, nor relevant to the instant action. Furthermore, although Intervenors and MSCJ are critical of the settlement, they fail to present the Court with an alternative solution. The reason for this is clear—they and their clients are happy with the *status quo*—they do not want the Source Code and they do not want resolution to this case.

This Court's task is to evaluate the Settlement. Given the public interest considerations associated with the Settlement, it is appropriate for the Court to consider whether the Settlement provides the State and Authorized Minnesota Litigants reasonable and meaningful access to the Source Code. After reviewing the terms of the Settlement under which the source code review will occur, and comparing that with the process required to perform a meaningful source code analysis, CMI respectfully submits that this Court will conclude that the review procedure detailed in the Settlement is the most fair, accurate, and reasonable method of review available.

## DISCUSSION

I.  THE CONSENT JUDGMENT PRESENTS THE MOST AUTHENTIC METHOD FOR REVIEWING THE SOURCE CODE.

The Settlement provides Authorized Minnesota Litigants with access to the Source Code in two different ways.  First, the Source Code will be available in printed, hardbound book form.  (Consent J. at 8.)  Second, the Source Code will be available for review in native electronic format at CMI's corporate headquarters in Owensboro, Kentucky.  (*Id.* at 6.)

A.  According to Intervenors' Own "Expert," Meaningful Source Code Review Requires Access to the Source Code Development Environment.

The Intervenors request access to the Source Code so that they may conduct a "meaningful analysis of it."  (Intervenors' Mem. Opp'n at 3.)  Throughout this litigation, the Intervenors have relied heavily—indeed, almost exclusively—on the testimony of Thomas E. Workman, Jr., submitted to this Court via three separate declarations.  Mr. Workman is an attorney and holds himself out as an expert on, *inter alia,* legal issues, computer forensics, and breath testing devices.  (First Workman Decl. ¶¶ 1 & 2; *see* Second Workman Decl.)  Notably, however, Mr. Workman has been less than forthcoming with this and other courts, as described in detail in CMI's Omnibus Response to Briefs by *Amici Curiae* at 19-25 [Doc No. 78.].

Rather than reiterate those points in full here, CMI provides only a summary of pertinent facts for this Court to consider when evaluating Mr. Workman's testimony.  He:

- Is a "professional" expert who makes his living testifying against breath-alcohol testing programs and instruments (*Id.* at 19-20);

- Concedes that he misrepresented to this Court and to others that he is a licensed patent attorney (Third Workman Decl. ¶¶ 19-23);

- Misrepresented to this Court and to others that CMI's Source Code is not a trade secret because the Intoxilyzer 5000 is or was patented (CMI's Omnibus Resp. *Amici Curiae* at 20-21);

- Published an article falsely stating that Draeger allowed him to observe its source code without limitation and, therefore, lost its trade secret status (*Id.* at 22);

- Though an officer of the court, was caught passing the answer to a question to a witness during live, in-court cross examination (*Id.*);

- Misrepresented to this Court that he supervised the review of Draeger's source code when, in fact, he refused to sign the non-disclosure agreement and did not receive or review the source code (*Id.*);

- Represented to this Court that CMI's source code is "missing basic safeguards," despite never having seen a single line of CMI's source code (*Id.* at 23);

- Introduced improper and erroneous argument in a declaration, misrepresenting the content of CMI's contract with the State of Minnesota and misstating the substance of the U.S. Copyright Act (*Id.* at 24); and

- Has had his testimony and theories excluded or found to be "unpersuasive," "without merit," and just plain "incorrect" (*Id.* at 24-25).

Each of these should give the Court pause, and each represents a separate reason for this Court to consider Mr. Workman's testimony with caution and substantial skepticism.

But setting aside these concerns, and assuming that Mr. Workman is knowledgeable about source code (which CMI does not concede), Mr. Workman's published description of meaningful source code review is instructive for purposes of evaluating the Settlement. On April 20, 2007, Mr. Workman presented an article entitled, "*Source Code Primer: The Inside Scoop on ALL Breath Instrument Computers and Electronics.*" (Affidavit of David Aafedt Ex. A.) Mr. Workman swore to an affidavit on

June 10, 2008 in the case *Minnesota v. Bowen*, Court File No. 82-CR-08-2575 (Minn. Dist. Ct.), in which he declared he would testify to the contents of that paper. (Aafedt Aff. Ex. B.)

In the *Source Code Primer*, Mr. Workman describes what information a defendant should request, and further describes the method an expert should use when conducting a source code review. Mr. Workman suggests a defendant make an initial request for 1) disclosure of the computer language used to write the source code, 2) identification of the microprocessor used on the machine, 3) the number of lines of code in the source code, 4) and what changes there have been in the software in the past two years, "expecting that the state will tell you that nothing has changed." (Aafedt Aff. Ex. A. at 19.)

Once the expert has that information, "the expert will need to process that source code with the same 'Compiler' or 'Assembler' used by the manufacturer." (*Id.* at 20.) Mr. Workman notes:

> [i]t is thus important to ask the manufacturer **what compiler or assembler they use to convert the source code into the machine code** delivered with their machine. It is important to ask for the name of the package, the manufacturer, the version designator, and **whether the company has applied the updates that are often delivered by the software compiler or assembler company**.

(*Id.* (emphasis in original).) In addition, Mr. Workman states that source code should be requested "in electronic format…. It should be the same source code that would be used by the breath test machine manufacturer, should the manufacturer decide to change the

source code." (*Id.* at 21.)  It should be noted that Mr. Workman does not mention the need for any previous or future versions of the source code.  (*See id.* generally.)

"Armed with this information," according to Mr. Workman, "your expert **has a chance** to duplicate the environment at the breath test company's software house, so that **theoretically** your expert can recreate the machine code delivered in firmware in your state's machine.  (*Id.* at 20 (emphasis added).)  In other words, according to Mr. Workman, even under the best circumstances, an off-site source code review has only a "chance" of "theoretically" creating an environment for a meaningful review.

An expert conducting a source code review must go to great lengths—obtaining the same model of assembler, compiler and linker with the same manufacturer-specific software, verifying the versions of that software, and installing updates—all in hopes of having a "chance" to "theoretically" replicate "the environment at the breath test company's software house." (*Id.*)  But there is one surefire way to guarantee that every expert who chooses to analyze the source code has more than a "chance" of replicating the environment at the breath test company's software house, and that is by actually providing those experts with access to the breath test company's facility and the actual assembler, compiler, linker, and source code development environment.  That is exactly what the Consent Judgment does.

> B.    The Consent Judgment Provides the Native Source Code in its Native Development Environment, Ensuring the Most Meaningful Review.

In addition to making a printed, hardbound version of the Source Code available within the State of Minnesota, the Consent Judgment provides access to the Source Code

at CMI's corporate headquarters in Owensboro, Kentucky. CMI will provide Authorized

Minnesota Litigants with the following:

    i.     All Source Code files for the current version of the Intoxilyzer 5000EN software. . . in native electronic format.

    ii.    All libraries and files used to assemble or compile and link the Source Code.

    iii.    All make files and script files used to assemble or compile and link the Source Code.

    iv.    The assembler and linker for the Z-80 processor and the compiler and linker for the 8051 processor.

    v.     A computer capable of assembling or compiling and linking the Source Code. . . .

    vi.    Completely assembled or compiled and linked "HEX files" for both the Z-80 and 8051 systems, and EPROMs with the HEX files loaded for both the Z-80 and 8051 systems.

    vii.    A printout of actual data obtained as a result of the calibration.

    viii.    A COBRA system as used by the State of Minnesota to download data from instruments and the cables required to link to a test instrument.

    ix.    A Minnesota-configured Intoxilyzer 5000EN for testing, loaded with the EPROMs mentioned in item vi. CMI will also make available wet bath simulators and solution for instrument testing.

(Consent J. at 6-7.) All of this will be available to Authorized Minnesota Litigants free of

charge, and with CMI's cooperation and assistance to "ensure a meaningful review of the

Source Code." (*Id.* at 7-8.) This package cannot be made available to an expert at his or

her office, because CMI uses its compiler, linker, and assembler pursuant to the terms of license agreements. (Affidavit of Toby Hall ¶ 12.)

The procedure for review set out by the Consent Judgment removes the chance, theory, and guesswork inherent in the off-site review contemplated by Mr. Workman. By providing access to the live Source Code in its native development environment, the integrity of Source Code review will be enhanced considerably. (Hall Aff. ¶ 9.)

As Mr. Workman insists, providing the Source Code alone would not allow for complete analysis. (Aafedt Aff. Ex. A. at 19-20.) The instrument does not operate from nor contain the Source Code directly. (Hall Aff. ¶ 4.) Source Code must first be "assembled" or "compiled." (*Id.*) A "make" file is used to assemble or compile the Source Code by running through the file list. (*Id.*) The make file needs to know the location of all parts of the Source Code so it can assemble or compile the appropriate files. (*Id.*) Off site, each litigant's expert could only attempt to recreate the development environment and attempt to duplicate CMI's assembler, compiler, and linker—which would mean identifying each system's manufacturer, version, software package, and all patches and revisions of the software—and maintain all files in the test computer in the same manner in which they are maintained by CMI so that they may be properly located by the "make" file. (Hall Aff. ¶ 11.)

During an off-site review, if even a single file was stored in the wrong place, or any part of the software did not match the CMI systems, the resulting analysis would likely be inaccurate. (Hall Aff. ¶ 13.) Indeed, there are literally hundreds of things that could go wrong in a "theoretical" development environment. (*Id.*) Rather than giving

authorized Minnesota litigants a mere "chance" at testing and analyzing the Source Code in a "theoretical" environment, CMI is offering access to the actual, native development environment. (Hall Aff. ¶ 14.) Providing the native development environment for testing the Source Code is consistent with CMI's intent to support the State of Minnesota's breath-alcohol testing program, as well as Minnesota's law enforcement professionals, and the safety of Minnesota's roadways. (Hall Aff. ¶ 16.)

The access provided by the Consent Judgment goes far beyond anything any Minnesota litigant has ever requested. To the best of CMI's knowledge, the State of Minnesota has never been ordered by any court to produce the native development environment, CMI's assembler, compiler, linker, or any information about the Source Court development environment. (Hall Aff. ¶ 15.) Nonetheless, CMI has agreed to make each of these, and other aspects of the software development and installation process available to authorized Minnesota litigants to ensure the most meaningful Source Code review possible. (*Id.*)

II.  THE CONSENT JUDGMENT PROVIDES A FAIR AND REASONABLE METHOD OF RESOLVING THIS DISPUTE.

As discussed above, the Consent Judgment provides a technically superior method of reviewing Source Code, and the Court should enter the Consent Judgment on that basis alone. But there are additional reasons that the Consent Judgment is a fair and reasonable settlement of the contract dispute between the State and CMI. First, the Consent Judgment provides Authorized Minnesota Litigants with unprecedented access to the Source Code for the Intoxilyzer 5000EN, access that has never been ordered by any

Minnesota Court and is not mandated by the Contract between the State and CMI. Second, the Consent Judgment provides this access while protecting the confidential, proprietary, and trade secret status of the Source Code.

A.   The Contract Between the State and CMI Does Not Mandate Disclosure of the Source Code, Much Less the Source Code Development Environment.

The Consent Judgment provides Authorized Minnesota Litigants with access to the Source Code for the Intoxilyzer 5000EN, which they are not entitled to receive under the Contract between the State and CMI, as discussed more fully in CMI's Memorandum in Support of Judgment on the Pleadings or Partial Summary Judgment [Doc. No. 133]. The Contract consists of the RFP, CMI's Proposal, the State's Request for Clarification, CMI's Response, and the State's Notification of Contract Award.  (*Id.* at 12.)  The Contract plainly states that the RFP, the Proposal, and the Notification of Contract Award together form the final Contract.  (*Id.*)  The Notification of Contract Award states that those documents, along with CMI's Response to the State's letter requesting clarification, constitute the entire Contract.  (*Id.*)

The RFP, one document in the Contract, states that CMI will provide "information to attorneys . . . to be used by attorneys representing individuals charged with crimes. . . ."  (*Id.* at 10.)  However, it is clear from the Contract ***as a whole*** that "information" does not include the Source Code.  (*Id.* at 11.)  Indeed, CMI agreed to provide only a copy of the Operation Manual for the Intoxilyzer 5000EN to criminal defendants who obtained an order from the state district court. (*Id.*)  Although the term "information" is not defined in the RFP, it is defined in CMI's Proposal—in other words—in the Contract.

Thus, the Consent Judgment provides Authorized Minnesota Litigants with more access than the Contract between the State and CMI ever contemplated, making it more than a fair and reasonable settlement.

B.    The Consent Judgment Provides The Access Necessary for Meaningful Source Code Review While Protecting Its Proprietary, Confidential, and Trade Secret Status.

The access provided to Authorized Minnesota Litigants must be balanced by the measures necessary to protect the confidentiality of the Source Code.  Confidentiality is crucial for two reasons.  First, the Source Code is one of CMI's most valuable assets, deriving competitive and economic value from not being generally known.  (Hall Aff. ¶ 17.)  Second, the Source Code contains passcodes and security information that, if public, would compromise the security of the State's testing program. (Hall Aff. ¶ 28.)

The Consent Judgment contains built-in confidentiality mechanisms designed to protect the integrity of the Source Code.  First, the Source Code will be protected by protective orders and non-disclosure agreements.  (Consent J. at 9-10.)  Second, an electronic version of the Source Code will be available only at CMI headquarters, where it will be protected from disclosure.  (*Id.* at 6-8.)  Finally, the Source Code will be available in Minnesota in hardbound book form, redacted to exclude passcode and security information.  (*Id.* at 8.)

The hardbound book format provides an efficient and effective method for reviewing the Source Code. (Affidavit of Mario D. Santana ¶¶ 12, 15-15.10.)[1] In fact, actually *reading* the Source Code is the only way to review it for efficacy and function. (*Id.* ¶ 11.) The hardbound book format also provides increased confidentiality, as it is not as readily duplicated or transferred as electronic information, thus protecting CMI's Source Code from broad distribution. (*See* Hall Aff. ¶¶ 23 & 24.) And by redacting passcodes and security information from the book form, the State's testing program is protected from tampering. (Hall Aff. ¶ 28.) It appears the Intervenors do not object to these measures.

Instead the Intervenors suggest that, since CMI is making the Source Code available in Minnesota in hardbound form, "there is no reason" CMI should not allow the "complete copy of the electronic digital version" to be released into Minnesota. (Intervenors' Mem. Opp'n at 9.) But the Intervenors' logic does not follow.

First, the Intervenors fail to address the primary problem with releasing an electronic version of the Source Code into Minnesota; namely, that it can be transferred around the globe in a matter of seconds. (Hall Aff. ¶ 24.) The risk of exposure of the confidential information outweighs any potential benefit of releasing an electronic version of the Source Code, particularly when the Court considers that any review

---

[1] The Affidavit of Mario D. Santana was submitted in support of CMI's Memorandum of Law in Support of Joint Motion for Entry of Consent Judgment and Permanent Injunction [Doc. No. 47].

conducted by an expert at his or her own facility would be inferior to review at CMI's facility.

Second, the Intervenors ignore that the hardbound copy will be redacted to protect passcode and security information crucial to the integrity of the State's breath-alcohol testing program. (*See* Hall Aff. ¶ 28.) This safety feature is critical to providing security for the State's Intoxilyzer machines.

The Consent Judgment provides Authorized Minnesota Litigants with the most meaningful Source Code review procedure available, while also providing the appropriate security measures necessary to protect the confidential and proprietary Source Code.

III. THE ISSUES RAISED BY THE INTERVENORS AND THE MSCJ ARE DISTRACTIONS DESIGNED TO PROLONG THIS LITIGATION AND MAINTAIN THE STATUS QUO.

Resolution of the Source Code issue is the last thing that Intervenors, the MSCJ, and the Defense Bar want. The reason for this is clear—the Intervenors, the MSCJ, and many of their clients are happy with the current state of affairs. By persuading state district court judges to order production of something the State cannot produce, the Defense Bar has seriously disrupted Minnesota's breath-alcohol testing system for more than three years. The net result of these tactics is that many State District Court judges have thrown out the results from breath-alcohol testing upon which so many cases rely.

Intervenors and the MSCJ raise a laundry list of complaints in hopes of thwarting the Settlement and prolonging this litigation. Upon close examination, each of their

complaints can be seen for what it truly is—yet another red herring designed to delay indefinitely a fair and reasonable resolution of the claims between the State and CMI.

A.    The Intervenors' and the MSCJ's Concerns About the Source Code Review Are Unfounded.

The Intervenors and the MSCJ raise several issues regarding the method of Source Code review contemplated by the Consent Judgment, but none is a legitimate concern.  In fact, they are nothing more than red herrings designed to distract this Court.

Intervenors object to the methods by which the Source Code will be made available, stating "a paper copy of the Source Code actually inhibits the required Source Code analysis the Minnesota appellate courts expect to be done," and "[t]he electronic format in Kentucky . . . similarly inhibits the meaningful Source Code analysis expected by the Minnesota Courts."  (Intervenors' Mem. Opp'n at 8.)  These statements do not follow.  As an initial matter, no Minnesota court has ever addressed "how" the Source Code review should occur or prescribed a method for completing a Source Code review.  At most, some courts have said that authorized Minnesota litigants may be entitled to the Source Code, but nothing more.  Intervenors do not explain how the proposed access to the Source Code could possibly *inhibit* review, as they claim.  Moreover, they ignore the fact that the review method set forth in the Consent Judgment allows for the most meaningful Source Code review available.

Intervenors also object because the Consent Judgment provides only the current version of the Source Code for review.  Intervenors  have never requested prior versions

of the Source Code in the past. This is likely because previous versions of the Source Code are irrelevant to a Source Code review. (Hall Aff. ¶ 10.)

Intervenors and the MSCJ complain about the alleged inconvenience of performing the source code review in Kentucky. These alleged inconveniences are outweighed by the benefits of access to the native Source Code in its native development environment. This eliminates the chance and guesswork of off-site review, and allows for the most meaningful and complete source code review.

For example, Intervenors and the MSCJ complain about the cost of travel and having access to the CMI facility only during business hours. The complaint regarding cost may be disregarded entirely. The MSCJ estimates that the cost of a source code analysis is between $50,000 and $200,000. (MSCJ Mem. at 8.) Against these costs, the cost of travel pales to the point of irrelevance by comparison.

Equally meritless is Intervenors' contention that an "8 hour work day inhibits proper review" because some automated processing requires "more than 8 hour contiguous blocks to perform." (Intervenors' Mem. Opp'n at 10.) Intervenors' argument fails to take into account that a computer can continue to run after business hours, allowing the necessary block of time to perform automatic processing.

Intervenors also claim Kentucky is inconvenient because an expert will not have access to his or her library of books. (*Id.*; Third Workman Decl. ¶ 8.) The Intervenors do not seem to consider that reference sources can be delivered to Kentucky for use there. Instead, the Intervenors object that, even if materials were available from the CMI facility, CMI would gain an "unfair advantage of knowing what specific avenues were

pursued by Defendant's expert." (Third Workman Decl. ¶ 8.) But this objection is unfounded. There should be nothing secret or surprising about the method for analyzing Source Code. Mr. Workman described how the Source Code should be reviewed in his First Declaration. (*See* First Workman Decl.) Moreover, an expert's analysis must be subject to rigorous review and cross-examination in order to survive the *Frye-Mack* standard for expert evidence. *See Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923); *State v. Mack,* 292 N.W.2d 764 (Minn. 1980). Intervenors and other Authorized Minnesota Litigants should have nothing to hide.

The MSCJ objects on the grounds that the State and CMI never "requested or welcomed" input from Intervenors' counsel. (MSCJ Mem. at 2 n.1.) This accusation is patently false. At the status conference on March 4, 2009, and at subsequent settlement conferences on April 23, 2009, May 6, 2009, and May 11, 2009, CMI and the State met and conferred with Intervenors' counsel, both privately and with Magistrate Judge Boylan. Indeed, the process by which the Source Code will be made available for review in Kentucky came about as a result of suggestions made by Intervenors' counsel.

Finally, both Intervenors and the MSCJ urge the Court not to act hastily, stating there is "no real crisis" in resolving this matter because the State can obtain DWI evidence using blood and urine tests. (Intervenors' Mem. Opp'n at 6; MSCJ Mem. at 12-16.) To the contrary, this issue has bedeviled the Minnesota courts and law enforcement for more than two years. As described by the Minnesota County Attorneys Association and the Hennepin County Prosecutors Association, many law enforcement agencies are not currently using the Intoxilyzer 5000EN, creating dangerous delay and a

back-log of cases based on blood and urine tests. (Minnesota County Attorneys Assoc. Mem. at 5-6; Hennepin County Prosecutors Assoc. Mem. at 5-6.)

It is not surprising that Intervenors and the MSCJ would attempt to delay a fair and reasonable settlement of this matter, because they benefit from maintaining the status quo. By prolonging this litigation, Intervenors and the MSCJ can maximize the confusion and backlog of evidence for DWI cases. The only people that stand to benefit from delaying the ultimate resolution of this case are the Intervenors, the MSCJ and their clients, because at this time, "Minnesota's breath test program is effectively shut down" which "severely damages the deterrent impact of the State's impaired driving laws." (Minnesota County Attorneys Assoc. Mem. at 5-6.)

> B. There Is No Basis for the Intervenors' and MSCJ's Objections to the Proposed Findings of Fact in the Consent Judgment.

In addition to their baseless concerns regarding review of the Source Code, Intervenors and the MSCJ lodge meritless complaints about the findings of fact and conclusions of law contained in the Consent Judgment.

Intervenors object that the Consent Judgment "requires" the Court to make certain findings. (Intervenors' Mem. Opp'n at 11.) Of course, the State and CMI cannot "require" this Court to make any findings. The Court will consider the Consent Judgment and Permanent Injunction on this motion and make findings of fact and conclusions of law. The Consent Judgment cannot supersede the decision-making authority of this Court.

Nor does the Consent Judgment impair the ability of Minnesota State Court judges to render decisions in cases pending before them. The Intervenors object to the Consent Judgment because "it would likely become a model for use by the Minnesota State Courts," and "Minnesota Court's [sic] will likely follow this Judgment." (Intervenors' Mem. Opp'n at 11.) Intervenors' concern is misplaced. This Consent Judgment is not binding on Minnesota State Court judges. Minnesota State Courts are free to make decisions, find facts, and determine the law as they see fit.

The Intervenors also object to the Consent Judgment because it assigns to the State only that portion of Source Code that arose under the Contract. (Consent Judgment at 4.) According to Intervenors, this finding is "inconsistent with the Minnesota appellate courts' construction of the RFP, as well as other authorities." (Intervenors' Mem. Opp'n at 12.) But the Minnesota Appellate decisions cited by the Intervenors are fatally flawed in three ways.

First, CMI has never been before these courts, and has never presented arguments regarding appropriate construction of the Contract. Second, the **RFP is not the Contract**—it is a request for proposal. The RFP is only one piece of a multi-part Contract, and it cannot be construed on its own as a binding contract. Finally, no Minnesota State Court has ever reviewed the complete Contract as part of a case in which the parties to the Contract—the State and CMI—are present and part of the adversarial process.

Finally, Intervenors object to the findings of fact because they believe the findings are "intended to defeat Plaintiffs-Intervenors claims in their Complaints-in-Intervention

that the State owns the full Source Code." (Intervenors' Mem. Opp'n at 12.) This argument fails because the Intervenors have no standing to assert any claims related to ownership of the Source Code. This argument is without merit and need not be considered by this Court.

However, the Intervenors arguably have standing to assert a third-party beneficiary claim regarding CMI's duties under Special Condition 12 of the Contract. That claim is expressly carved out from the Consent Judgment, and will not be impacted by the Settlement between the State and CMI, save and except for CMI's dispositive motion on this issue presently pending before this Court. (Settlement Agreement ¶ 14; Doc. No. [104].)

C.    The Intervenors Have No Legitimate Objection to the Additional Findings of Fact and Conclusions of Law Sought by CMI.

The Intervenors object to the Additional Findings of Fact and Conclusions of Law submitted by CMI, calling those proposed findings "unspecified." (Intervenors' Mem. Opp'n at 12.) But CMI is clear that it asks the court to "determine the proprietary and confidential nature of the source code for the Intoxilyzer 5000EN." (Mot. Addt'l Findings [Doc. No. 184].)

CMI is entitled to a finding from this Court that its Source Code is proprietary and confidential. CMI has taken reasonable steps to ensure the confidentiality of its Source Code by maintaining the Source Code at a secured facility and limiting access to the Source Code. (Hall Aff. ¶¶ 17-21.) The disclosure of the Source Code contemplated by the Consent Judgment protects the confidential and proprietary nature of Source Code by

requiring entry of an appropriate protective order, a non-disclosure agreement before disclosure, among other measures.  (Hall Aff. ¶ 5.)

D.      The MSCJ Raises Arguments That Are Irrelevant and Unpersuasive.

The MSCJ spends much of its Amicus Brief discussing evidentiary matters in Minnesota State Court, including analysis of the cost of mounting a defense to a DWI charge.  (MSCJ Mem. at 6-9.)  These issues are not relevant to what the MSCJ recognizes is "the original legal issue before [the Court]—ownership of the Source Code."  (*Id.* at 12.)  Of course, the actual issue before the Court on this motion is whether the settlement between the State and CMI is fair and reasonable.  But MSCJ's characterization of the dispute between the State and CMI demonstrates that all of the discussion surrounding criminal procedure and prosecution in the Minnesota State Court system is completely irrelevant to the instant dispute.  The issues raised by the MSCJ in this vein, in addition to being meaningless, are merely meant to distract this Court from the matters at hand.

For example, the MSCJ alleges that "the provisions of the proposed protective order that specifically allow for disclosure of information do not allow for information to be disclosed as evidence in jury trials."  (MSCJ Mem. at 10.)  The MSCJ willfully misconstrues the proposed Protective Order agreed to by the State and CMI.  The protective order allows disclosure of Confidential documents to any person "specified in Paragraph 4 [of the Protective Order] and the federal Consent Judgment and Permanent Injunction."  (Proposed Protective Order ¶ 3.)  The Consent Judgment in turn states that "Any attorney who has retained an expert in a DWI or implied consent proceeding and has obtained a report from the expert regarding review of the Source Code, may . . . use

the report and offer testimony of the expert. . . ." (Consent J. at 11.) The Consent Judgment also specifies that an expert report based on the Source Code must not be "offered into evidence in any forum or jurisdiction other than courts in Minnesota," clearly indicating that the report may be offered as evidence in Minnesota courts. (*Id.*)

The MSCJ also requests that the Court reject the Settlement and "set a reasonable time frame for discovery to occur." (MSCJ Mem. at 19.) It is unclear what discovery the MSCJ contemplates. The Intervenors have been parties to this case for months and have not issued a single interrogatory or document request. Meanwhile, the State and CMI have produced thousands of pages of discovery to date. There is no need to delay the Settlement based upon Intervenors' failure to avail themselves of the opportunity to conduct discovery.

Finally, the MSCJ objects because the Court intends to maintain continuing jurisdiction over the Consent Judgment. This objection is meritless, as it is standard for a court to retain jurisdiction over consent judgments.

## CONCLUSION

Intervenors and the MSCJ do everything they can to distract the Court and cloud the actual issues in these motions, but their diversionary tactics will not succeed. The Consent Judgment provides Authorized Minnesota Litigants with the most meaningful method for reviewing Source Code. Authorized Minnesota litigants are getting more than a "chance" at a "theoretical" review—they are getting access to the live Source Code in its native development environment, which creates the best opportunity for meaningful review. And the Consent Judgment does this while protecting the integrity and

confidentiality of the Source Code. The Settlement Agreement, Consent Judgment, and Proposed Additional Findings of Fact and Conclusions of Law represent a fair and reasonable resolution to the case between the State and CMI. CMI respectfully requests that the Court grant its motions for Entry of the Consent Judgment and Additional Findings of Fact and Conclusions of Law.

Respectfully Submitted,

Dated: June 16, 2009

s/David M. Aafedt
David M. Aafedt, #27561X
William A. McNab, #320924
Erin A. Oglesbay, #343092

WINTHROP & WEINSTINE, P.A.
225 South Sixth Street, Ste. 3500
Minneapolis, Minnesota 55402-4629
Tel: (612) 604-6400
Fax: (612) 604-6800
daafedt@winthrop.com
wmcnab@winthrop.com
eoglesbay@winthrop.com

ATTORNEYS FOR DEFENDANT
CMI OF KENTUCKY, INC.

4553538v1